UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



Ellington Management Group, L.L.C.; Ellington
Overseas Partners, Ltd.; Ellington Mortgage
Investors, LP; Ellington Mortgage Partners, L.P.;
Ellington Credit Fund, Ltd.; Ellington Long Term
Fund, Ltd.; and Ellington Special Opportunities,
Ltd.

Plaintiffs,

v.

Ameriquest Mortgage Company; Ameriquest
Mortgage Securities Inc.; Argent Mortgage
Company, L.L.C.; Argent Securities Inc.; ACC
Capital Holdings Corporation; and Ameriquest
Capital Corporation (now known as SBP Capital
Corporation)

Defendants.

Civil Action No.:

09 CIV. 0416

ECF CASE

**COMPLAINT**

JUDGE RAKOFF

Plaintiffs Ellington Management Group, L.L.C.; Ellington Overseas Partners,

Ltd.; Ellington Mortgage Investors, LP; Ellington Mortgage Partners, L.P.; Ellington Credit

Fund, Ltd.; Ellington Long Term Fund, Ltd.; and Ellington Special Opportunities, Ltd.

(collectively "Ellington") as and for their complaint against Defendants Ameriquest Mortgage

Company ("Ameriquest"); Ameriquest Mortgage Securities Inc.; Argent Mortgage Company,

L.L.C.; Argent Securities Inc. (collectively with Ameriquest the "Mortgage Company

Defendants"); ACC Capital Holdings Corporation; and Ameriquest Capital Corporation (now

known as SBP Capital Corporation) (the latter two, the "Control Person Defendants") on

personal knowledge as to matters pertaining to Ellington and on information and belief as to all

other matters, allege as follows:

## NATURE OF THE ACTION

1.     This is an action for violation of federal securities laws, fraud and negligent

misrepresentation for damages incurred by Ellington as a result of the Mortgage Company

Defendants' fraudulent misrepresentations and material omissions made in connection with

Ellington's purchase of five series of mortgage-backed securities.  The Mortgage Company

Defendants made misrepresentations and omissions in prospectuses and other disclosure

documents, including documents filed with the Securities and Exchange Commission, and in

direct communications with Ellington representatives.  In reliance on the Mortgage Company

Defendants' representations, Ellington paid over $354 million to purchase various mortgage-

backed securities.

2.     The Mortgage Company Defendants were in the business of making mortgage

loans and then selling the loans to third-party investors.  By selling the mortgage loans they

originated, the Mortgage Company Defendants could realize their profits from the loans

immediately, instead of collecting their profits over the life of the loans.  Additionally, by selling

the loans, the Mortgage Company Defendants transferred the default risk associated with the

loans to the investors who bought the loans.  The value to investors was in having a steady, long-

term income stream from the regular mortgage payments of the borrowers.

3.     The Mortgage Company Defendants sold the loans to investors, such as Ellington,

by creating securities backed by large pools of individual mortgage loans.  The Mortgage

Company Defendants would then sell these mortgage-backed securities to institutional investors

through prospectuses and other disclosure documents.  The Mortgage Company Defendants'

securitization schemes included the issuance by third-party investment banks of "net interest

margin" ("NIM") securities that were linked to certain of the securities created directly by the

Mortgage Company Defendants. Both the securities that the Mortgage Company Defendants created and the NIM securities were based on, and ultimately drew their value from, the pools of mortgage loans underlying the securities created by the Mortgage Company Defendants.

4.     The value of the mortgage-backed securities (and particularly the NIM securities that Ellington acquired) depended in large part on the default rate of the individual mortgage loans in the securitized pool. To the extent individual borrowers defaulted on their loan payments, the income stream – and thus the value of the securities – was reduced. For this reason, information about the quality or riskiness of the underlying mortgages was critical to a potential investor's assessment of the value of the mortgage-backed securities. In this regard, the Mortgage Company Defendants made numerous representations and warranties about the nature and quality of the mortgage pool that was relied upon by investors.

5.     Unbeknownst to investors, the Mortgage Company Defendants increased the volume of loans they made (and the profits they made by securitizing the loans) by making risky loans in violation of the lender's underwriting standards and then by misrepresenting the quality or riskiness of the loans to investors. This allowed the Mortgage Company Defendants to sell loans to investors for more than they were worth, and left the investors holding assets that were much riskier and therefore less valuable than the Mortgage Company Defendants had led them to believe.

6.     Thus, in the documents by which the Mortgage Company Defendants advertised and offered the mortgage-backed securities for sale, they knowingly misrepresented the nature and quality of the underlying mortgages to increase the apparent value of the mortgage-backed securities and to induce investors such as Ellington to pay a higher price for the securities.

7.      In reliance on the Mortgage Company Defendants' false and misleading representations and warranties, Ellington acquired an interest in five mortgage-backed securities for over $354 million.  After Ellington bought the securities, the underlying mortgages performed far worse than would be expected based on the Mortgage Company Defendants' false statements and fraudulent misstatements.  The value of Ellington's investment in the securities thus proved to be illusory and was largely lost.

8.      The Mortgage Company Defendants' liability arises not from increasing default rates associated with a general economic downturn, but from their fraud — from lying to Ellington about the riskiness of the loans in the securitized mortgage pools.

## PARTIES

Plaintiffs

9.      **Ellington Management Group, L.L.C.** (the "Manager"), a Delaware limited liability company with its principal place of business in Old Greenwich, Connecticut, is a private registered investment advisor that, at all relevant times, managed each of the other plaintiffs (collectively, the "Funds").  Ellington's investors include major pension funds, endowments, foundations, commercial and private banks, insurance companies, funds of funds and individuals.

10.      **Ellington Overseas Partners, Ltd.** is a Cayman Islands corporation that is managed by the Manager.

11.      **Ellington Mortgage Investors, LP** is a Cayman Islands limited partnership that is managed by the Manager.

12.      **Ellington Mortgage Partners, L.P.** is a Delaware limited partnership that is managed by the Manager.

13.     **Ellington Credit Fund, Ltd.** is a Cayman Islands corporation that is managed by the Manager.

14.     **Ellington Long Term Fund, Ltd.** is a Cayman Islands corporation that is managed by the Manager.

15.     **Ellington Special Opportunities, Ltd.** is a Cayman Islands corporation that is managed by the Manager.

Defendants

16.     **Ameriquest Mortgage Company**, a Delaware corporation with its principal executive offices in California, is a specialty finance company engaged in the business of originating, purchasing and selling retail and wholesale mortgage loans.  Ameriquest was formed in 1979 as a savings and loan association and has been involved in the wholesale or retail mortgage markets in various forms from 1979 until its sale to Citigroup, Inc. in 2007.  During the relevant period, Ameriquest had offices and conducted business in New York.

17.     **Ameriquest Mortgage Securities Inc.,** a Delaware corporation with its principal executive offices in California, was formed on December 23, 1999 as an indirect wholly-owned subsidiary of Ameriquest for the purpose of serving as a private secondary mortgage market conduit.  During the relevant period, Ameriquest Mortgage Securities Inc. conducted business in New York

18.     **Argent Mortgage Company, L.L.C.**, a Delaware limited liability company with its principal executive offices in California, is or was the wholesale origination lending unit of Ameriquest.  During the relevant period, Argent Mortgage Company, L.L.C. conducted business in New York.

19.     **Argent Securities Inc.,** a Delaware corporation with its principal executive offices in California, was formed on May 22, 2003 as a direct wholly-owned subsidiary of Argent Mortgage Company, LLC for the purpose of serving as a private secondary mortgage market conduit.  During the relevant period, Argent Securities Inc. conducted business in New York.

20.     **ACC Capital Holdings Corporation**, a Delaware corporation with its principal executive offices in California, was formed on November 13, 2003.  ACC Capital Holdings Corporation is the direct parent corporation of Ameriquest.  During the relevant period, ACC Capital Holdings Corporation conducted business in New York.  ACC Capital Holdings Corporation controlled the Mortgage Company Defendants and induced the fraud perpetrated by them.

21.     **Ameriquest Capital Corporation (now known as SBP Capital Corporation),** a Delaware corporation with its principal executive offices in California, was formed on June 17, 1994 ("ACC").  ACC is the direct parent corporation of ACC Capital Holdings Corporation. During the relevant period, ACC conducted business in New York.  ACC controlled the Mortgage Company Defendants and induced the fraud perpetrated by them.

## JURISDICTION AND VENUE

22.     The claims in this action arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and principles of state common law.

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the action involves a federal question arising under the laws of the United States.  The

Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 in that those state law claims are so inextricably related to the claims under Section 10(b) of the Exchange Act, that those state law claims form part of the same case or controversy under Article III of the United States Constitution.  This Court also has subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States.

24.     Venue lies in this district pursuant to 15 U.S.C. § 78aa and 18 U.S.C. §§ 1391.

## THE MORTGAGE-BACKED SECURITIES

25.     Between October 2005 and April 2007, the Manager caused the Funds to acquire interests in five series of mortgage-backed securities created by the Mortgage Company Defendants.

26.     *Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2005-W3 ("Series 2005-W3").*  On October 18, 2005, the Manager caused Ellington Overseas Partners, Ltd.; Ellington Credit Fund, Ltd.; and Ellington Mortgage Investors, LP (the "2005-W3 Plaintiffs") to purchase $78.4 million of Series 2005-W3 CE and P certificates created by Ameriquest, Argent Securities Inc., and Argent Mortgage Company, L.L.C. (the "2005-W3 Defendants").  On October 27, 2005 those certificates were effectively converted to NIM notes and preference shares linked to the Series 2005-W3 CE and P securities.  In connection with the Series 2005-W3 securities, the 2005-W3 Defendants made numerous false representations and warranties about the nature and quality of the underlying mortgage pool.

27.     *Ameriquest Mortgage Securities Inc., Asset Backed Pass-Through Certificates, Series 2005-R10 ("Series 2005-R10").*  On December 2, 2005, the Manager caused Ellington Overseas Partners Ltd.; Ellington Credit Fund, Ltd.; and Ellington Mortgage Investors, LP (the

"2005-R10 Plaintiffs") to purchase $76.4 million of NIM notes and preference shares linked to Series 2005-R10 CE and P securities created by Ameriquest and Ameriquest Mortgage Securities Inc. (the "2005-R10 Defendants"). In connection with the Series 2005-R10 securities, the 2005-R10 Defendants made numerous false representations and warranties about the nature and quality of the underlying mortgage pool.

28. *Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2005-W2 ("Series 2005-W2").* On September 30, 2005, the Manager caused Ellington Overseas Partners Ltd. to purchase $33.5 million of NIM notes linked to Series 2005-W2 securities created by Ameriquest; Argent Securities Inc.; and Argent Mortgage Company, L.L.C. (the "2005-W2 Defendants"). On December 6, 2005, the Manager caused Ellington Credit Fund, Ltd.; and Ellington Long Term Fund, Ltd. (collectively with Ellington Overseas Partners Ltd. the "2005-W2 Plaintiffs") to purchase approximately $23 million of NIM notes and preference shares linked to the Series 2005-W2 securities. In connection with the Series 2005-W2 securities, the 2005-W2 Defendants made numerous false representations and warranties about the nature and quality of the underlying mortgage pool.

29. *Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2006-W1 ("Series 2006-W1").* On February 13, 2006, the Manager caused Ellington Credit Fund, Ltd. to purchase $79.6 million of Series 2006-W1 CE and P certificates created by Ameriquest; Argent Securities Inc.; and Argent Mortgage Company, L.L.C. (the "2006-W1 Defendants"). On March 9, 2006, the Series 2006-W1 CE and P certificates were effectively converted to NIM notes and preference shares linked to the Series 2006-W1 CE and P securities. The NIM notes and preference shares were then acquired by Ellington Overseas Partners, Ltd. and Ellington Credit Fund, Ltd. (the "2006-W1 Plaintiffs"). In connection with the Series 2006-W1 securities, the

8

2006-W1 Defendants made numerous false representations and warranties about the nature and quality of the underlying mortgage pool.

30.     *Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2006-W5 ("Series 2006-W5").*  On May 23, 2006, the Manager through various intermediaries caused Ellington Special Opportunities, Ltd.; Ellington Credit Fund, Ltd.; Ellington Long Term Fund, Ltd.; and Ellington Mortgage Partners, L.P. (the "2006-W5 Plaintiffs") to purchase $62.1 million Series 2006-W5 CE and P certificates created by Ameriquest; Argent Securities Inc.; and Argent Mortgage Company, L.L.C. (the "2006-W5 Defendants").   In connection with the Series 2006-W5 securities, the 2006-W5 Defendants made numerous false representations and warranties about the nature and quality of the underlying mortgage pool.

31.     The creation by non-affiliated investment banks of NIM securities based upon securities created by the Mortgage Company Defendants was an integral part of the Mortgage Companies' securitization scheme, as reflected in the prospectus supplements for the securities created directly by the Mortgage Company Defendants.

32.     The Mortgage Company Defendants intended that investors such as Ellington would rely on the completeness and truthfulness of their statements about the underlying mortgages when considering whether to buy the NIM securities and knew they would in fact do so.

33.     The Mortgage Company Defendants also knew that investors who bought the securities at issue in this action would be injured thereby, because the income streams generated by the securities would be far less than the investors could reasonably expect, based on the Mortgage Company Defendants' fraudulent statements and material omissions.

34.    The assurances provided by the Mortgage Company Defendants concerning the underlying mortgages were critical to Ellington's decisions to invest in the securities at issue here. Ellington reasonably relied on the completeness and truthfulness of such assurances. If Ellington had known the assurances were not true or had known of the matters the Mortgage Company Defendants fraudulently failed to disclose, Ellington would not have bought the securities at the price that it did.

## THE FRAUD

35.    The Mortgage Company Defendants fraudulently misrepresented the nature and quality of the mortgages underlying the securities that Ellington purchased as being less risky than they really were. The fraud consisted of both affirmative statements about the quality of the mortgage loans in documents that the Mortgage Company Defendants disseminated in connection with the sale of securities and in direct representations to Ellington, as well as the non-disclosure of material information.

36.    The Mortgage Company Defendants fraudulently failed to disclose that many of the loans underlying the securities did not conform to the lender's underwriting guidelines and policies -- which information the Mortgage Company Defendants knew to be material to investors, and without which the information the Mortgage Company Defendants did provide was misleading.

37.    Additionally, despite the Mortgage Company Defendants' knowledge that many of the mortgages in the securitized loan pool were non-conforming, the Mortgage Company Defendants affirmatively represented to Ellington that the mortgage loans were underwritten in accordance with its guidelines.

The Mortgage Company Defendants' Inclusion of A Significant Percentage of Non-Conforming Loans

38.      In 2007, because of the high default rate among the mortgages underlying the securities it had bought, Ellington requested that the Mortgage Company Defendants provide Ellington with certain documentation regarding the mortgage loans underlying the Mortgage Company Defendants' securities.  After much delay and initial refusal, the Mortgage Company Defendants provided sample mortgage loan files for some, but not all, of the defaulted mortgages underlying the securities purchased by Ellington.  Ellington, with the assistance of third-party analysts, reviewed these sample loan files.

39.      Ellington's analysis of the loan files revealed that a large percentage of the loans that had defaulted violated the lender's underwriting guidelines.  For example, Ellington's review of one file containing approximately 3,500 loans found that nearly 40% of the loans did not conform to the lender's guidelines.

40.      These loans violated the lender's guidelines by, for example, originating loans with unacceptable credit risks, failing to verify employment or ignoring negative mortgage history, inadequate analysis of borrowers' ability to make payments, inadequate documentation or verification of borrower income, and understated debt-to-income ratios.  Additionally, Ellington's analysis showed that many of the underlying mortgage loans violated predatory or high-cost lending laws by, for example, violating borrowers' bill-of-rights laws, overcharging fees, or failing to give proper disclosures and notices.

41.      The large number of defective loans in the samples that Ellington reviewed indicates that a large number of loans in the broad loan pools — beyond the particular samples Ellington reviewed — were similarly deficient.

42.    Furthermore, the internal documentation that existed in the Mortgage Company Defendants' possession at the time it created the original securities backed by the mortgages (and the documents marketing those securities) showed the deficiencies. Such deficiencies included, for example:

    a.  property appraisals by unlicensed appraisers;

    b.  absence of documentation of the borrowers' stated income;

    c.  conflict between the appraised value of a mortgaged property and the property value listed on the related schedule listing loan terms and characteristics, provided in connection with each of the securitizations (each, a "Mortgage Loan Schedule");

    d.  conflict between the first and second borrower FICO scores (a commonly used measure of credit risk) set forth on the related Mortgage Loan Schedule and the qualifying FICO listed in the lender credit report; and

    e.  conflict between borrower occupancy information at origination of the loan and the borrower occupancy listed on the related Mortgage Loan Schedule.

43.    The foregoing are merely examples of the defects in thousands of defective loans Ellington's review identified. These deficiencies are so apparent that they would have been readily discovered had the Mortgage Company Defendants conducted even a minimal compliance review of these loan files prior to creating the securities backed by these mortgages.

44.    Although the prospectuses and prospectus supplements pertaining to the securities discussed the underwriting standards and the characteristics of the mortgage loans, none of the documents by which the Mortgage Company Defendants marketed the relevant securities disclosed that large numbers of the loans underlying the securities failed to conform to the lender's underwriting standards.

The Mortgage Company Defendants' Fraudulent Assurances

45.    In addition to fraudulently omitting material information, the Mortgage Company Defendants also fraudulently provided affirmative assurances about the mortgage loans that underlay the securities.

46.    In connection with each of the securities Ellington bought, the Mortgage Company Defendants made statements through a prospectus which incorporated a prospectus supplement as well as related documents filed with the Securities and Exchange Commission. These documents contain specific representations concerning the underlying mortgages, as of the time of the respective securitization. Thus, the Mortgage Company Defendants represented that:

a.    The information set forth on the Mortgage Loan Schedule with respect to each mortgage loan is true and correct in all material respects.

b.    Each mortgage loan was underwritten in accordance with the Mortgage Company Defendants' underwriting guidelines.

c.    No material error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to any mortgage loan had taken place on the part of any person, including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the mortgage loan or in the application of any insurance in relation to such mortgage loan.

d.    Every mortgaged property was properly appraised as part of the loan application process, and the mortgage file contains an appraisal which was either (i) performed by an appraiser who satisfied, and which was conducted in accordance with, all of the applicable requirements of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended or (ii) conducted in accordance with an insured valuation model.

e.    Each mortgaged property was covered by a valid hazard insurance policy.

f.    Origination, collection and servicing practices used by the Mortgage Company Defendants or its affiliates with respect to each mortgage loan were in all material respects legal, proper, reasonable and customary in the subprime mortgage origination and servicing business.

g.    Each mortgage loan at origination complied in all material respects with applicable local, state and federal laws and regulations, including, without limitation, usury, equal credit opportunity, real estate settlement procedures, truth-

in-lending, disclosure laws and all applicable predatory and abusive lending laws, and consummation of the transactions contemplated hereby will not involve the violation of any such laws.

h.  None of the mortgage loans was a "high cost" loan as defined by predatory or abusive lending laws.

i.  All payments due prior to the cut-off date had been made and none of the mortgage loans were contractually delinquent for more than one calendar month more than once since the origination thereof.

j.  There was no default, breach, violation or event of acceleration existing under the Mortgage or the related mortgage note.

k.  No mortgage loan had a loan-to-value ratio in excess of 100%.

47.    Additionally, in the case of two securitizations completed in 2006, the Mortgage Company Defendants also provided directly to Ellington an electronic file (each, a "Mortgage Loan Tape") purporting to set forth the general financial characteristics of the loans in the related loan pool.  In each case, the Mortgage Company Defendants represented directly to Ellington that such Mortgage Loan Tape was complete, true, and correct in all material respects.

48.    Each of the foregoing assurances were false and the Mortgage Company Defendants knew the statements were false when they made or adopted the statements, or caused the statements to be made or adopted.

49.    The Mortgage Company Defendants knew of their widespread use of deceptive, predatory and illegal sales practices.  The Mortgage Company Defendants' failure to disclose such practices, and their false statements detailed above, were knowing and willful.

Causation and Damages

50.    The Mortgage Company Defendants knew at the time of their fraudulent statements and material omissions that the value of the securities purchased by Ellington was dependant on the income streams generated by the regular mortgage payments of the individual borrowers whose mortgages were included in the relevant mortgage pool.

51.     Because the underlying mortgages were much riskier than Ellington reasonably expected based upon the fraudulent statements and material omissions of the Mortgage Company Defendants, the income streams from the securities Ellington bought have been much lower than Ellington reasonably expected.  As a result, Ellington has been damaged.

## COUNT ONE
(Violation of Section 10b of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

52.     Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 through 51, inclusive, with the same force and effect as if set forth in full herein.  Based upon the allegations in the foregoing, Plaintiffs, upon information and belief, make the following allegations.

53.     The 2005-W3 Defendants, 2005-R10 Defendants, 2005-W2 Defendants, 2006-W1 Defendants and 2006-W5 Defendants are liable to the 2005-W3 Plaintiffs, 2005-R10 Plaintiffs, 2005-W2 Plaintiffs, 2006-W1 Plaintiffs and 2006-W5 Plaintiffs, respectively, for violation of Section 10(b) of the Securities Exchange Act of 1934) (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) in connection with the Mortgage Company Defendants' fraudulent statements and omissions of material facts.

54.     As discussed above, the Mortgage Company Defendants made false statements or material omissions with regard to the quality and nature of the mortgages underlying their respective securities.  In doing so, the Mortgage Company Defendants employed a device, scheme or artifice, directly or indirectly, to defraud Plaintiffs.  The Mortgage Company Defendants intentionally and/or recklessly made these untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55.    The Mortgage Company Defendants made these false statements or omissions in connection with the respective Plaintiffs' purchases of the respective securities.  At the time the Mortgage Company Defendants made the false statements and material omissions, they knew their statements were false and that investors such as Ellington would rely on the statements in connection with the purchase of securities.

56.    Plaintiffs reasonably relied on the Mortgage Company Defendants' false statements and material omissions.

57.    As a result of the Mortgage Company Defendants' false statements and material omissions, Plaintiffs suffered losses.  The Mortgage Company Defendants' false statements and material omissions induced Plaintiffs to pay for value that was subsequently shown to be illusory — leaving Plaintiffs to have lost both the money they paid and the value they thought they were buying.

58.    Additionally, with respect to Ellington Management Group, L.L.C., the Mortgage Company Defendants' false statements and material omissions caused losses in the form of lost management fees (which are based in part on the performance of the Funds the Manager manages) and in the form of reputational injury.

59.    As a result of the actions of the Mortgage Company Defendants alleged herein, Plaintiffs are entitled to damages in an amount to be proven at trial.

## COUNT TWO
(Control-Person Liability Pursuant to Section 20(a) of the Exchange Act)

60.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 through 51, inclusive, with the same force and effect as if set forth in full herein.

Based upon the allegations in the foregoing, Plaintiffs, upon information and belief, make the following allegations.

61.    ACC Capital Holdings Corporation and ACC controlled the Mortgage Company Defendants.

62.    ACC Capital Holdings Corporation and ACC, acting in bad faith, induced the fraud perpetrated by the Mortgage Company Defendants.

63.    Accordingly, pursuant to Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)), ACC Capital Holdings Corporation and ACC each are liable to Ellington for the fraudulent statements and omissions of material facts by the Mortgage Company Defendants.

## COUNT THREE
### (Common Law Fraud)

64.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 through 51, inclusive, with the same force and effect as if set forth in full herein. Based upon the allegations in the foregoing, Plaintiffs, upon information and belief, make the following allegations.

65.    Each of the Mortgage Company Defendants intentionally and/or recklessly made false statements or omitted to state material facts with regard to the quality and nature of the mortgages underlying their respective securities.

66.    The Mortgage Company Defendants made these false statements or omissions in connection with the relevant Plaintiffs' purchases of the respective securities. At the time the Mortgage Company Defendants made the false statement or material omissions they knew their statements were false and that investors such as Ellington would rely on the statements in connection with the purchase of securities.

67.     Plaintiffs reasonably relied on the Mortgage Company Defendants' false statements and material omissions.

68.     As a result of the Mortgage Company Defendants' false statements and material omissions, Plaintiffs suffered losses. The Mortgage Company Defendants' false statements and material omissions induced Plaintiffs to pay for value that was subsequently shown to be illusory – leaving Plaintiffs to have lost both the money they paid and the value they thought they were buying.

69.     Additionally, with respect to Ellington Management Group, L.L.C., the Mortgage Company Defendants' false statements and material omissions caused losses in the form of lost management fees (which are based in part on the performance of the Funds the Manager manages) and in the form of reputational injury.

70.     As a result of the actions of the Mortgage Company Defendants alleged herein, the 2005-W3 Defendants, 2005-R10 Defendants, 2005-W2 Defendants, 2006-W1 Defendants and 2006-W5 Defendants are liable to the 2005-W3 Plaintiffs, 2005-R10 Plaintiffs, 2005-W2 Plaintiffs, 2006-W1 Plaintiffs and 2006-W5 Plaintiffs, respectively, in an amount to be proven at trial.

## COUNT FOUR
### (Common Law Negligent Misrepresentation)

71.     Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 through 51, inclusive, with the same force and effect as if set forth in full herein. Based upon the allegations in the foregoing, Plaintiffs, upon information and belief, make the following allegations.

72.    Each of the Mortgage Company Defendants made material misrepresentations to the respective Plaintiffs regarding the quality and nature of the mortgages underlying their respective securities.  The Mortgage Company Defendants either knew that their representations were false or were reckless or negligent in failing to realize their falsity.

73.    The Mortgage Company Defendants knew that Plaintiffs sought information about the quality and nature of underlying mortgages in their respective mortgage pools so that Plaintiffs could determine the value of the securities and what price to pay for the securities.

74.    The Mortgage Company Defendants knew and intended that Plaintiffs and others would rely on their materially false representations regarding the nature and quality of the mortgages contained in the mortgage pool.

75.    Plaintiffs reasonably relied on the Mortgage Company Defendants' misrepresentations in determining whether and at what price to acquire the mortgage-backed securities.

76.    Accordingly, the 2005-W3 Defendants, 2005-R10 Defendants, 2005-W2 Defendants, 2006-W1 Defendants and 2006-W5 Defendants are liable to the 2005-W3 Plaintiffs, 2005-R10 Plaintiffs, 2005-W2 Plaintiffs, 2006-W1 Plaintiffs and 2006-W5 Plaintiffs, respectively, in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

77.    For the foregoing reasons, Plaintiffs seek judgment awarding them:

    a.    compensatory damages for all injuries they have suffered as a result of Defendants' wrongful conduct, in an amount to be determined at trial,

    b.    punitive damages for Defendants' willful and wanton misconduct,

    c.    pre-judgment and post-judgment interest,

d.  costs, expenses and attorneys' fees incurred by Plaintiffs in connection with this action, and

e.  such other and further relief as the Court may deem just.

Dated: January 14, 2009
      Armonk, NY

By: _____

BOIES, SCHILLER & FLEXNER LLP
Robin A. Henry (RH 6781)
Motty Shulman (MS 0351)
Daniel E. Holloway (DH 5254)
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Fax: (914) 749-8300