# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Ellington Management Group, L.L.C.; Ellington Overseas Partners, Ltd.; Ellington Mortgage Investors, LP; Ellington Mortgage Partners, L.P.; Ellington Credit Fund, Ltd.; Ellington Long Term Fund, Ltd.; and Ellington Special Opportunities, Ltd.

Plaintiffs,

v.

Ameriquest Mortgage Company; Ameriquest Mortgage Securities Inc.; Argent Mortgage Company, L.L.C.; Argent Securities Inc.; ACC Capital Holdings Corporation; and Ameriquest Capital Corporation (now known as SBP Capital Corporation)

Defendants.

Civil Action No.: 09-cv-0416 (JSR)

**ECF CASE**

**AMENDED COMPLAINT**



# TABLE OF CONTENTS

I. NATURE OF THE ACTION ..................................................................................... 1

II. PARTIES ................................................................................................................. 6

    A. Plaintiffs ............................................................................................................ 6

    B. Defendants ......................................................................................................... 7

III. JURISDICTION AND VENUE ........................................................................... 8

IV. THE MORTGAGE-BACKED SECURITIES ..................................................... 9

    A. The Nature of the Securities ............................................................................ 9

    B. Creation of the Securities in this District ...................................................... 11

    C. The Securities In Question ............................................................................. 12

        1.   Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2005-W3 ("Series 2005-W3") ................................................................ 12

        2.   Ameriquest Mortgage Securities Inc., Asset Backed Pass-Through Certificates, Series 2005-R10 ("Series 2005-R10") ................................. 12

        3.   Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2005-W2 ("Series 2005-W2") ................................................................ 13

        4.   Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2006-W1 ("Series 2006-W1") ................................................................ 13

        5.   Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2006-W5 ("Series 2006-W5") ................................................................ 14

    D. The Materiality of Defendants' Misrepresentations ...................................... 14

V. THE FRAUD ......................................................................................................... 15

    A. Overview ......................................................................................................... 15

    B. Ellington's 2007 Review of Sample Loan Files and Discovery of the Fraud ............... 16

    C. The Misstatements .......................................................................................... 18

        MLPA Representation No. 1: Accuracy of the Mortgage Loan Schedule .................... 19

        MLPA Representation No. 2: Material Errors ................................................. 20

        MLPA Representation No. 4: Valid Lien ........................................................ 21

        MLPA Representation No. 7: No Defense to Mortgage .................................. 22

MLPA Representation No. 10: Compliance with Lending Laws ....................................23

MLPA Representation No. 12: Title Insurance Policy Effective ..................................24

MLPA Representation No. 13: No Violation of Underwriting Standards ....................25

MLPA Representation No. 18: Genuine Mortgage Note and Mortgage ......................27

MLPA Representation No. 23: Adherence to Industry Standards ................................28

MLPA Representation No. 26: Hazard Insurance ........................................................30

MLPA Representation No. 28: No Default or Waiver ..................................................31

MLPA Representation No. 32: Proper Appraisal .........................................................32

MLPA Representation No. 40: No High Cost Loans ....................................................32

**D. The Violations** ..............................................................................................................**33**

*Inaccuracies in the Mortgage Loan Schedules (Violations 1-7)* ........................................34

Violation 1:      First Borrower FICO on Mortgage Loan Schedule Unequal to FICO on Lender Credit Report .................................................34

Violation 2:      Second Borrower FICO on Mortgage Loan Schedule Unequal to FICO on Lender Credit Report ...........................................36

Violation 3:      Property Value on Mortgage Loan Schedule Unequal to Appraised Value ..........................................................................36

Violation 4:      Prepayment Penalty Term on Security Deed Unequal to Mortgage Loan Schedule ...........................................................37

Violation 5:      Purchase LTV on Mortgage Loan Schedule Unequal to LTV Calculated from HUD Form .......................................................38

Violation 6:      Refinance LTV on Mortgage Loan Schedule Unequal to LTV Calculated from Appraised Value ...............................................38

Violation 7:      Occupancy at Origination Unequal to Mortgage Loan Schedule .............................................................................................39

*Creditworthiness or Reliability of the Borrower (Violations 8-22)* .................................39

Violations 8 & 9:   No Credit Report .........................................................................39

Violation 10:      Required Income Documentation Missing ..............................40

Violation 11:      No Stated Income Letter .........................................................41

Violation 12:      Stated Income Letter Not Executed by All Borrowers ...........42

Violation 13:    First Borrower Income Lower on Stated Income Letter than on Final 1003 (Uniform Loan Application) ............................... 42

Violation 14:    No Verification of Assets ............................................................ 43

Violations 15 & 16:    No Verification of Employment ................................................. 43

Violation 17:    No Verification of Rent or Mortgage ........................................ 44

Violation 18:    Current Borrower Housing Expense Lower on Initial 1003 (Uniform Loan Application) than on Final 1003 ..................... 45

Violation 19:    No Executed Sales Contract ....................................................... 45

Violations 20 & 21:    No Initial or Final Form 1003 Loan Applications ................... 46

Violation 22:    No Form 1008 (Uniform Underwriting & Transmittal Summary) ..................................................................................... 47

*Property Value (Violations 23-26)* ...................................................................... 47

Violation 23:    Unlicensed Appraiser ................................................................. 47

Violation 24:    LTV Violation Due to Property Valuation ............................... 48

Violation 25:    No Appraisal ............................................................................... 49

Violation 26:    No Review Appraisal for Minimum Improvement Property .. 50

*Regulatory Compliance (Violations 27-32)* ......................................................... 50

Violation 27:    Regulatory Compliance Violations Generally ......................... 50

Violation 28:    No Final HUD-1 Settlement Statement .................................... 52

Violation 29:    No Notice of Right to Cancel ..................................................... 52

Violations 30 & 31:    No Final Truth In Lending Disclosures .................................... 53

Violation 32:    Seller Closing Costs Exceeded Three Percent of Purchase Price .................................................................................................... 54

*Protection of the Rights of the Security-Holders (Violations 33-41)* .................. 55

Violations 33 & 34:    No Executed Note (First or Second Liens) ............................... 55

Violations 35 & 36:    No Deed ....................................................................................... 55

Violation 37:    No Title Search (Second Lien) ................................................... 56

Violation 38:    No Title Insurance Policy (Commitment) ................................ 57

Violation 39:    No Title Insurance Policy (Final) .............................................. 57

Violation 40:    Security Instrument Violation: Waiver of Acceleration .......... 58

Violation 41:    No Hazard Insurance ................................................................. 59

E. Scienter .................................................................................................................. 59

    1.   Extreme Departure from the Standards of Ordinary Care ...................................... 60

    2.   Recklessness Compounded by Discretion Granted to Subordinates ....................... 61

    3.   Recklessness Compounded by Knowledge of Widespread Improprieties .............. 63

  F. Causation and Damages .......................................................................................... 68

**VI. CONTROL PERSON ALLEGATIONS** ........................................................................ 68

**VII. CAUSES OF ACTION** ................................................................................................ 72

  COUNT ONE ................................................................................................................ 72

  COUNT TWO ............................................................................................................... 74

  COUNT THREE ........................................................................................................... 74

  COUNT FOUR ............................................................................................................. 76

**PRAYER FOR RELIEF** .................................................................................................... 77

Plaintiffs Ellington Management Group, L.L.C.; Ellington Overseas Partners, Ltd.;

Ellington Mortgage Investors, LP; Ellington Mortgage Partners, L.P.; Ellington Credit Fund,

Ltd.; Ellington Long Term Fund, Ltd.; and Ellington Special Opportunities, Ltd. (collectively

"Ellington") as and for their complaint against Defendants Ameriquest Mortgage Company

("Ameriquest"); Ameriquest Mortgage Securities Inc.; Argent Mortgage Company, L.L.C.

("Argent"); Argent Securities Inc. (collectively with Ameriquest the "Mortgage Companies");

ACC Capital Holdings Corporation; and Ameriquest Capital Corporation (now known as SBP

Capital Corporation) (the latter two, the "Control Persons") on personal knowledge as to matters

pertaining to Ellington and on information and belief as to all other matters, allege as follows:

## I. **NATURE OF THE ACTION**

1.      This is an action for violation of the federal securities laws, common law fraud

and negligent misrepresentation for damages incurred by Ellington as a result of the Mortgage

Companies' misrepresentations and material omissions made in connection with Ellington's

purchase of five series of mortgage-backed securities. The Mortgage Companies made

misrepresentations and omissions in prospectuses and other disclosure documents, including

documents filed with the Securities and Exchange Commission. In reliance on the Mortgage

Companies' representations, Ellington paid approximately $354 million to purchase various

mortgage-backed securities.

2.      The Mortgage Companies were principally in the business of making subprime

mortgage loans ("mortgages" or "loans") to homeowners and then selling the loans to third-party

investors. The principal business of the Control Persons was to oversee the Mortgage

Companies and to collect the profits they generated.

3. By selling the mortgage loans they originated, the Mortgage Companies could realize profits from the loans immediately, instead of collecting profits over the life of the loans. Additionally, by selling the loans, the Mortgage Companies transferred the default risk associated with the loans to the investors who bought them. The value to investors was in having a steady, long-term income stream from the regular mortgage payments of the borrowers.

4. The Mortgage Companies sold the loans to investors, such as Ellington, by creating securities backed by thousands of individual mortgage loans. The Mortgage Companies would then sell these mortgage-backed securities to institutional investors through prospectuses and other disclosure documents. The Mortgage Companies' securitization program included the issuance by third-party investment banks of "net interest margin" ("NIM") securities that were linked to certain of the securities created directly by the Mortgage Companies. Both the securities that the Mortgage Companies created and the NIM securities were based on, and ultimately drew their value from, the underlying pools of mortgage loans.

5. The value of the mortgage-backed securities (and particularly the NIM securities that Ellington acquired) depended in large part on the default rate of the mortgage loans in the securitized pool. To the extent individual borrowers defaulted on their loan payments, the income stream – and thus the value of the securities – was reduced. For this reason, information about the quality or riskiness of the underlying mortgages was critical to a potential investor's assessment of the value of the mortgage-backed securities. In this regard, the Mortgage Companies made numerous representations and warranties about the nature and quality of the mortgage pool upon which Ellington relied.

6. As detailed below, the offering materials for each series of securities made unqualified representations ranging from very specific assurances about the attributes of each

individual loan (*e.g.*, that "The improvements upon *each* Mortgaged Property are covered by a valid, binding and existing hazard insurance policy" (Mortgage Loan Purchase Agreement ("MLPA") § 6(13) (emphasis added)) to broad assurances about the integrity of the underwriting process (*e.g.*, that "*No* material error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to *any* Mortgage Loan has taken place" (MLPA § 6(2) (emphasis added)).

7.    In addition to these assurances, which applied to all of the loans in the securitized pools, the Mortgage Companies provided Mortgage Loan Schedules (also known as "loan tapes") to prospective investors. The loan tapes contained detailed information about the attributes of each loan in the securitized pools including the value of the mortgaged property, the borrower's credit score, the loan–to–value ratio, and occupancy status. The Mortgage Companies represented that "The information set forth on the Mortgage Loan Schedule with respect to each Mortgage Loan is true and correct in all material respects." (MLPA § 6(1).)

8.    Like other investors, Ellington used the categorical assurances and the information contained in the Mortgage Loan Schedules to decide whether and at what price to buy the securities. Ellington used the assurances and other information to model the expected performance of the securities and the expected payment streams under various economic conditions.

9.    While information about the quality of the underlying mortgages is important for any mortgage-backed security, it was especially important in the securities at issue here for three principal reasons:

     a.    First, because the mortgages in the securitizations that Ellington purchased were subprime and were made to borrowers who represented higher credit risks than traditional

borrowers, seemingly small differences in the borrower's qualifications, the terms of the loan, or the integrity of the loan-origination process could affect the assessment of the likelihood of a default by the borrower;

b. Second, the securitizations created stratified classes of securities such that all losses from defaults were absorbed first by the lowest-ranking class of security – "first-loss" securities (which Ellington held) – before any losses were borne by the next higher class. Accordingly, even small increases in the default rate could cause heavy losses to the investors holding first-loss securities;

c. Finally, the Mortgage Companies' unqualified representation that the information in the disclosure documents and Mortgage Loan Schedules were "true and correct in all material respects," were of particular importance because the Mortgage Companies had been accused of engaging in deceptive lending practices which – if actually employed – would increase the riskiness of loans. Indeed, the Mortgage Companies entered into a $295 million settlement with 49 states and the District of Columbia to resolve allegations of unlawful and deceptive lending practices.

10.     Recognizing that information about the quality of the underlying mortgages was important to potential investors in the mortgage-backed securities, the Mortgage Companies inflated the apparent value of the securities in question by giving unqualified assurances about both the nature of the loans selected for inclusion in the securitized loan pools and the underwriting process by which the loans were made.

11.     The Mortgage Companies were not required to provide the categorical assurances they provided. They could have chosen to provide more limited – or no – assurances. Of course

then investors would have paid less for the securities and the Mortgage Companies would have made correspondingly smaller profits.

12.     Several of the categorical assurances the Mortgage Companies gave in the offering materials for the securities at issue here were false, and a substantial percentage of the securitized loan pools at issue here consisted of loans that did not conform to the categorical assurances the Mortgage Companies provided.

13.     The quality and value of the loans and of the securities based on them were less than they appeared to be based on the Mortgage Companies' categorical assurances, and the Mortgage Companies knew or recklessly avoided knowledge that the categorical assurances they provided were false.

14.     In reliance on the Mortgage Companies' false and misleading assurances, Ellington acquired interests in five mortgage-backed securities for over $354 million. After Ellington bought the securities, the underlying mortgages performed far worse than would be expected based on the Mortgage Companies' assurances, even in light of a subsequent economic downturn. Ellington lost a substantial amount of the investments it made in reliance on those categorical assurances.

15.     The Mortgage Companies' liability arises not from the general risks associated with subprime mortgage loans, nor from increasing default rates associated with a general economic downturn. Rather, the Mortgage Companies' liability is a direct consequence of their fraud – from providing extensive categorical assurances to Ellington about the loans in the securitized mortgage pools, when they knew or recklessly avoided knowledge that those assurances were materially false.

16.    All Exhibits to this Complaint are incorporated into and made part of the Complaint. For the sake of convenience and readability, voluminous detailed information is set forth in Exhibits numbered 1 through 41. However, where the text of this Complaint refers to information in the Exhibits, such information is expressly incorporated as if set forth directly in the main text of the Complaint.

## II. PARTIES

### A. Plaintiffs

17.    **Ellington Management Group, L.L.C.** (the "Manager"), a Delaware limited liability company with its principal place of business in Old Greenwich, Connecticut, is a private registered investment advisor that, at all relevant times, managed each of the other plaintiffs (collectively, the "Funds"). Ellington's investors include major pension funds, endowments, foundations, commercial and private banks, insurance companies, funds of funds and individuals. The Manager is the attorney-in-fact for the Funds and has full power to bring suit on their behalf. The Manager brings this suit both as a representative of the Funds and on its own behalf.

18.    **Ellington Overseas Partners, Ltd.** is a Cayman Islands corporation that is managed by the Manager.

19.    **Ellington Mortgage Investors, LP** is a Cayman Islands limited partnership that is managed by the Manager.

20.    **Ellington Mortgage Partners, L.P.** is a Delaware limited partnership that is managed by the Manager.

21.    **Ellington Credit Fund, Ltd.** is a Cayman Islands corporation that is managed by the Manager.

22.     **Ellington Long Term Fund, Ltd.** is a Cayman Islands corporation that is managed by the Manager.

23.     **Ellington Special Opportunities, Ltd.** is a Cayman Islands corporation that is managed by the Manager.

**B. Defendants**

24.     **Ameriquest Mortgage Company**, a Delaware corporation with its principal executive offices in California, is a specialty finance company engaged in the business of originating, purchasing and selling retail and wholesale mortgage loans. Ameriquest was formed in 1979 as a savings and loan association and was involved in the wholesale or retail mortgage markets in various forms from 1979 until 2007. During the relevant period, Ameriquest had offices and conducted business in New York.

25.     **Ameriquest Mortgage Securities Inc.,** a Delaware corporation with its principal executive offices in California, was formed on December 23, 1999, as an indirect wholly-owned subsidiary of Ameriquest for the purpose of serving as a private secondary mortgage market conduit. During the relevant period, Ameriquest Mortgage Securities Inc. conducted business in New York.

26.     **Argent Mortgage Company, L.L.C.,** a Delaware limited liability company with its principal executive offices in California, is or was the wholesale origination lending unit of Ameriquest. During the relevant period, Argent Mortgage Company, L.L.C. conducted business in New York.

27.     **Argent Securities Inc.,** a Delaware corporation with its principal executive offices in California, was formed on May 22, 2003 as a direct wholly-owned subsidiary of Argent Mortgage Company, LLC for the purpose of serving as a private secondary mortgage

market conduit. During the relevant period, Argent Securities Inc. conducted business in New York.

28. **ACC Capital Holdings Corporation**, a Delaware corporation with its principal executive offices in California ("ACC Holdings"), was formed on November 13, 2003. ACC Holdings is the direct parent corporation of Ameriquest. During the relevant period, ACC Holdings conducted business in New York. ACC Holdings controlled the Mortgage Companies and induced the fraud perpetrated by them.

29. **Ameriquest Capital Corporation (now known as SBP Capital Corporation)**, a Delaware corporation with its principal executive offices in California ("ACC"), was formed on June 17, 1994. ACC is the direct parent corporation of ACC Holdings. During the relevant period, ACC conducted business in New York. ACC controlled the Mortgage Companies and induced the fraud perpetrated by them.

### III. JURISDICTION AND VENUE

30. The claims in this action arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) and principles of state common law.

31. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the action involves a federal question arising under the laws of the United States. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 in that those state law claims are so inextricably related to the claims under Section 10(b) of the Exchange Act, that those state law claims form part of the same case or controversy under Article III of the United States Constitution.

8

32.     This Court has personal jurisdiction over each of the Defendants by virtue of their business dealings in this district, as partially described below in the section entitled "The Mortgage-Backed Securities" and because they have each submitted to the jurisdiction of this Court in this action.

33.     Venue lies in this district pursuant to 28 U.S.C. §§ 1391(b)(1), 1391(b)(2) and 15 U.S.C. § 78aa because each Defendant is subject to personal jurisdiction in this district and, as described below in the section entitled "The Mortgage-Backed Securities," a substantial part of the events or omissions giving rise to the claim occurred in this district.

## IV.  THE MORTGAGE-BACKED SECURITIES

### A.  The Nature of the Securities

34.     The Mortgage Companies created various series of mortgage-backed securities, in the form of Asset-Backed Pass-Through Certificates, a fixed-income security whereby mortgage payments pass from the original lender through intermediary entities to the investors who purchase the securities.

35.     For each series, multiple classes of certificates were issued.  The classes were stratified so that more senior classes received the cash flows owing to them before the more subordinate classes received any cash flows, so that the lowest-ranking certificates were first-loss securities.

36.     For each series of Asset-Backed Pass-Through Certificates, the securitization program included the creation of NIM securities linked to the certificates, as reflected in the prospectus supplements for the securities created directly by the Mortgage Companies.

37.     The NIM securities consisted of interest-bearing notes issued by a trust.  The notes were secured by the trust estate, which consisted of the most subordinate class of

certificates and the class of certificates entitled to prepayment charges on the related mortgage loans.

38. Ellington bought certificates and NIM securities with face amounts totaling approximately $354 million. Five series of securities – representing over $10 billion in mortgage loan principal amounts – are at issue here.

39. Each of the five series of securities at issue in this case was offered to investors through standardized offering documents that were substantially the same and consisted of a Prospectus, Prospectus Supplement, MLPA and Pooling and Servicing Agreement.

40. The Mortgage Companies intended that investors such as Ellington would rely on the completeness and truthfulness of their statements about the underlying mortgages when considering whether to buy the certificates or NIM securities and knew they would in fact do so.

41. The Mortgage Companies also knew that investors who bought the securities at issue in this action would be injured thereby, because the income streams generated by the mortgage loans would be far less than the investors could reasonably expect, based on the Mortgage Companies' fraudulent statements and material omissions.

42. The assurances provided by the Mortgage Companies concerning the underlying mortgages were critical to Ellington's decisions to invest in the securities at issue here. Ellington reasonably relied on the completeness and truthfulness of such assurances. If Ellington had known the assurances were not true or had known of the matters the Mortgage Companies fraudulently failed to disclose, Ellington would not have bought the securities or would have paid substantially less for them.

**B.  Creation of the Securities in this District**

43.     Each series of securities was created largely in the borough of Manhattan, New York, through business arrangements made by the Defendants with entities in Manhattan.

44.     For each series of securities, the Mortgage Companies' certificates were offered to investors through underwriters operating out of Manhattan.

45.     For each series of securities, the NIM securities were an intended part of the securitization program, and the NIM securities were issued by banks operating out of Manhattan.

46.     For each series of securities, an integral part of the securitization program was the creation of an interest rate swap agreement as "credit enhancement" for the securities, and the swap agreements were made with banks operating out of Manhattan.

47.     For each series of securities, the certificates and NIM securities were sold to Plaintiffs by brokers in Manhattan.

48.     For each series of securities, the majority of the certificates (the "Offered Certificates," as defined in the respective Prospectus Supplements) were issued, maintained, and transferred on the book-entry records of the Depository Trust Company in Manhattan.

49.     For each series of securities, the securities were issued pursuant to legal opinions from Manhattan law firms.

50.     For each series of securities, the Mortgage Loan Purchase Agreement and the Pooling and Services Agreement (to which certain of the Mortgage Companies were party) invoked and are governed by New York law.

51.     In furtherance of their mortgage-origination and mortgage securities businesses – and with respect to the particular securities at issue here – the Defendants conducted substantial

activities in this district, including in-person meetings as well as telephonic, electronic, and postal communications.

## C. The Securities In Question

52. Between October 2005 and April 2007, the Manager caused the Funds to acquire interests in five series of mortgage-backed securities created by the Mortgage Companies.

## 1. Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2005-W3 ("Series 2005-W3")

53. On October 18, 2005, the Manager caused Ellington Overseas Partners, Ltd.; Ellington Credit Fund, Ltd.; and Ellington Mortgage Investors, LP (the "2005-W3 Plaintiffs") to purchase $78.4 million of Series 2005-W3 CE and P certificates created by Ameriquest, Argent Securities Inc., and Argent Mortgage Company, L.L.C. (the "2005-W3 Defendants"). On October 27, 2005 those certificates were effectively converted to NIM notes and preference shares linked to the Series 2005-W3 CE and P securities. In connection with the Series 2005-W3 securities, the 2005-W3 Defendants made numerous false representations and warranties about the nature and quality of the underlying mortgage pool.

## 2. Ameriquest Mortgage Securities Inc., Asset Backed Pass-Through Certificates, Series 2005-R10 ("Series 2005-R10")

54. On December 2, 2005, the Manager caused Ellington Overseas Partners Ltd.; Ellington Credit Fund, Ltd.; and Ellington Mortgage Investors, LP (the "2005-R10 Plaintiffs") to purchase $76.4 million of NIM notes and preference shares linked to Series 2005-R10 CE and P securities created by Ameriquest and Ameriquest Mortgage Securities Inc. (the "2005-R10 Defendants"). In connection with the Series 2005-R10 securities, the 2005-R10 Defendants made numerous false representations and warranties about the nature and quality of the underlying mortgage pool.

### 3. Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2005-W2 ("Series 2005-W2")

55.     On September 30, 2005, the Manager caused Ellington Overseas Partners Ltd. to purchase $33.5 million of NIM notes linked to Series 2005-W2 securities created by Ameriquest; Argent Securities Inc.; and Argent Mortgage Company, L.L.C. (the "2005-W2 Defendants"). On December 6, 2005, the Manager caused Ellington Credit Fund, Ltd.; and Ellington Long Term Fund, Ltd. (collectively with Ellington Overseas Partners Ltd. the "2005-W2 Plaintiffs") to purchase approximately $23 million of NIM notes and preference shares linked to the Series 2005-W2 securities. In connection with the Series 2005-W2 securities, the 2005-W2 Defendants made numerous false representations and warranties about the nature and quality of the underlying mortgage pool.

### 4. Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2006-W1 ("Series 2006-W1")

56.     On February 13, 2006, the Manager caused Ellington Credit Fund, Ltd. to purchase $79.6 million of Series 2006-W1 CE and P certificates created by Ameriquest; Argent Securities Inc.; and Argent Mortgage Company, L.L.C. (the "2006-W1 Defendants"). On March 9, 2006, the Series 2006-W1 CE and P certificates were effectively converted to NIM notes and preference shares linked to the Series 2006-W1 CE and P securities. The NIM notes and preference shares were then acquired by Ellington Overseas Partners, Ltd. and Ellington Credit Fund, Ltd. (the "2006-W1 Plaintiffs"). In connection with the Series 2006-W1 securities, the 2006-W1 Defendants made numerous false representations and warranties about the nature and quality of the underlying mortgage pool.

**5. Argent Securities Inc., Asset-Backed Pass-Through Certificates, Series 2006-W5 ("Series 2006-W5")**

57.     On May 23, 2006, the Manager through various intermediaries caused Ellington Special Opportunities, Ltd.; Ellington Credit Fund, Ltd.; Ellington Long Term Fund, Ltd.; and Ellington Mortgage Partners, L.P. (the "2006-W5 Plaintiffs") to purchase $62.1 million Series 2006-W5 CE and P certificates created by Ameriquest; Argent Securities Inc.; and Argent Mortgage Company, L.L.C. (the "2006-W5 Defendants").   In connection with the Series 2006-W5 securities, the 2006-W5 Defendants made numerous false representations and warranties about the nature and quality of the underlying mortgage pool.

**D.  The Materiality of Defendants' Misrepresentations**

58.     Ellington is a sophisticated investment firm with deep experience in the analysis and trading of mortgage-backed securities.  Since its founding nearly 15 years ago, Ellington has focused largely on mortgage-backed securities and Ellington's founding partners had many years of experience in mortgage-backed securities before starting the Ellington funds.

59.     The real estate securities industry – and Ellington, as part of that industry – has extensively studied, and continuously monitors, real estate market practices and trends, associations among various loan attributes, underwriting practices and the performance of mortgage-backed securities and their underlying loans.

60.     Before buying the securities at issue, Ellington performed analyses based on the characteristics of the loans in the securitized pools.  Ellington used both the loan-pool-wide information provided in the form of representations and warranties in the offering materials, as well as individual-loan-level information provided in Mortgage Loan Schedules in its analyses. Ellington also forwarded the information to outside vendors to conduct additional analyses.

61.     Ellington's analyses included sophisticated computer modeling based on knowledge gleaned from data concerning loan and mortgage-backed security performance. The models were used to perform "stress tests" on the securities – to estimate the performance of the securities under a range of assumptions concerning possible future economic conditions (including general economic downturns), expected future default rates, loss frequency, loss timing, loss severities and cash flows.

62.     Ellington's pre-purchase modeling and analyses of the securities relied on the truthfulness of the information the Mortgage Companies provided about the securitized loans and affected both the decision whether and at what price to buy the security.

63.     Because the loans backing the securities were subprime mortgages and Ellington was analyzing first-loss securities, the value of the securities was especially sensitive to inaccuracies or falsehoods in both the Mortgage Loan Schedules and in the broad, unqualified assurances the Mortgage Companies gave.

## V. **THE FRAUD**

### A. **Overview**

64.     As detailed below in the sub-section entitled "The Misstatements," the Mortgage Companies gave unqualified assurances about the quality and nature of the underlying loans and the integrity of the underwriting process.

65.     The misstatements were made for the purpose of inducing investors such as Ellington to purchase the securities.

66.     The unqualified assurances were economically valuable to the Defendants, materially increasing the apparent value of the securities and allowing the Defendants to make

greater profits from the loans than they would have made with more limited or qualified assurances.

67. The Defendants knew and intended that investors such as Ellington would rely on the extensive assurances the Mortgage Companies made.

68. Before giving these categorical assurances, the Defendants were obligated to confirm the truth of their misrepresentations. In violation of their obligation, the Defendants knew or recklessly avoided knowledge that many of the assurances were false.

**B. Ellington's 2007 Review of Sample Loan Files and Discovery of the Fraud**

69. In 2007, because of a default rate among the underlying mortgages that was unexpectedly high, even in light of then-current economic conditions, Ellington exercised its contractual right to review documentation regarding the underlying mortgage loans. After much delay and initial refusal, the Mortgage Companies provided sample mortgage loan files for some, but not all, of the defaulted mortgages underlying the securities purchased by Ellington. Ellington, with the assistance of third-party analysts, reviewed these sample loan files.

70. Ellington's analysis of the loan files was limited by the Defendants' improper refusal to cooperate. After initially providing copies of files electronically, the Defendant's improperly insisted on limiting Ellington's review of the files to a more difficult and costly on-site review. The Defendants further improperly limited the number of files Ellington could review and curtailed Ellington's on-site review of the files before Ellington could complete its review.

71. Nonetheless, Ellington reviewed 3,772 loans, of a combined securitized loan pool consisting of 47,259 loans. Ellington found approximately 1,500 violations of the representations and warranties based on information present in the files. In addition, Ellington's

review identified over 8,000 deficiencies or missing documents in the sample of 3,772 loan files it reviewed.

72.     Ellington was entitled to review copies of the missing documents and asked the Defendants to provide them, if they existed. The Defendants failed to provide the missing documents. Ellington thus concludes, on information and belief, that elements of the loan origination and underwriting process were omitted with respect to the affected loans.

73.     Of the 3,772 loan files it reviewed, 3,359 distinct loan files had one or more violation or deficiency. Thus, nearly 90% of the sample failed in at least one respect to conform to the categorical, unqualified assurances the Mortgage Companies gave. On average, each deficient loan had three different deficiencies. These results were consistent across each of the five securities at issue, as reflected in Exhibit A (Summary of Violations).

74.     The false representations that Ellington identified in the loan files concerned characteristics of the underwriting process and loan attributes that are material to the analysis and evaluation of the future performance of the loans and the value of the securities based on them. The misstatements that Ellington identified are described below in the sub-section entitled "The Misstatements."

75.     The nature and number of deficiencies in the overall loan pool were highly material to the analysis and valuation of the loans and the securities based on them.

76.     The deficiencies Ellington identified generally are readily apparent from the face of the documents in the loan files. The deficiencies are so apparent and so pervasive that they would have been discovered had the Mortgage Companies conducted even a minimal review prior to creating the securities.

## C. **The Misstatements**

77.     In Section 6 of the MLPA disseminated to investors as part of the offering materials for each series of securities, the Mortgage Companies made extensive, categorical assurances in the form of representations and warranties. These representations and warranties were absolute and unqualified.

78.     The representations and warranties in Section 6 of the MLPA are numbered from 1 to 48. The representations are such that a single deficiency may violate more than one representation, and a single representation may be violated by multiple deficiencies.

79.     Ellington's review of the sample loan files revealed 41 different violations or deficiencies, which materially falsified 13 of the representations and warranties in the MLPA.

80.     The 2005-W2 Defendants made these 13 misstatements in the offering materials with respect to Series 2005-W2. The 2005-W3 Defendants made these 13 misstatements in the offering materials with respect to Series 2005-W3. The 2005-R10 Defendants made these 13 misstatements in the offering materials with respect to Series 2005-R10. The 2006-W1 Defendants made these 13 misstatements in the offering materials with respect to Series 2006-W1. The 2006-W5 Defendants made these 13 misstatements in the offering materials with respect to Series 2006-W5.

81.     The 13 false representations and warranties in the MLPA are detailed below in this sub-section. Each of these representations and warranties is false or misleading as a result of the 41 violations or deficiencies discussed below in the following sub-section entitled "The Violations."

**MLPA Representation No. 1:  Accuracy of the Mortgage Loan Schedule**

82.     The MLPA disseminated as part of the offering materials for each series of securities at issue stated categorically, without qualification, that: "The information set forth on the Mortgage Loan Schedule with respect to each Mortgage Loan is true and correct in all material respects[.]" (MLPA § 6(1).)

83.     The Mortgage Loan Schedule was a spreadsheet containing, for each loan in the relevant securitized loan pool, information about the nature and terms of the loan and the borrower's qualifications.  As noted above, the Mortgage Loan Schedule (or "loan tape") was vital to Ellington's pre-deal analysis and valuation of the underlying loans and the securities based on the loans.

84.     With respect to each of the series of securities at issue, MLPA § 6(1) was misleading, because the information contained in the Mortgage Loan Schedules was materially incorrect, as further described below with reference to the following violations:

Violation 1: First Borrower FICO on Mortgage Loan Schedule Unequal to FICO on Lender Credit Report

Violation 2: Second Borrower FICO on Mortgage Loan Schedule Unequal to FICO on Lender Credit Report

Violation 3: Property Value on Mortgage Loan Schedule Unequal to Appraised Value

Violation 4: Prepayment Penalty Term on Security Deed Unequal to Mortgage Loan Schedule

Violation 5: Purchase LTV on Mortgage Loan Schedule Unequal to LTV Calculated from HUD Form

Violation 6: Refinance LTV on Mortgage Loan Schedule Unequal to LTV Calculated from Appraised Value

Violation 7: Occupancy at Origination Unequal to Mortgage Loan Schedule

**MLPA Representation No. 2: Material Errors**

85.     The MLPA disseminated as part of the offering materials for each series of securities at issue stated categorically, without qualification, that: "No material error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to any Mortgage Loan has taken place on the part of any person, including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan[.]" (MLPA § 6(2).)

86.     With respect to each of the series of securities at issue, MLPA § 6(2) was misleading, because several material errors had occurred with respect to the origination of a substantial number of loans, as further discussed below with respect to the following violations:

| | |
|---|---|
| Violations 8 & 9: | No Credit Report |
| Violation 10: | No Required Income Documentation |
| Violation 11: | No Stated Income Letter |
| Violation 12: | Stated Income Letter Not Executed by All Borrowers |
| Violation 13: | First Borrower Income Lower on Stated Income Letter than on Final 1003 (Uniform Loan Application) |
| Violation 14: | No Verification of Assets |
| Violations 15 & 16: | No Verification of Employment |
| Violation 17: | No Verification of Rent or Mortgage |
| Violation 18: | Current Borrower Housing Expense Lower on Initial 1003 (Uniform Loan Application) than on Final 1003 |
| Violation 19: | No Executed Sales Contract |
| Violations 20 & 21: | No Initial or Final Form 1003 Loan Applications |
| Violation 22: | No Form 1008 (Uniform Underwriting & Transmittal Summary) |

| Violation 23: | Unlicensed Appraiser |
| Violation 24: | LTV Violation Due to Property Valuation |
| Violation 25: | No Appraisal |
| Violation 26: | Review Appraisal Missing for Minimum Improvement Property |
| Violation 27: | Regulatory Compliance Violations Generally |
| Violation 28: | No Final HUD-1 Settlement Statement |
| Violation 29: | No Notice of Right to Cancel |
| Violations 30 & 31: | No Final Truth In Lending Disclosures |
| Violation 32: | Seller Closing Costs Exceeded Three Percent of Purchase Price |
| Violations 33 & 34: | No Executed Note (First or Second Liens) |
| Violations 35 & 36: | No Deed |
| Violation 37: | Failure to Perform Title Search (Second Lien) |
| Violation 38: | No Title Insurance Policy (Commitment) |
| Violation 39: | No Title Insurance Policy (Final) |

**MLPA Representation No. 4: Valid Lien**

87.     The MLPA disseminated as part of the offering materials for each series of

securities at issue stated categorically, without qualification, that: "Each Mortgage is a valid and

enforceable first or second lien on the Mortgaged Property, including all improvements thereon,

subject only to (a) the lien of nondelinquent current real property taxes and assessments, (b)

covenants, conditions and restrictions, rights of way, easements and other matters of public

record as of the date of recording of such Mortgage, such exceptions appearing of record being

acceptable to mortgage lending institutions generally or specifically reflected in the appraisal

made in connection with the origination of the related Mortgage Loan, (c) other matters to which

like properties are commonly subject which do not materially interfere with the benefits of the

security intended to be provided by such Mortgage and (d) in the case of a second lien, the first lien on such Mortgaged Property[.]" (MLPA § 6(4).)

88. The existence of a valid, enforceable lien on the mortgaged property is necessary to secure the interest of the lender or its assignee (and the holders of the securities at issue) in the event of a default by the borrower.

89. The existence of an executed note is essential to the existence of a valid, enforceable lien.

90. MLPA § 6(4) was misleading because for certain first or second lien loans, Ellington's file review revealed that no executed note had been obtained, as further discussed below with respect to the following violations:

Violations 33 & 34: No Executed Note (First or Second Liens).

**MLPA Representation No. 7: No Defense to Mortgage; No Right of Rescission**

91. The MLPA disseminated as part of the offering materials for each series of securities at issue stated categorically, without qualification, that: "There is no valid offset, defense or counterclaim to any Mortgage Note or Mortgage, including the obligation of the Mortgagor to pay the unpaid principal of or interest on such Mortgage Note, nor will the operation of any of the terms of the Mortgage Note and the Mortgage, or the exercise of any right thereunder, render the Mortgage unenforceable, in whole or in part, or subject to any valid right of rescission, set-off, counterclaim or defense, including the defense of usury and no such valid right of rescission, set-off, counterclaim or defense has been asserted with respect thereto[.]" (MLPA § 6(7).)

92. The existence of a right of rescission or any defense to the mortgage directly affects the ability of the lender or its successors in interest (ultimately, the securityholders) to enforce the payment obligations of the borrower.

93. Section 6(7) of the MLPA was misleading because for some loans there was an absence of documentary proof of the validity of the mortgage loan, as further discussed below with respect to the following violations:

Violation 27: Regulatory Compliance Violations Generally

Violation 28: No Final HUD-1 Settlement Statement

Violation 29: No Notice of Right to Cancel

Violations 30 & 31: No Final Truth In Lending Disclosures

Violation 32: Seller Closing Costs Exceeded Three Percent of Purchase Price

Violations 33 & 34: No Executed Note (First or Second Liens)

**MLPA Representation No. 10: Compliance with Lending Laws**

94. The MLPA disseminated as part of the offering materials for each series of securities at issue stated categorically, without qualification, that: "Each Mortgage Loan at origination complied in all material respects with applicable local, state and federal laws and regulations, including, without limitation, usury, equal credit opportunity, real estate settlement procedures, truth-in-lending, disclosure laws and all applicable predatory and abusive lending laws, and consummation of the transactions contemplated hereby will not involve the violation of any such laws[.]" (MLPA § 6(10).)

95. Compliance with lending laws is material to the value of the loans and the securities based on them, because compliance affects the risk of making unjustified and excessive credit risks and is related to the likelihood of future defaults. Additionally, failure to

23

comply with lending laws may impair – or altogether prevent – the lender or its successors in interest from enforcing the payment obligations of the borrower.

96.     Section 6(10) of the MLPA relating to the series of securities noted in the table below was misleading because there were regulatory compliance violations with respect to some of the loans, as further discussed below with respect to the following violations:

Violation 27:      Regulatory Compliance Violations Generally

Violation 28:      No Final HUD-1 Settlement Statement

Violation 29:      No Notice of Right to Cancel

Violations 30 & 31:  No Final Truth In Lending Disclosures.

**MLPA Representation No. 12: Title Insurance Policy Effective**

97.     The MLPA disseminated as part of the offering materials for each series of securities at issue stated categorically, without qualification, that: "A lender's policy of title insurance together with a condominium endorsement, extended coverage endorsement and an adjustable rate mortgage endorsement (each as applicable) in an amount at least equal to the Cut-off Date principal balance of each such Mortgage Loan or a commitment (binder) to issue the same was effective on the date of the origination of each Mortgage Loan, each such policy is valid and remains in full force and effect, the transfer of the related Mortgage Loan to the Purchaser will not affect the validity or enforceability of such policy and each such policy was issued by a title insurer qualified to do business in the jurisdiction where the Mortgaged Property is located and in a form acceptable to Fannie Mae or Freddie Mac, which policy insures the Seller and successor owners of indebtedness secured by the insured Mortgage, as to the first priority lien of the Mortgage; no claims have been made under such lender's title insurance policy and no prior holder of the related Mortgage, including the Seller, has done, by act or

omission, anything which would impair the coverage of such lender's title insurance policy[.]" (MLPA § 6(12).)

98.     The existence of a title insurance policy is necessary to protect the mortgage-backed securityholders against liens that may have priority over the mortgages backing the securities and that may impair efforts to seek remedies in the event the borrower defaults.

99.     Section 6(12) of the MLPA was misleading because for some loans there was not a title insurance policy, as further discussed below with respect to the following violations:

Violation 38:          No Title Insurance Policy (Commitment)

Violation 39:          No Title Insurance Policy (Final)

**MLPA Representation No. 13:  No Violation of Underwriting Standards**

100.     The MLPA disseminated as part of the offering materials for each series of securities at issue stated categorically, without qualification, that: "Each Mortgage Loan was originated by the Seller or an Affiliate of the Seller in accordance with the underwriting standards as set forth in the Prospectus Supplement (or, if generated by an entity other than the Seller or an Affiliate of the Seller, in accordance with such other underwriting standards as set forth in the Prospectus Supplement or, if generated on behalf of the Seller or an Affiliate of the Seller by a person other than the Seller or an Affiliate of the Seller is subject to the same underwriting standards and procedures used by the Seller in originating mortgage loans directly as set forth in the Prospectus Supplement) or by a savings and loan association, savings bank, commercial bank, credit union, insurance company or similar institution which is supervised and examined by a federal or state authority (including a mortgage broker), or by a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Sections 203 and 211 of the National Housing Act[.]"  (MLPA § 6(13).)

101. The MLPA thus promised strict adherence to the "underwriting standards" as set forth in the Prospectus Supplement. The various Prospectus Supplements stated that one component of the "underwriting standards" was a set of "Underwriting Guidelines." In certain circumstances, the "underwriting standards" permitted loan officers to depart from the component "Underwriting Guidelines" with respect to the borrower qualifications that determined what "Risk Category" the borrower was in. Thus, a departure from the Guidelines was permitted under the standards where a borrower's less-than-required qualifications on one Risk-Category criterion were compensated for by better-than-required qualifications on other criteria.

102. The Risk Category criteria consisted of: (i) mortgage history, (ii) bankruptcy or foreclosure history, (iii) credit score, (iv) loan-to-value ratio, (v) debt ratio, and (vi) other major credit items. (*See, e.g.*, 2005-W3 Pro. Supp. at S-28.)

103. The Prospectus Supplements made clear that departures from the "Underwriting Guidelines" permitted under the standards concerned the borrower's substantive qualifications with respect to the Risk Category criteria and did not extend to omitting elements of the underwriting process.

104. Thus, the Prospectus Supplement for Series 2005-W3 stated (at S-26):

**Underwriting Standards of the Originator**

... The following is a description of the underwriting standards used by [the Originator] in connection with its origination or acquisition of the Mortgage Loans.

The Mortgage Loans were originated generally in accordance with guidelines (the "Underwriting Guidelines") established by the Originator with one of the following income documentation types: "Full Documentation," "Limited Documentation" or "Stated Income." The Underwriting Guidelines are primarily intended to evaluate: (1) the applicant's credit standing and repayment ability and (2) the value and adequacy of the mortgaged property as collateral. On a case-by-case basis, the Originator may determine that, based upon compensating factors, a

26

loan applicant, not strictly qualifying under one of the Risk Categories described below, warrants an exception to the requirements set forth in the Underwriting Guidelines. Compensating factors may include, but are not limited to, loan-to-value ratio, debt-to-income ratio, good credit history, stable employment history, length at current employment and time in residence at the applicant's current address. It is expected that a substantial number of the Mortgage Loans to be included in the mortgage pool will represent such underwriting exceptions.

105. MLPA § 6(13) was misleading because many of the loans in the securitized pools violated the underwriting standards, as further discussed below with respect to the following violations:

| | |
|---|---|
| Violations 8 & 9: | No Credit Report |
| Violation 10: | No Required Income Documentation |
| Violations 15 & 16: | No Verification of Employment |
| Violations 20 & 21: | No Initial or Final Form 1003 Loan Applications |
| Violation 23: | Unlicensed Appraiser |
| Violation 24: | LTV Violation Due to Property Valuation |
| Violation 25: | No Appraisal |
| Violation 27: | Regulatory Compliance Violations Generally |
| Violation 28: | No Final HUD-1 Settlement Statement |
| Violation 29: | No Notice of Right to Cancel |
| Violations 30 & 31: | No Final Truth In Lending Disclosures |
| Violation 37: | Failure to Perform Title Search (Second Lien) |
| Violation 38: | No Title Insurance Policy (Commitment) |
| Violation 39: | No Title Insurance Policy (Final) |

**MLPA Representation No. 18: Genuine/Executed Mortgage Note and Mortgage**

106. The MLPA disseminated as part of the offering materials for each series of securities at issue stated categorically, without qualification, that: "The Mortgage Note and the

related Mortgage are genuine, and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms and with applicable laws. All parties to the Mortgage Note and the Mortgage had legal capacity to execute the Mortgage Note and the Mortgage and each Mortgage Note and Mortgage have been duly and properly executed by such parties[.]" (MLPA § 6(18).)

107.    The existence of an executed mortgage note and related mortgage is of course essential to a mortgage-backed security.

108.    Section 6(18) of the MLPA was misleading because for some loans a mortgage note was not executed, as further discussed below with respect to the following violations:

Violations 33 & 34:    No Executed Note (First or Second Liens)

**MLPA Representation No. 23: Adherence to Industry Standards**

109.    The MLPA disseminated as part of the offering materials for each series of securities at issue stated categorically, without qualification, that: "The origination, collection and servicing practices used by the Seller (or its affiliate) with respect to each Mortgage Loan have been in all material respects legal, proper, reasonable and customary in the subprime mortgage origination and servicing business and each of the Mortgage Loans has been serviced by the Seller since origination[.]" (MLPA § 6(23).)

110.    MLPA § 6(23) thus required both that the "Underwriting Guidelines" themselves conform to industry standards and that any departures that individual loan officers might make from the "Underwriting Guidelines" must also conform to industry standards.

111.    Compliance with industry standards – what was "proper, reasonable and customary in the subprime mortgage origination and servicing business" – was material to the value of the loans and the securities based on them, because industry standards constrained the discretion given to individual loan officers by the Defendants, because industry standards reflect

the business, ethical, and prudential factors developed within the industry over many years, because compliance with industry standards is a significant indicator of the likelihood of future defaults, and because violations may enable a borrower to assert defenses to the mortgage.

112. With respect to each of the series of securities at issue, MLPA § 6(23) was misleading, because the mortgage loans violated industry standards in multiple ways, as described below with respect to the following violations:

| | |
|---|---|
| Violations 8 & 9: | No Credit Report |
| Violation 10: | No Required Income Documentation |
| Violation 11: | No Stated Income Letter |
| Violation 12: | Stated Income Letter Not Executed by All Borrowers |
| Violation 13: | First Borrower Income Lower on Stated Income Letter than on Final 1003 (Uniform Loan Application) |
| Violation 14: | No Verification of Assets |
| Violations 15 & 16: | No Verification of Employment |
| Violation 17: | No Verification of Rent or Mortgage |
| Violation 18: | Current Borrower Housing Expense Lower on Initial 1003 (Uniform Loan Application) than on Final 1003 |
| Violation 19: | No Executed Sales Contract |
| Violations 20 & 21: | No Initial or Final Form 1003 Loan Applications |
| Violation 22: | No Form 1008 (Uniform Underwriting & Transmittal Summary) |
| Violation 23: | Unlicensed Appraiser |
| Violation 24: | LTV Violation Due to Property Valuation |
| Violation 25: | No Appraisal |
| Violation 26: | Review Appraisal Missing for Minimum Improvement Property |
| Violation 27: | Regulatory Compliance Violations Generally |
| Violation 28: | No Final HUD-1 Settlement Statement |

| Violation 29: | No Notice of Right to Cancel |
| Violations 30 & 31: | No Final Truth In Lending Disclosures |
| Violation 32: | Seller Closing Costs Exceeded Three Percent of Purchase Price |
| Violations 33 & 34: | No Executed Note (First or Second Liens) |
| Violations 35 & 36: | No Deed |
| Violation 37: | Failure to Perform Title Search (Second Lien) |
| Violation 38: | No Title Insurance Policy (Commitment) |
| Violation 39: | No Title Insurance Policy (Final) |
| Violation 41: | No Hazard Insurance |

**MLPA Representation No. 26: Hazard Insurance**

113.   The MLPA disseminated as part of the offering materials for each series of securities at issue stated categorically, without qualification, that: "The improvements upon each Mortgaged Property are covered by a valid, binding and existing hazard insurance policy that is in full force and effect with a generally acceptable carrier that provides for fire extended coverage and such other hazards as are customary in the area where the Mortgaged Property is located representing coverage not less than the lesser of the outstanding principal balance of the related Mortgage Loan or the minimum amount required to compensate for damage or loss on a replacement cost basis. All individual insurance policies and flood policies referred to in clause (27) below contain a standard mortgagee clause naming the Seller or the original mortgagee, and its successors in interest, as mortgagee, and the Seller has received no notice that any premiums due and payable thereon have not been paid; the Mortgage obligates the Mortgagor thereunder to maintain all such insurance, including flood insurance, at the Mortgagor's cost and expense, and upon the Mortgagor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at the Mortgagor's cost and expense and to seek reimbursement therefor

from the Mortgagor, except as may be limited or restricted by applicable law[.]" (MLPA § 6(26).)

114.    The existence of a hazard insurance policy is essential to guard against the loss of value of a mortgaged property in the event that a hazard occurs in respect of the mortgaged property.

115.    MLPA § 6(26) was misleading because, as Ellington's file review revealed, for some loans, the improvements upon the mortgaged property were not covered by a valid, binding and existing hazard insurance policy, as further discussed below with respect to the following violation:

Violation 41:  No Hazard Insurance.

**MLPA Representation No. 28:  No Default or Waiver**

116.    The MLPA disseminated as part of the offering materials for each series of securities at issue stated categorically, without qualification, that:  "There is no default, breach, violation or event of acceleration existing under the Mortgage or the related Mortgage Note; and the Seller has not waived any default, breach, violation or event of acceleration[.]" (MLPA § 6(28).)

117.    Waiver of an event of acceleration is material to the ability to seek remedies in the event of a change of ownership of the mortgaged property.

118.    MLPA § 6(28) was misleading because the Seller had waived events of acceleration with respect to some loans, as discussed further below with respect to the following violation:

Violation 40: Security Instrument Violation: Waiver of Acceleration.

**MLPA Representation No. 32: Proper Appraisal**

119.    The MLPA disseminated as part of the offering materials for each series of securities at issue stated categorically, without qualification, that: "The Mortgage File contains an appraisal which was either (i) performed by an appraiser who satisfied, and which was conducted in accordance with, all of the applicable requirements of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended or (ii) conducted in accordance with an insured valuation model[.]" (MLPA § 6(32).)

120.    As discussed below, a proper appraisal is essential to assessing the quality of a mortgage and determining the proper amount to loan against the property.

121.    MLPA § 6(32) was misleading, because no appraisal was obtained for some loans, and for other loans, the appraisal was conducted by an unlicensed appraiser in violation of the requirements of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended, as further discussed below with respect to the following violations:

Violation 23: Unlicensed Appraiser

Violation 25: No Appraisal.

**MLPA Representation No. 40: No High Cost Loans**

122.    The MLPA disseminated as part of the offering materials for each series of securities at issue stated categorically, without qualification, that: "(a) No Mortgage Loan is a High Cost Loan as defined by HOEPA or any other applicable predatory or abusive lending laws and (b) no Mortgage Loan is a 'high cost home', 'covered' (excluding home loans defined as 'covered home loans' in the New Jersey Home Ownership Security Act of 2002 that were originated between November 26, 2003 and July 7, 2004) , 'high risk home' or 'predatory' loan

under any other applicable state, federal or local law (or a similarly classified loan using different terminology under a law imposing heightened regulatory scrutiny or additional legal liability for resident mortgage loans having high interest rates, points and/or fees)[.]" (MLPA § 6(40).)

123. As discussed below, the status of a mortgage as a high cost loan is material because it may affect the ability of the lender or its successors in interest to enforce the payment obligations of the borrower and it speaks to the credit quality of the borrower and his or her ability to fulfill the obligations under the mortgage note.

124. MLPA § 6(40) was misleading, because some of the securitized loans were high cost loans, as further discussed below with respect to the following violation:

Violation 27: Regulatory Compliance Violations Generally.

**D. The Violations**

125. As noted above, Ellington's review of sample loan files – though curtailed by the Defendants' improper refusal to cooperate – revealed over 9,500 violations or deficiencies of the MLPA's representations and warranties, affecting 3,359 of the 3,772 loan files Ellington reviewed.

126. The over 9,500 violations and deficiencies are of 41 types. These violations and deficiencies generally concern inaccuracies in the Mortgage Loan Schedules, the creditworthiness or reliability of the borrower, property value, regulatory compliance and protection of the rights of the security-holders.

127. Each type of violation or deficiency is material. Ellington based its valuation of the securities on its analysis of the information contained in the Mortgage Loan Schedules and the creditworthiness or reliability of the borrower is central to the level of risk presented by a mortgage and therefore by mortgage-backed securities.

128.     Compliance with lending laws and regulations is necessary to ensure that the borrower's obligations to pay the mortgage are fully enforceable.  A failure of regulatory compliance creates a risk of lost or diminished payment streams for the buyers of the mortgage-backed securities from the affected loans.

129.     Protection of the rights of the lender and its successors in interest (i.e., the buyers of the securities) requires observance of documentary formalities without which the security-holders may be unable to obtain remedies from the default of a borrower.  (The significance of the proper documentation of mortgages is emphasized in the October 31, 2007, decision in *In re Foreclosure Cases*, 2007 WL 3232430 (N.D. Ohio 2007), dismissing foreclosure cases for failure of standing where the transactions had either not been properly executed or the documentation had been lost.)

### *Inaccuracies in the Mortgage Loan Schedules (Violations 1-7)*

### Violation 1:  First Borrower FICO on Mortgage Loan Schedule Unequal to FICO on Lender Credit Report

130.     For the loans identified at Exhibit 1, Ellington's file review revealed that the Mortgage Loan Schedule stated a "FICO score" – *i.e.*, a credit score – for the first borrower that was different from the credit score contained in the credit report in the physical loan file.

131.     A FICO score is a statistical credit score based on a mortgagor's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit, and bankruptcy experience, that is obtained by many mortgage lenders in connection with the loan application to help assess a mortgagor's creditworthiness.  The FICO score is a "measurement of the relative degree of risk a mortgagor represents to a lender, i.e., that a mortgagor with a higher score is statistically

expected to be less likely to default in payment than a mortgagor with a lower score." 2005-W3
Prospectus Supplement at S-25-26.

132.    While a FICO score alone does not necessarily determine the level of risk
presented by a prospective mortgagor, the score is one important indicator of credit risk.

133.    Ellington used the information in the Mortgage Loan Schedules to analyze the
expected future performance of the securities and to model the expected cash flows under a
variety of assumptions, including stress-test scenarios.

134.    Discrepancies with respect to the borrower's credit score was material to the
analysis and valuation of the underlying loans and the securities based on the loans because
credit scores reflect the relative degree of risk a mortgagor represents to a lender and is one
important indicator of the likely future performance of the loan.

135.    Generally, an overstatement of the borrower's credit score is material where the
score is overstated by approximately 20 points.

136.    An understatement of the borrower's credit score, while not material in itself, may
be material where (as here) it is part of a pattern of errors (of the same type or of different types),
because such a pattern calls into question the reliability of the loan origination process generally.
Such errors are especially important where (as here) the individual loan officers were endowed
with discretion to depart from the Underwriting Guidelines with respect to certain qualifications.
In such a situation, errors with respect to significant borrower qualifications raise serious
questions about the reliability of the underwriting and the discretionary judgments by loan
officers, and suggest potential deficiencies that may not be observable from the documents
included in the loan file. Such general questions of reliability – even where raised by errors not
material in themselves – can and do cause investors to reject an opportunity to buy the respective

mortgage-backed securities. This is particularly true where, as here, the errors and lack of documentation are not only material but also appear in nearly every loan in the mortgage loan pool.

137.    Violation 1 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 1:  Accuracy of the Mortgage Loan Schedule.

## Violation 2:  Second Borrower FICO on Mortgage Loan Schedule Unequal to FICO on Lender Credit Report

138.    For the loans identified at Exhibit 2, Ellington's file review revealed that the Mortgage Loan Schedule stated a credit score for the second borrower that was different from the credit score contained in the credit report in the physical loan file.

139.    These discrepancies were material for the same reasons noted with respect to Violation 1 above.

140.    Violation 2 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 1:  Accuracy of the Mortgage Loan Schedule.

## Violation 3:  Property Value on Mortgage Loan Schedule Unequal to Appraised Value

141.    For the loans identified at Exhibit 3, Ellington's file review revealed that the Mortgage Loan Schedule incorrectly stated the appraised value of the mortgaged property, as recorded in the physical loan file.

142.    The appraised value of the property was material to the analysis and valuation of the underlying loans and the securities based on the loans because the value of the property is related to the expected future performance of the loan.  Property value relates to the security of the mortgage.  Thus, the 2005-W3 Prospectus Supplement, for instance, states (at S-27) that

"Generally, properties below average standards in condition and repair are not acceptable as security for mortgage loans under the Underwriting Guidelines." Additionally, property value – as a determinant of loan-to-value ratio – relates to the risk of default. The higher the loan-to-value ratio, the more vulnerable the borrower is to negative financial or economic developments. Additionally, higher loan-to-value ratios are associated with greater risk-seeking behavior. In the event of default, the higher the loan-to-value ratio, the greater the loss caused by the default.

143.    Violation 3 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 1: Accuracy of the Mortgage Loan Schedule.

## Violation 4: Prepayment Penalty Term on Security Deed Unequal to Mortgage Loan Schedule

144.    For the loans identified at Exhibit 4, Ellington's file review revealed that the Mortgage Loan Schedule stated a longer prepayment penalty term than actually applied to the loan.

145.    The length of the prepayment penalty terms was material to the analysis and valuation of the underlying loans and the securities based on the loans because Ellington bought securities entitling it to payment streams from prepayment penalties. The longer the prepayment penalty term, the greater the payment stream – both because a greater percentage of prepaid loans would incur the penalty and because the deterrent effect of the penalty would cause more loans to remain in the pool, generating regular payments.

146.    Violation 4 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 1: Accuracy of the Mortgage Loan Schedule.

**Violation 5: Purchase LTV on Mortgage Loan Schedule Unequal to LTV Calculated from HUD Form**

147.     For the loans identified at Exhibit 5, Ellington's file review revealed that the Mortgage Loan Schedule incorrectly stated the loan-to-value ratio, as contrasted with the loan-to-value ratio reflected in the physical loan file in standard mortgage documentation on forms created by the Federal Department of Housing and Urban Development.

148.     The loan-to-value ratio was material to the analysis and valuation of the underlying loans and the securities based on the loans because, as noted at ¶ 142 above, it is an indicator of the expected future performance of the loan.

149.     Violation 5 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 1: Accuracy of the Mortgage Loan Schedule.

**Violation 6: Refinance LTV on Mortgage Loan Schedule Unequal to LTV Calculated from Appraised Value**

150.     For the loans identified at Exhibit 6, Ellington's file review revealed that the Mortgage Loan Schedule incorrectly stated the refinance loan-to-value ratio of the mortgaged property, as contrasted with the loan-to-value ratio calculated from the appraised value of the property as recorded in the physical loan file.

151.     The loan-to-value ratio was material to the analysis and valuation of the underlying loans and the securities based on the loans because it is an indicator of the expected future performance of the loan.

152.     Violation 6 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 1: Accuracy of the Mortgage Loan Schedule.

**Violation 7: Occupancy at Origination Unequal to Mortgage Loan Schedule**

153.    For the loans identified at Exhibit 7, Ellington's file review revealed that the Mortgage Loan Schedule incorrectly stated the occupancy status of the borrower, as recorded in the physical loan file.

154.    The occupancy status of the borrower was material to the analysis and valuation of the underlying loans and the securities based on the loans because non-owner-occupancy status is a negative indicator of the expected future performance of the loan.

155.    Violation 7 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 1:  Accuracy of the Mortgage Loan Schedule.

### *Creditworthiness or Reliability of the Borrower (Violations 8-22)*

**Violations 8 & 9:  No Credit Report**

156.    For the loans identified in Exhibits 8 & 9, Ellington's file review revealed that the loan originators failed to obtain the borrower's credit report.

157.    Review of a borrower's credit reports is an essential element of the underwriting process and is necessary to protect the lender, its assignees, and the holders of the securities at issue from unjustified and excessive risks.

158.    Violation (and Exhibit) 8 concerns loans initiated by a broker.  Violation (and Exhibit) 9 concerns loans initiated by the Mortgage Companies themselves.

159.    The failure to obtain credit reports was a material error and an impermissible procedural departure from the Underwriting Guidelines and violated both the underwriting standards – strict adherence to which was required by MLPA § 6(13) – and industry standards.

160.    Violations 8 & 9 falsify the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2:  No Material Errors

MLPA Representation No. 13:  No Violation of Underwriting Standards

MLPA Representation No. 23:  Adherence to Industry Standards.

**Violation 10:  Required Income Documentation Missing**

161.    The various Prospectus Supplements provided that documentation of income was required for "Full Documentation" or "Limited Documentation" loans.  For the loans identified in Exhibit 10, Ellington's file review revealed that required income documentation was not obtained.

162.    Obtaining required income documentation is a significant element of the underwriting process, is important to evaluation of the borrower's credit risk, and is necessary to protect the lender, its assignees, and the holders of the securities at issue from unjustified and excessive risks.

163.    The failure to obtain required income documentation was a material error and an impermissible procedural departure from the Underwriting Guidelines and violated both the underwriting standards – strict adherence to which was required by MLPA § 6(13) – and industry standards.

164.    Violation 10 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2:  No Material Errors

MLPA Representation No. 13:  No Violation of Underwriting Standards

MLPA Representation No. 23:  Adherence to Industry Standards.

**Violation 11: No Stated Income Letter**

165.     For the stated income loans identified at Exhibit 11, Ellington's file review revealed that no stated income letter had been obtained.

166.     "Stated income" refers to a loan type in which the borrower states what his income is but the loan officer does not obtain any confirmation of that.  In connection with such "stated income" loans, it is customary both in the sub-prime mortgage industry at large to require a signed letter from the borrower attesting to his income, in addition to the statement of income on the loan application.  The Mortgage Companies' internal Underwriting Guidelines did not in all cases require a stated income letter, but in keeping with what was proper, reasonable, and customary in the industry, it was also common for the loan officers employed by the Mortgage Companies to require a stated income letter.

167.     The customary and reasonable practice in the subprime industry is to obtain a letter from the borrower stating his or her income, in addition to the report of income on the loan application.  The stated income letter is significant corroboration of the accuracy of the income reported on the loan application.

168.     The practice of obtaining a stated income letter is reflected, for instance, in the many stated income loans by the Mortgage Companies that did contain stated income letters.

169.     The failure to obtain required income documentation was a material error and violated industry standards.

170.     Violation 11 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2:  No Material Errors

MLPA Representation No. 23:  Adherence to Industry Standards.

41

**Violation 12:  Stated Income Letter Not Executed by All Borrowers**

171.    For the loans identified at Exhibit 12, Ellington's file review revealed that the stated income letter was not executed by all borrowers.

172.    Failure to obtain a fully executed stated income letter is a red flag for borrower or underwriter fraud or material inaccuracy of the stated income, and thus is material to the value of the underlying loans.

173.    The failure to obtain a fully executed stated income letter was a material error and violated industry standards.

174.    Violation 12 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2:  No Material Errors

MLPA Representation No. 23:  Adherence to Industry Standards.

**Violation 13:  First Borrower Income Lower on Stated Income Letter than on Final 1003 (Uniform Loan Application)**

175.    For the stated income loans identified at Exhibit 13, Ellington's file review revealed that the first borrower's stated income was reported as being greater on the final loan application than in the borrower's stated income letter.

176.    Discrepancies between the stated income letter and the loan application are a red flag for borrower or underwriter fraud or material inaccuracies, and thus are material to the value of the underlying loans.

177.    Violation 13 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2:  No Material Errors

MLPA Representation No. 23:  Adherence to Industry Standards.

**Violation 14: No Verification of Assets**

178.    For the loans identified at Exhibit 14, Ellington's file review revealed that no verification of assets had been obtained.

179.    Verification of the borrower's reported assets provides significant protection against inaccuracy in the borrower's loan application, and against unjustified and excessive credit risks. It is standard practice in the sub-prime mortgage industry to verify the borrower's assets to the extent required.

180.    Failing to obtain required verification of assets was a material error and violated industry standards.

181.    Violation 14 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2: No Material Errors

MLPA Representation No. 23: Adherence to Industry Standards.

**Violations 15 & 16:  No Verification of Employment**

182.    For the loans identified at Exhibits 15 & 16, Ellington's file review revealed that no verification of employment (for salaried or self-employed borrowers) had been obtained.

183.    Verification of the borrower's employment – whether salaried or self-employed – provides significant protection against inaccuracy in the borrower's loan application, and against unjustified and excessive credit risks. It is standard practice in the sub-prime mortgage industry to verify the borrower's employment.

184.    Failing to obtain required verification of employment was a material error and an impermissible procedural departure from the Underwriting Guidelines and violated both the

underwriting standards – strict adherence to which was required by MLPA § 6(13) – and industry standards.

185. Violations 15 & 16 falsify the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2: No Material Errors

MLPA Representation No. 13: No Violation of Underwriting Standards

MLPA Representation No. 23: Adherence to Industry Standards.

**Violation 17: No Verification of Rent or Mortgage**

186. For the loans identified at Exhibit 17, Ellington's file review revealed that no verification of the borrower's current rent or mortgage payments had been obtained.

187. Verification of the borrower's reported rent or mortgage payments provides significant protection against inaccuracy in the borrower's loan application, and against unjustified and excessive credit risks. It is standard practice in the sub-prime mortgage industry to verify the borrower's current rent or mortgage payments.

188. Failing to obtain required verification of rent or mortgage was a material error and violated industry standards.

189. Violation 17 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2: No Material Errors

MLPA Representation No. 23: Adherence to Industry Standards.

**Violation 18:  Current Borrower Housing Expense Lower on Initial 1003 (Uniform Loan Application) than on Final 1003**

190.    For the loans identified at Exhibit 18, Ellington's file review revealed discrepancies between the borrower's initial and final loan applications (the "1003" forms), concerning the borrower's current housing expense.

191.    Such discrepancies are a red flag for borrower or underwriter fraud or material inaccuracies and thus are material to the value of the underlying loans and the securities backed by the loans.

192.    Accepting discrepancies between the initial and final loan applications was a material error and violated industry standards.

193.    Violation 18 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2:  No Material Errors

MLPA Representation No. 23:  Adherence to Industry Standards.

**Violation 19:  No Executed Sales Contract**

194.    For the loans identified at Exhibit 19, Ellington's file review revealed that no property sales contract had been executed or obtained.

195.    An executed sales contract is, among other things, a significant part of the documentary evidence of the transfer of property and the validity of the lender's security interest in the property.  The absence of an executed sales contract may impair the lender's or its assignee's efforts to obtain remedies in the event the borrower defaults.  Additionally, review of the sales contract is necessary to ensure that the property sale is a genuine arms-length transaction – which relates to the value of the loan.

196. Failing to obtain an executed sales contract was a material error and violated industry standards.

197. Violation 19 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2: No Material Errors

MLPA Representation No. 23: Adherence to Industry Standards.

**Violations 20 & 21: No Initial or Final Form 1003 Loan Applications**

198. With respect to the loans identified in Exhibits 20 & 21, Ellington's file review revealed that a final Form 1003 (Uniform Residential Loan Application) was not obtained, or that an initial Form 1003 was not obtained.

199. The Form 1003 loan application is a significant element of the underwriting process and constitutes the borrower's certification of the accuracy of the information he or she has provided. Use of the form is customary, is significant for the proper evaluation of the borrower's credit risk, and is necessary to protect the lender, its assignees, and the holders of the securities at issue from unjustified and excessive risks.

200. The failure to obtain the Form 1003 application was a material error and an impermissible procedural departure from the Underwriting Guidelines and violated both the underwriting standards – strict adherence to which was required by MLPA § 6(13) – and industry standards.

201. Violations 20 & 21 falsify the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2: No Material Errors

MLPA Representation No. 13: No Violation of Underwriting Standards

MLPA Representation No. 23: Adherence to Industry Standards.

**Violation 22: No Form 1008 (Uniform Underwriting & Transmittal Summary)**

202.    For the loans identified in Exhibit 22, Ellington's file review revealed that a Form 1008 (Uniform Underwriting & Transmittal Summary) was not obtained.

203.    The Form 1008 is a significant element of the loan origination process, used to permit meaningful and effective review of the individual loan officer's decision or recommendation. Its use is customary, is significant for the proper evaluation of the borrower's credit risk, and is necessary to protect the lender, its assignees, and the holders of the securities at issue from unjustified and excessive risks.

204.    The failure to obtain the Form 1008 was a material error and violated industry standards.

205.    Violation 22 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2: No Material Errors

MLPA Representation No. 23: Adherence to Industry Standards.

*__Property Value (Violations 23-26)__*

**Violation 23: Unlicensed Appraiser**

206.    For the loans identified at Exhibit 23, Ellington's file review revealed that the property appraisal was performed by an unlicensed appraiser.

207.    The appraisal of a property by an unlicensed appraiser was a material error, omission, misrepresentation, negligence, fraud, or similar occurrence. The existence of an appraisal by a licensed appraiser was material to the value of the underlying loans and the securities based on the loans because the value of the property is an indicator of the expected

future performance of the loan, and the licensure of the appraiser is an important indicator of the reliability of the appraisal.

208.    Appraisal by an unlicensed appraiser is a violation of the requirements of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended, and was a material error and an impermissible procedural departure from the Underwriting Guidelines and violated both the underwriting standards – strict adherence to which was required by MLPA § 6(13) – and industry standards.

209.    Violation 23 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2:  No Material Errors

MLPA Representation No. 13:  No Violation of Underwriting Standards

MLPA Representation No. 23:  Adherence to Industry Standards

MLPA Representation No. 32:  Proper Appraisal.

**Violation 24:  LTV Violation Due to Property Valuation**

210.    For the loans identified at Exhibit 24, Ellington's file review revealed that the loan-to-value ratio was misstated because it was based on an improperly inflated appraisal of the property value.

211.    The inflated property value appraisal and misstated loan-to-value ratio resulting therefrom were material errors, omissions, misrepresentations, negligence, fraud, or similar occurrences.

212.    The appraisal and loan-to-value ratio were material to the value of the underlying loans and the securities based on the loans because they are indicators of the expected future performance of the loan.

213.  The inflated appraisals were material errors and impermissible procedural departures from the Underwriting Guidelines and violated both the underwriting standards – strict adherence to which was required by MLPA § 6(13) – and industry standards.

214.  Violation 24 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2:  No Material Errors

MLPA Representation No. 13:  No Violation of Underwriting Standards

MLPA Representation No. 23:  Adherence to Industry Standards.

215.  In some instances, the loans affected by Violation 24 also falsify the statement in the Prospectus Supplements that "No Mortgage Loan had a loan-to-value ratio or combined loan-to-value ratio exceeding 100.00% at origination." (2005-W3 Pro. Supp. at S-11.)  Such loans also falsify MLPA § 6(35), which represented that "The Mortgage Loans comply in all material respects with the descriptions set forth under the captions 'The Mortgage Pool' and Annex III in the Prospectus Supplement[.]"  The referenced sections of the Prospectus Supplements indicate that no loan had a loan-to-value ratio exceeding 100%.

**Violation 25:  No Appraisal**

216.  For the loans identified at Exhibit 25, Ellington's file review revealed that no appraisal of the value of the property had been obtained.

217.  A property appraisal is an essential element of the underwriting process.  Failing to obtain an appraisal was a material error and an impermissible procedural departure from the Underwriting Guidelines and violated both the underwriting standards – strict adherence to which was required by MLPA § 6(13) – and industry standards.

218. Violation 25 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2: No Material Errors

MLPA Representation No. 13: No Violation of Underwriting Standards

MLPA Representation No. 23: Adherence to Industry Standards

MLPA Representation No. 32: Proper Appraisal.

**Violation 26: No Review Appraisal for Minimum Improvement Property**

219. For the loans identified in Exhibit 26, Ellington's file review revealed that a review appraisal for a minimum improvement property – i.e., a small residence – was not obtained, where standard practice would require it to be obtained.

220. The failure to obtain a review appraisal is material because appraisals of such properties are particularly subject to error and require confirmation. Property value relates to the expected future performance of the loan.

221. Failing to obtain an appraisal was a material error and violated industry standards.

222. Violation 26 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2: No Material Errors

MLPA Representation No. 23: Adherence to Industry Standards.

*__Regulatory Compliance (Violations 27-32)__*

**Violation 27: Regulatory Compliance Violations Generally**

223. For the loans identified in Exhibit 27, the underwriting process or the loan terms violated applicable lending laws by understating finance charges and fees, failing to provide a

benefit to the borrower (in the case of refinancing loans), and failing to provide pre-disclosure of fees.

224.    The specific violations are noted in Exhibit 27 with respect to each loan.

225.    Compliance with lending laws is material to the value of the loans and the securities based on them, because compliance affects the risk of making unjustified and excessive credit risks and is related to the likelihood of future defaults.

226.    Additionally, failure to comply with lending laws may impair – or altogether prevent – the lender or its successors in interest from enforcing the payment obligations of the borrower.

227.    Failure to comply with applicable laws and regulations – apart from violating such laws and regulations – was a material error and an impermissible procedural departure from the Underwriting Guidelines and violated both the underwriting standards – strict adherence to which was required by MLPA § 6(13) – and industry standards.

228.    Violation 27 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2:  No Material Errors

MLPA Representation No. 7:  No Defense to Mortgage

MLPA Representation No. 10:  Compliance with Lending Laws

MLPA Representation No. 13:  No Violation of Underwriting Standards

MLPA Representation No. 23:  Adherence to Industry Standards

MLPA Representation No. 40:  No High Cost Loans.

**Violation 28: No Final HUD-1 Settlement Statement**

229.    For the loans identified in Exhibit 28, Ellington's file review revealed that no final HUD-1 Settlement Statement was provided to the borrower.

230.    The HUD-1 Settlement Statement discloses detailed information regarding the terms and costs of the mortgage loan and is required to be provided to borrowers at the closing of the loan.

231.    Failure to provide the disclosure was a regulatory violation and thus created a risk of impairing – or altogether preventing – the lender or its successors in interest from enforcing the payment obligations of the borrower.

232.    Failure to provide the disclosure thus was a material error and an impermissible procedural departure from the Underwriting Guidelines and violated both the underwriting standards – strict adherence to which was required by MLPA § 6(13) – and industry standards.

233.    Violation 28 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2:  No Material Errors

MLPA Representation No. 7:  No Defense to Mortgage

MLPA Representation No. 10:  Compliance with Lending Laws

MLPA Representation No. 13:  No Violation of Underwriting Standards

MLPA Representation No. 23:  Adherence to Industry Standards.

**Violation 29: No Notice of Right to Cancel**

234.    For the loans identified in Exhibit 29, Ellington's file review revealed that legally required notices of the borrower's right to cancel the transaction were not provided to the borrower.

235. Failure to provide the disclosure was a regulatory violation and thus created a risk of impairing – or altogether preventing – the lender or its successors in interest from enforcing the payment obligations of the borrower.

236. Failure to provide the disclosure thus was a material error and an impermissible procedural departure from the Underwriting Guidelines and violated both the underwriting standards – strict adherence to which was required by MLPA § 6(13) – and industry standards.

237. Violation 29 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2: No Material Errors

MLPA Representation No. 7: No Defense to Mortgage

MLPA Representation No. 10: Compliance with Lending Laws

MLPA Representation No. 13: No Violation of Underwriting Standards

MLPA Representation No. 23: Adherence to Industry Standards.

**Violations 30 & 31: No Final Truth In Lending Disclosures**

238. For the loans identified in Exhibits 30 & 31, Ellington's file review revealed that legally required initial or final Truth-in-Lending disclosures were not provided to the borrower.

239. Failure to provide the disclosure was a regulatory violation and thus created a risk of impairing – or altogether preventing – the lender or its successors in interest from enforcing the payment obligations of the borrower.

240. Failure to provide the disclosure thus was a material error and an impermissible procedural departure from the Underwriting Guidelines and violated both the underwriting standards – strict adherence to which was required by MLPA § 6(13) – and industry standards.

241.    Violations 30 & 31 falsify the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2:  No Material Errors

MLPA Representation No. 7:  No Defense to Mortgage

MLPA Representation No. 10:  Compliance with Lending Laws

MLPA Representation No. 13:  No Violation of Underwriting Standards

MLPA Representation No. 23:  Adherence to Industry Standards.

**Violation 32: Seller Closing Costs Exceeded Three Percent of Purchase Price**

242.    For the loans identified in Exhibit 32, Ellington's file review revealed that the closing costs exceeded three percent of the total purchase price – the proper, reasonable, and customary limit on closing costs in the subprime industry.

243.    The existence of such excessive closing costs is material to the value of the underlying loans and the securities based on the loans because excessive costs and fees are a negative indicator of the expected future performance of the loan.  Such excessive closing costs were a material error and violated industry standards.

244.    Violation 32 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2:  No Material Errors

MLPA Representation No. 7:  No Defense to Mortgage

MLPA Representation No. 23:  Adherence to Industry Standards.

## *Protection of the Rights of the Security-Holders (Violations 33-41)*

### Violations 33 & 34:  No Executed Note (First or Second Liens)

245.     For the loans identified at Exhibits 33 (regarding first liens) & 34 (regarding second liens), Ellington's file review revealed that no executed note had been obtained.

246.     The note is essential proof of the borrower's obligation to the lender or its successors in interest and is vital to the protection of the securityholder's interests in the mortgage-backed securities.

247.     Failing to obtain an executed note was a material error and violated industry standards.

248.     Violations 33 & 34 falsify the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2:  No Material Errors

MLPA Representation No. 4:  Valid Lien

MLPA Representation No. 7:  No Defense to Mortgage

MLPA Representation No. 18:  Genuine Mortgage Note and Mortgage

MLPA Representation No. 23:  Adherence to Industry Standards.

### Violations 35 & 36:  No Deed

249.     For the loans identified in Exhibits 35 & 36, the Seller had impaired the mortgages by failing to obtain the deed to the mortgaged properties.

250.     The deed is essential proof of the borrower's ownership right in the property securing the interests of the lender or its successors in interest in the mortgaged property. Obtaining the deed is vital to the protection of the security-holder's interests in the mortgage-backed securities.

251. Failure to obtain a deed thus created a risk of impairing – or altogether preventing – the lender or its successors in interest from enforcing the payment obligations of the borrower.

252. Failing to obtain a deed was a material error and violated industry standards.

253. Violations 35 & 36 falsify the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2: No Material Errors

MLPA Representation No. 7: No Defense to Mortgage

MLPA Representation No. 23: Adherence to Industry Standards.

**Violation 37: No Title Search (Second Lien)**

254. For the second-lien loans identified at Exhibit 37, Ellington's file review revealed that no title search for the property had been performed.

255. A title search is necessary to ensure the lender's lien position, to protect the interests of the lender or its successors in interest.

256. Failure to perform a title search thus created a risk of impairing – or altogether preventing – the lender or its successors in interest from enforcing the payment obligations of the borrower.

257. Failing to perform a title search was a material error and an impermissible procedural departure from the Underwriting Guidelines and violated both the underwriting standards – strict adherence to which was required by MLPA § 6(13) – and industry standards.

258. Violation 37 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2: No Material Errors

MLPA Representation No. 13: No Violation of Underwriting Standards

MLPA Representation No. 23: Adherence to Industry Standards.

**Violation 38: No Title Insurance Policy (Commitment)**

259.    For the loans identified at Exhibit 38, Ellington's file review revealed that no commitment to obtain title insurance policy had been obtained.

260.    A title insurance policy provides significant protection for the lender or its assignee against title encumbrances that may impair the lender's or its assignee's efforts to seek remedies in the event the borrower defaults.

261.    Failing to obtain a title policy commitment was a material error and an impermissible procedural departure from the Underwriting Guidelines and violated both the underwriting standards – strict adherence to which was required by MLPA § 6(13) – and industry standards.

262.    Violation 38 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2: No Material Errors

MLPA Representation No. 12: Title Insurance Policy Effective

MLPA Representation No. 13: No Violation of Underwriting Standards

MLPA Representation No. 23: Adherence to Industry Standards.

**Violation 39: No Title Insurance Policy (Final)**

263.    For the loans identified at Exhibit 39, Ellington's file review revealed that no final title insurance policy had been obtained.

264.    A title insurance policy protects the lender or its assignee against title encumbrances that may impair their efforts to obtain remedies in the event the borrower defaults.

265.     Failing to obtain a final title policy was a material error and an impermissible procedural departure from the Underwriting Guidelines and violated both the underwriting standards – strict adherence to which was required by MLPA § 6(13) – and industry standards.

266.     Violation 39 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2:  No Material Errors

MLPA Representation No. 12:  Title Insurance Policy Effective

MLPA Representation No. 13:  No Violation of Underwriting Standards

MLPA Representation No. 23:  Adherence to Industry Standards.

**Violation 40:  Security Instrument Violation: Waiver of Acceleration**

267.     For the loans identified at Exhibit 40, Ellington's file review revealed that the Mortgage Companies had waived an event of acceleration in connection with a transfer of the property or a beneficial interest in the borrower to a corporate entity.

268.     The waiver of an event of acceleration (e.g., a due-on-sale clause) was material to the value of the loans and the securities based on them, because it impacted the ability of the trust that nominally owned the loans and was responsible for protecting the interests of the security-holders to seek redress in the event of a violation of the mortgage and to ensure payment in the event of a sale of the secured property, particularly if the sale is to a less creditworthy owner.

269.     Violation 40 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 28:  No Default or Waiver.

**Violation 41: No Hazard Insurance**

270.     For the loans identified at Exhibit 41, Ellington's file review revealed that the improvements upon the mortgaged property were not covered by a valid, binding and existing hazard insurance policy. The failure to obtain hazard insurance was a material error.

271.     Violation 41 falsifies the following categorical assurances given by the Mortgage Companies:

MLPA Representation No. 2: No Material Errors

MLPA Representation No. 23: Adherence to Industry Standards

MLPA Representation No. 26: Hazard Insurance.

**E. Scienter**

272.     The Defendants – including the Control Persons as well as the Mortgage Companies – knew or recklessly avoided knowledge that the categorical assurances contained in the MLPA representations and warranties were materially false. The violations enumerated above were so prevalent and apparent that they would have been known to the Defendants had they either instituted customary quality control measures or conducted a customary review of the securitized loan pools before giving categorical assurances about them.

273.     If the Defendants neither instituted customary quality control measures nor performed a customary review of the loan pools before allowing such assurances to be given, then the Defendants were grossly reckless.

a. First, to give categorical assurances regarding the specific characteristics of the loans in the absence of quality control checks would be an extreme departure from the standards of ordinary care.

b. Second, such recklessness was compounded by having granted discretion to low-level employees and non-employee brokers throughout the country to depart from the Defendants' Underwriting Guidelines with respect to the Risk Category criteria. Thus, the Defendants designed a system that actively undermined any basis for confidence that management might otherwise have that they knew the bases on which their personnel were originating loans or that they knew the nature of those loans.

c. Third, the Defendants were aware of serious allegations of widespread improper lending practices, had admitted that such allegations were true at least in substantial part, had blamed the wrongdoing on the very brokers and low-ranking employees they endowed with discretion, and had promised to adhere to a code of "best practices" and to eliminate the improprieties.

## 1. Extreme Departure from the Standards of Ordinary Care

274.    With respect to the securities at issue, the Mortgage Companies gave expansive, categorical assurances with respect to approximately 47,000 individual mortgage loans originated by thousands of loan officers and independent brokers across the country.

275.    It is standard practice in the mortgage origination and securitization industry to institute quality-control measures to monitor and ensure the integrity of the loan origination processes and to ensure that the loans meet the lender's requirements.

276.    Additionally, it is standard practice in the industry to conduct a review of a securitized loan pool before giving assurances as to the character of the underwriting process and the specific attributes pertaining to the securitized loan pool. Typically, senior management causes such a review to be performed, the review is overseen by management officials, and the results are reviewed by senior managers before assurances as to the securitized loan pool are disseminated to investors.

277.     The Defendants constituted a sophisticated, large-scale enterprise that had originated and securitized many billions of dollars worth of mortgages.  The Defendants well understood the significance to investors such as Ellington of the categorical assurances and the loan-level data that the Mortgage Companies provided.

278.     It would constitute willful blindness – a knowing turning away from a high risk of finding out what the Mortgage Companies did not want to find out – to give economically important, categorical assurances about tens of thousands of loans originated by a decentralized, nationwide workforce of thousands of non-employee brokers and low-ranking employees, without undertaking a significant review to determine whether those assurances were true.

### 2.  Recklessness Compounded by Discretion Granted to Subordinates

279.     The Defendants' recklessness is compounded by their having designed a system that actively worked against the ability of management to be confident in the integrity of the loan origination processes or the attributes of the loans.

280.     The Defendants promulgated Underwriting Guidelines to the loan officers and independent mortgage brokers across the country who were responsible for originating the mortgage loans.  However, the Defendants conferred discretion on those loan officers and brokers to depart from the Underwriting Guidelines' Risk Category criteria – without even limiting such discretion by providing a defined set of compensating factors which could justify a departure.

281.     In practice, the Defendants' reliance on low-ranking loan officers was even greater than the official conferral of discretion would indicate.  For example, Argent Mortgage Company, L.L.C. ("Argent") made loans largely through independent, non-employee brokers, whom Argent did not oversee or supervise.  According to testimony of Tami Carnes, formerly a Vice President of Loan Resolution for ACC Holdings, and previously a Vice President of Loan

61

Resolution and Post-Close for Argent, the application materials submitted by the non-employee brokers were reviewed and given an initial decision "usually within 24 hours but then through the process of the loan, on receiving documents, each document is reevaluated for the loan." When asked whether Argent seeks to confirm the accuracy of the information submitted by the non-employee broker, Ms. Carnes answered, "Argent relies on the broker. That's the responsibility of the broker."

282.　Such heavy reliance on subordinates was particularly dangerous because Argent signaled to brokers that Argent would not be vigilant in reviewing loan application materials. In Underwriting Guidelines, Argent adopted language that gave a presumption of validity to materials submitted by the non-employee brokers even where the brokers departed from the Guidelines:

> Argent evaluates and approves all applicants based on credit, capacity to repay, and collateral. Every associate of Argent Mortgage Company is responsible for ensuring that credit is marketed and made available to all creditworthy individuals. Following a credit evaluation and review, Argent will notify the broker/agent of all loan programs in which the applicant(s) is qualified to participate. Argent may deny approval or funding, allow re-pricing or require repurchase of any loan that is ineligible for the program under which the loan was submitted.
>
> *Argent exercises reasonableness in underwriting judgment and will exercise its discretion only when the loan deficiency is a material breach of the standards disclosed in these guidelines.*
>
> (Argent Underwriting Guidelines, Effective Date: December 12, 2005, at p. 1-1 (emphasis added).)

283.　The Mortgage Companies thus knowingly and deliberately created substantial uncertainty as to the particular attributes of the mortgage loans originated by its own non-managerial employees and non-employee brokers.

284.　Because it deliberately conferred broad discretion on loan officers and independent brokers to depart from the Defendants' own internal Underwriting Guidelines –

absent a review of the individual loan files – the Mortgage Companies (through their managerial employees) had no basis on which to be confident of the specific attributes of the loans or to give the extensive, categorical assurances about the loans that are contained in the MLPA.

### 3. Recklessness Compounded by Knowledge of Widespread Improprieties

285.    It would have been still more reckless and deceptive for the Defendants to give such broad, categorical assurances without conducting a significant review, because the Defendants (i) were aware – at the most senior levels of their entire organization, including the Control Persons – of grave allegations of widespread improprieties on the part of the thousands of loan officers; (ii) recognized and admitted that the allegations were true, at least in substantial part; (iii) blamed non-employee brokers and rogue employees; and (iv) made substantial public commitments to monitor their lending practices and to punish wrongdoers.

286.    The Prospectus Supplement for Series 2005-W3 (at S-23) reflected the Control Persons' awareness of widespread allegations of improper lending practices (which, if actually employed, would cause the affected loans to violate the representations and warranties at issue) and the Control Persons' recognition that the allegations were very serious:

> "Representatives of the financial regulatory agencies and/or attorney general's offices of thirty-three states and the District of Columbia (the 'States') have raised concerns relating to the lending policies of Ameriquest Mortgage Company and its retail lending affiliates, Bedford Home Loans, Inc. and Town & Country Credit Corp. (collectively, the 'Affiliates'), for the appropriateness of discount points charged prior to February 2003; the accuracy of appraisal valuations; stated income loans and oral statements to borrowers relating to loan terms and disclosures. Based on extensive discussions with the States, ACC Capital Holdings Corporation ('ACCCHC'), the parent of the Affiliates, has recorded a provision of $325 million in its financial statements representing its best estimate of the ultimate financial liability."

287.    The Defendants' awareness of the problem was facilitated by prominent news reports. Thus, in a January 24, 2006, article titled "Millions to Settle Loan Abuse," the *San*

*Francisco Chronicle* reported that the investigators found that AMC had a culture of engaging in deceptive practices that increased the riskiness of loans:

> In a conference call, several state attorneys general said Monday they found evidence that Ameriquest had engaged in a wide variety of unethical and possibly illegal sales tactics.
>
> Before 2003, they found many instances where Ameriquest customers ended up with more expensive loans than sales reps had promised. Those abuses abated after Ameriquest changed some sales practices in 2003, but others persisted, and in some cases, worsened, regulators said.
>
> Some Ameriquest sales reps allegedly inflated borrowers' incomes so they could take out a bigger loan, often one they couldn't afford to repay.
>
> In some states, Ameriquest reps hired appraisers who inflated the value of homes being refinanced so customers could get a larger loan, regulators said. When the borrowers tried to refinance or sell their homes, they found they were worth much less.

288.   On January 23, 2006, AMC and certain affiliated entities entered into a settlement with 49 states and the District of Columbia (collectively, the "States"), resolving allegations by the States – which AMC continued to deny – that AMC and affiliated entities had engaged in unlawful, deceptive lending practices.  Under the settlement, AMC and the affiliated entities agreed to an extensive scheme of injunctive relief – spelled out over the course of more than 22 pages and creating minimum standards with respect to a wide variety of issues.  Additionally, the settlement imposed a monitoring and compliance regime to ensure that AMC and the affiliated entities complied with the requirements of the injunctive relief imposed.

289.   The Defendants (or their parent or predecessor entities) had long been focused on allegations of deceptive lending practices (which would result in loans that did not conform to the assurances given with respect to the securities at issue).  As the *Los Angeles Times* reported on July 29, 2005, "Ameriquest, founded by Arnall as Long Beach Savings in 1979, has faced off with consumer activists, regulators and private litigants in a series of disputes over its lending

practices dating to 1996. The company has paid millions of dollars in restitution and for borrower education. . . ."

290. The Defendants recognized and admitted that the accusations of illicit lending practices were, to a significant degree at least, true. The Defendants assigned responsibility for the wrongdoing to non-employee brokers and rogue employees. The founder and principal owner of the Defendants, Roland Arnall, was personally aware of and responded to the accusations. On the occasion of Mr. Arnall's death, the *Los Angeles Times* reported (on March 18, 2008), that the Defendants were "dogged by allegations from government authorities, community groups and angry customers. Former employees said Ameriquest ran 'boiler rooms' of loan agents who socked borrowers with hidden fees and higher-than-promised interest rates while steering customers into loans they couldn't afford. Arnall blamed the problems on rogue agents who were terminated."

291. The Defendants appeared to address the allegations of wrongdoing seriously. Thus, again from the *Los Angeles Times* on July 29, 2005, "Ameriquest, whose slogan is 'Do the right thing,' has denied that there has been a systematic pattern of lending abuses. Arnall and his executives have attributed problems to outside mortgage brokers and rogue employees who, Arnall has said, have been disciplined or fired when wrongdoing has been revealed. A spokesman for Arnall said Thursday that his attitude was, 'Try to learn from these situations, and constantly try to improve your practices.'"

292. The Defendants' response to allegations of improper lending practices – from the very highest levels of their management, including by Mr. Arnall himself won the Defendants substantial public trust. The Defendants publicly committed to ensuring that their enterprise adhered to a code of "best practices." As the *Los Angeles Times* reported on February 4, 2005,

"Ameriquest . . . has been held up as an industry model since agreeing in 2000 to establish a fund for needy borrowers and to adhere to a list of 'best practices.' The company says it holds itself 'to the highest standards' and does not tolerate unethical or improper behavior by its employees."

293. In short, senior management of the Mortgage Companies and the Control Persons were aware that there were serious allegations of improper and deceptive lending practices nationwide in their organization. They were aware that the accusations were, at least in substantial part, true. And they assigned responsibility for the wrongdoing to the very loan officers – non-employee brokers as well as rogue employees – whom they endowed with discretion to depart from the Underwriting Guidelines.

294. In light of the grave allegations of nationwide improprieties in the Mortgage Companies' origination of loans, it was important that the Defendants responded by assuring government investigators, the public, and investors that the companies were supervising the originating and underwriting processes to ensure that loans were originated properly and that any misconduct was limited to isolated cases.

295. It was important, additionally, that the Mortgage Companies assured investors that the securitized loans consisted of loans specifically selected for inclusion in the securitized pool, and that the included loans met the description set forth in the extensive, unqualified representations and warranties. Thus, § 2 of the Mortgage Loan Purchase Agreement ("MLPA") (promulgated as part of the offering materials) – by which one of the Defendants bought the mortgages from another of the Defendants, as part of the securitization structure – stated that:

> The Purchaser and the Seller have agreed upon which of the mortgage loans owned by the Seller are to be purchased by the Purchaser pursuant to this Agreement, and the Seller shall prepare or cause to be prepared on or prior to the Closing Date a final schedule (the "Closing Schedule") describing such Mortgage Loans and setting forth all of the Mortgage Loans to be purchased under this Agreement.

296.    The MLPA for each series of securities proceeded (in § 6) to provide 48 unqualified "Representations and Warranties of the Seller Relating to the Mortgage Loans." These unqualified, categorical assurances about the integrity of the underwriting process and the specific attributes of the loans for the securitized pools – specifically selected from among the Mortgage Companies' entire portfolio of loans – were particularly important in light of the grave allegations of widespread improprieties in the underwriting of the Mortgage Companies' loans.

297.    The import of the Defendants' public response to the allegations of widespread improprieties by loan officers spread throughout the country, and of the representations and warranties in the MLPA, was that the Defendants recognized that their overall loan portfolio included a substantial number of loans that failed to meet the description of the representations and warranties, and that the Defendants had sifted the deficient loans from the pools that formed the basis for the mortgage-backed securities.

298.    In fact, however, the Defendants did not sift the deficient loans from the pools.

299.    In fact, either the Defendants did not perform a reasonable and necessary review before giving those broad assurances (and thus avoided knowledge of the inaccuracy of the assurances, through gross recklessness), or the Defendants did perform such a review but proceeded to deliberately misrepresent the loans and the underwriting of them.

300.    If the Mortgage Companies did not make the misstatements enumerated above while knowing that they were false, then they fraudulently omitted disclosure of the material fact that despite the variegated loan pool consisting of approximately 45,000 loans, despite the discretion conferred upon the thousands of loan officers spread across the country and despite the grave allegations of widespread improprieties, they made no attempt to confirm the accuracy of

the extensive, unqualified, categorical assurances they gave to investors. The omission of this information was material and misleading.

## F. **Causation and Damages**

301. The Mortgage Companies knew at the time of their fraudulent statements and material omissions that the value of the securities purchased by Ellington was dependent on the income streams generated by the regular mortgage payments of the individual borrowers whose mortgages were included in the relevant mortgage pool.

302. Because the underlying mortgages were much riskier than Ellington reasonably expected based upon the fraudulent statements and material omissions of the Mortgage Companies, the income streams from the securities Ellington bought have been much lower than Ellington reasonably expected. As a result, Ellington has been damaged.

## VI. **CONTROL PERSON ALLEGATIONS**

303. ACC and ACC Holdings, the Control Persons, are holding companies that own, directly or through wholly owned subsidiaries, each of the other Defendants in this action.

304. The Control Persons have no business operations unrelated to those of the Mortgage Companies. The principal business of the Control Persons is to oversee the Mortgage Companies and to collect profits generated by the latter.

305. ACC Holdings actively participated in and induced the securitization of the loans at issue in this case. Thus, ACC Holdings participated in the MLPA transaction for each series of securities, agreeing that "as an inducement" to the sale of the loans from one of the Mortgage Companies to the other as part of the securitization structure, ACC Holdings would indemnify the purchaser in the event the purchaser was later required to repurchase any of the loans after depositing them into a trust fund. (MLPA § 20.)

306.    ACC Holdings therefore not only participated in and induced the securitizations, but had a direct economic incentive to ensure that the securitized loans conformed to the assurances given about them in the offering materials – so that ACC Holdings would not be obligated to indemnify the repurchase of any defective loans.

307.    In addition to controlling the Mortgage Companies by virtue of owning them, the Control Persons shared senior management personnel in common with the Mortgage Companies and had access to all the resources of the Mortgage Companies (including the loan files).

308.    At all relevant times, the officers of the Control Persons were substantially the same individuals who are officers of the Mortgage Companies, and the Control Persons had access to the loan files and had substantially the same knowledge as the Mortgage Companies.

309.    Current or past personnel jointly employed by more than one of the Defendants includes high-ranking officers, mid-level management, and low-ranking employees.  A partial list includes:

      a.    Aseem Mital, Chief Executive Officer of ACC, ACC Holdings, and Ameriquest;

      b.    Sam Marzouk, President of "Argent Mortgage" and ACC Holdings;

      c.    John Grazer, Chief Financial Officer of ACC, ACC Holdings, and Argent Securities Inc., and Executive Vice President of Ameriquest;

      d.    Mark Sarago, Senior Vice President, Chief Information Officer of ACC and Ameriquest;

      e.    Lynn Ryan, Chief Information Officer at ACC and Ameriquest;

      f.    Brian Woods, Chief Marketing Officer of ACC and Ameriquest;

      g.    Jane Johnson, Senior Vice President, Director of Loan Servicing at ACC, Ameriquest, and AMC Mortgage Services, Inc.;

      h.    Derek Gee, Vice President at ACC and Ameriquest;

      i.    John Williams, Director of Product Development at ACC and Ameriquest;

j. Teri Picarone, Purchasing Agent at ACC and IS Purchasing Administrator at Ameriquest;

k. Brian Heath, Director of Loan Origination at ACC and Vice President of Loan Origination – Continuous Improvement at Ameriquest;

l. Steve Donovan, Manager of Loan Servicing Systems at ACC and Ameriquest;

m. Greg Peter, General Manager at ACC and Ameriquest;

n. Jason Tucker, Regional Manager at ACC and Ameriquest;

o. Branden Townsend, Branch Manager at ACC and Ameriquest;

p. Spencer Sutherland, Junior Project Manager at ACC and Ameriquest;

q. Joe Strattan, Senior Loan Officer at ACC and Ameriquest;

r. Liana Hutchinson, Mortgage Specialist at ACC and Ameriquest;

s. Edward Foy, Account Executive at ACC and Ameriquest;

310. The Control Persons and their subsidiaries functioned as a single enterprise, as shown through the employment by ACC – the top-most parent company – of loan servicing and loan originating officers (including simple "loan officers" or "account executives") even though the loan origination units of the enterprise were Ameriquest and Argent Mortgage Company, L.L.C. Such employment by ACC is noted above, and is reflected (with respect to ACC Holdings) in testimony of Tami Carnes, a former employee of ACC Holdings, who testified that she was employed directly by ACC Holdings as Vice President of Loan Resolution, to handle title resolution issues.

311. The functional intertwining of the Defendants is exemplified also in the process leading up to Ellington's loan file review in 2007. While ACC Holdings was not directly involved in the securitizations and did not directly own the loan files, ACC Holdings was the principal point of contact for Ellington in arranging the file review. Among the Defendants' personnel involved in the preliminaries to the loan review were (i) John P. Grazer, as Executive

Vice-President – Chief Financial Officer of ACC Holdings, who was also Executive Vice-President of Ameriquest and Chief Financial Officer of Argent Securities Inc.; (ii) Stephanie Sanchez, a Due Diligence Manager directly affiliated with AMC Mortgage Services, Inc. (one of the Defendants' affiliated entities) whose email address ("Stephanie_Sanchez@acc-capitalholdings.com") indicated that she was also affiliated with ACC Holdings; (iii) Lorraine Ybarra, Director, Due Diligence & Argent Investor Relations, with an ACC Holdings email address; and (iv) Art Heffner, Director – Capital Markets for ACC Holdings.

312.    The Control Persons were aware of the nature of the loans made by the Mortgage Companies and of the representations the Mortgage Companies made to third-party investors in connection with the securitization of the loans.

313.    As demonstrated in the sub-section "Scienter" above, the Control Persons were aware of public accusations of improprieties in the Mortgage Companies' lending practices.

314.    The Control Persons had the power and responsibility to cause the Mortgage Companies to ensure the accuracy of the categorical assurances they gave with respect to the securitized loans.

315.    The Control Persons actively encouraged the securitization of loans while knowing, or recklessly avoiding knowledge, that the securitizations included such defective loans.

# VII. CAUSES OF ACTION

## COUNT ONE

(Violation of Section 10b of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

*By the 2005-W2 Plaintiffs and the Manager against the 2005-W2 Defendants,*
*with respect to Series 2005-W2*

*By the 2005-W3 Plaintiffs and the Manager against the 2005-W3 Defendants,*
*with respect to Series 2005-W3*

*By the 2005-R10 Plaintiffs and the Manager against the 2005-R10 Defendants,*
*with respect to Series 2005-R10*

*By the 2006-W1 Plaintiffs and the Manager against the 2006-W1 Defendants,*
*with respect to Series 2006-W1*

*By the 2006-W5 Plaintiffs and the Manager against the 2006-W5 Defendants,*
*with respect to Series 2006-W5*

316. Plaintiffs repeat and reallege each and every allegation set forth above with the same force and effect as if set forth in full herein. Based upon the allegations in the foregoing, Plaintiffs, upon information and belief, make the following allegations.

317. The 2005-W3 Defendants, 2005-R10 Defendants, 2005-W2 Defendants, 2006-W1 Defendants and 2006-W5 Defendants are liable to the Manager and to the 2005-W3 Plaintiffs, 2005-R10 Plaintiffs, 2005-W2 Plaintiffs, 2006-W1 Plaintiffs and 2006-W5 Plaintiffs, respectively, for violation of Section 10(b) of the Securities Exchange Act of 1934) (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) in connection with the Mortgage Companies' fraudulent statements and omissions of material facts.

318. As discussed above, the Mortgage Companies made false statements or material omissions with regard to the quality and nature of the mortgages underlying their respective securities. In doing so, the Mortgage Companies employed a device, scheme or artifice, directly or indirectly, to defraud Plaintiffs. The Mortgage Companies intentionally and/or recklessly made these untrue statements of material facts or omitted to state material facts necessary in

order to make the statements made, in light of the circumstances under which they were made, not misleading.

319. The Mortgage Companies made these false statements or omissions in connection with the respective Plaintiffs' purchases of the respective securities. At the time the Mortgage Companies made the false statements and material omissions, they knew their statements were false and that investors such as Ellington would rely on the statements in connection with the purchase of securities.

320. Plaintiffs reasonably relied on the Mortgage Companies' false statements and material omissions.

321. As a result of the Mortgage Companies' false statements and material omissions, Plaintiffs suffered losses. The Mortgage Companies' false statements and material omissions induced Plaintiffs to pay for value that was subsequently shown to be illusory – leaving Plaintiffs to have lost both the money they paid and the value they thought they were buying.

322. Additionally, with respect to Ellington Management Group, L.L.C., the Mortgage Companies' false statements and material omissions caused losses in the form of lost management fees (which are based in part on the performance of the Funds the Manager manages) and in the form of reputational injury.

323. As a result of the actions of the Mortgage Companies alleged herein, Plaintiffs are entitled to damages in an amount to be proven at trial.

## COUNT TWO
(Control-Person Liability Pursuant to Section 20(a) of the Exchange Act)
*By all Plaintiffs against ACC Capital Holdings Corporation and Ameriquest Capital Corporation (now known as SBP Capital Corporation)*

324.　Plaintiffs repeat and reallege each and every allegation set forth above, with the same force and effect as if set forth in full herein. Based upon the allegations in the foregoing, Plaintiffs, upon information and belief, make the following allegations.

325.　ACC Capital Holdings Corporation and ACC controlled the Mortgage Companies.

326.　ACC Capital Holdings Corporation and ACC, acting in bad faith, induced the fraud perpetrated by the Mortgage Companies.

327.　Accordingly, pursuant to Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)), ACC Capital Holdings Corporation and ACC each are liable to Ellington for the fraudulent statements and omissions of material facts by the Mortgage Companies.

## COUNT THREE
(Common Law Fraud)
*By the 2005-W2 Plaintiffs and the Manager against the 2005-W2 Defendants, with respect to Series 2005-W2*
*By the 2005-W3 Plaintiffs and the Manager against the 2005-W3 Defendants, with respect to Series 2005-W3*
*By the 2005-R10 Plaintiffs and the Manager against the 2005-R10 Defendants, with respect to Series 2005-R10*
*By the 2006-W1 Plaintiffs and the Manager against the 2006-W1 Defendants, with respect to Series 2006-W1*
*By the 2006-W5 Plaintiffs and the Manager against the 2006-W5 Defendants, with respect to Series 2006-W5*

328.　Plaintiffs repeat and reallege each and every allegation set forth above, with the same force and effect as if set forth in full herein. Based upon the allegations in the foregoing, Plaintiffs, upon information and belief, make the following allegations.

329.     Each of the Mortgage Companies intentionally and/or recklessly made false statements or omitted to state material facts with regard to the quality and nature of the mortgages underlying their respective securities.

330.     The Mortgage Companies made these false statements or omissions in connection with the relevant Plaintiffs' purchases of the respective securities. At the time the Mortgage Companies made the false statement or material omissions they knew their statements were false and that investors such as Ellington would rely on the statements in connection with the purchase of securities.

331.     Plaintiffs reasonably relied on the Mortgage Companies' false statements and material omissions.

332.     As a result of the Mortgage Companies' false statements and material omissions, Plaintiffs suffered losses. The Mortgage Companies' false statements and material omissions induced Plaintiffs to pay for value that was subsequently shown to be illusory – leaving Plaintiffs to have lost both the money they paid and the value they thought they were buying.

333.     Additionally, with respect to Ellington Management Group, L.L.C., the Mortgage Companies' false statements and material omissions caused losses in the form of lost management fees (which are based in part on the performance of the Funds the Manager manages) and in the form of reputational injury.

334.     As a result of the actions of the Mortgage Companies alleged herein, the 2005-W3 Defendants, 2005-R10 Defendants, 2005-W2 Defendants, 2006-W1 Defendants and 2006-W5 Defendants are liable to the 2005-W3 Plaintiffs, 2005-R10 Plaintiffs, 2005-W2 Plaintiffs, 2006-W1 Plaintiffs and 2006-W5 Plaintiffs, respectively, in an amount to be proven at trial.

## COUNT FOUR
(Common Law Negligent Misrepresentation)
*By the 2005-W2 Plaintiffs and the Manager against the 2005-W2 Defendants,*
*with respect to Series 2005-W2*
*By the 2005-W3 Plaintiffs and the Manager against the 2005-W3 Defendants,*
*with respect to Series 2005-W3*
*By the 2005-R10 Plaintiffs and the Manager against the 2005-R10 Defendants,*
*with respect to Series 2005-R10*
*By the 2006-W1 Plaintiffs and the Manager against the 2006-W1 Defendants,*
*with respect to Series 2006-W1*
*By the 2006-W5 Plaintiffs and the Manager against the 2006-W5 Defendants,*
*with respect to Series 2006-W5*

335.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1 through 51, inclusive, with the same force and effect as if set forth in full herein. Based upon the allegations in the foregoing, Plaintiffs, upon information and belief, make the following allegations.

336.    Each of the Mortgage Companies made material misrepresentations to the respective Plaintiffs regarding the quality and nature of the mortgages underlying their respective securities. The Mortgage Companies either knew that their representations were false or were reckless or negligent in failing to realize their falsity.

337.    The Mortgage Companies knew that Plaintiffs sought information about the quality and nature of underlying mortgages in their respective mortgage pools so that Plaintiffs could determine the value of the securities and what price to pay for the securities.

338.    The Mortgage Companies knew and intended that Plaintiffs and others would rely on their materially false representations regarding the nature and quality of the mortgages contained in the mortgage pool.

339.    Plaintiffs reasonably relied on the Mortgage Companies' misrepresentations in determining whether and at what price to acquire the mortgage-backed securities.

340.    Accordingly, the 2005-W3 Defendants, 2005-R10 Defendants, 2005-W2 Defendants, 2006-W1 Defendants and 2006-W5 Defendants are liable to the 2005-W3 Plaintiffs, 2005-R10 Plaintiffs, 2005-W2 Plaintiffs, 2006-W1 Plaintiffs and 2006-W5 Plaintiffs, respectively, in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

341.    For the foregoing reasons, Plaintiffs seek judgment awarding them:

   a.   compensatory damages for all injuries they have suffered as a result of Defendants' wrongful conduct, in an amount to be determined at trial,

   b.   punitive damages for Defendants' willful and wanton misconduct,

   c.   pre-judgment and post-judgment interest,

   d.   costs, expenses and attorneys' fees incurred by Plaintiffs in connection with this action, and

   e.   such other and further relief as the Court may deem just.

Dated: May 15, 2009
       Armonk, NY                    By:

BOIES, SCHILLER & FLEXNER LLP
Robin A. Henry (RH 6781)
Motty Shulman (MS 0351)
Daniel E. Holloway (DH 5254)
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Fax:  (914) 749-8300