**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ELLINGTON MANAGEMENT GROUP, L.L.C.;
ELLINGTON OVERSEAS PARTNERS, LTD.;
ELLINGTON MORTGAGE INVESTORS, LP;
ELLINGTON MORTGAGE PARTNERS, L.P.;
ELLINGTON CREDIT FUND, LTD.;
ELLINGTON LONG TERM FUND, LTD.; and
ELLINGTON SPECIAL OPPORTUNITIES,
LTD.,

                 Plaintiffs,

       vs.

AMERIQUEST MORTGAGE COMPANY;
AMERIQUEST MORTGAGE SECURITIES
INC.; ARGENT MORTGAGE COMPANY,
L.L.C.; ARGENT SECURITIES INC.; ACC
CAPITAL HOLDINGS CORPORATION; and
AMERIQUEST CAPITAL CORPORATION
(now known as SBP Capital Corporation),

                 Defendants.

CIVIL ACTION NO. 09 CIV. 0416

ECF CASE

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Victor J. Rocco (VR-4191)
Law Offices of Victor J. Rocco
500 Fifth Avenue, 29th Floor
New York, New York 10110
Telephone:  (212) 575-5533
Fax:  (212) 997-7646

Michael J. Cereseto (*pro hac vice*)
Kalley R. Aman (*pro hac vice*)
Buchalter Nemer, P.C.
1000 Wilshire Blvd, Ste. 1500
Los Angeles, California 90017
Phone:  (213) 891-0700
Fax: (213) 891-0400

*Attorneys for Defendants Ameriquest Mortgage*
*Company; Ameriquest Mortgage Securities Inc.;*
*Argent Mortgage Company; LLC, Argent Securities*
*Inc.; ACC Capital Holdings Corporation; and*
*Ameriquest Capital Corporation (now known as*
*SBP Capital Corporation)*

## Table of Contents

Table of Contents...................................................................................................... i

Table of Authorities .................................................................................................. ii

Background ................................................................................................................1

Argument ..................................................................................................................6

I.      The Amended Complaint Violates Rule 8(a)........................................................6

II.     The Amended Complaint Fails to State a Claim Under Section 10(b)...............8

      A.     Plaintiffs Fail to Allege a Material Omission or Misstatement ...............9

           1.     Plaintiffs Were Not Misled by the Offering Materials ...............9

           2.     Plaintiffs Fail to Allege the Misrepresentations with Sufficient Particularity..........................................................................10

      B.     Plaintiffs Fail to Plead the Requisite Scienter........................................15

      C.     Plaintiffs Fail to Allege Loss Causation .................................................22

III.    The Section 20 Claim Fails to Allege Culpable Participation ...........................24

Conclusion ...............................................................................................................25

## Table of Authorities

### Cases

*Ashcroft v. Iqbal,*
129 S. Ct. 1240, 1937, 1949 (2009) ........................................................................ 8, 22, 24

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
493 F.3d 87, 98-99, 105 (2d Cir. 2007) ........................................................................ 8, 10

*In re Bayou Hedge Fund Litig.,*
534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007) .................................................................... 16, 18

*Bell Atlantic Corp. v. Twombly,*
127 S. Ct. 1955, 1973, fn. 14 ........................................................................................ 22

*In re Carter-Wallace, Inc. Sec. Litig.,*
220 F.3d 36, 42 (2d Cir. 2000) ........................................................................................ 19

*Chambers v. Time Warner, Inc.,*
282 F.3d 147, 153 (2d Cir. 2002) ..................................................................................... 8

*Chill v. General Elec. Co.,*
101 F.3d 263, 268-271 (2d Cir. 1996) ........................................................................ 18, 19

*Dura Pharm., Inc. v. Broudo,*
544 U.S. 336, 342, 347 (2005) ................................................................................... 22, 24

*ECA Local 134 IBEW Joint Pension Trust v. J.P. Morgan Chase,*
553 F.3d 187, 198-199 (2d Cir. 2009) ........................................................................ 15, 16

*Edison Fund v. Cogent Inv. Strategies Fund,*
551 F. Supp. 2d 210, 230-231 (S.D.N.Y. 2008) .................................................................. 24

*Feinman v. Schluman Berlin & Davis,*
677 F. Supp. 168, 170 (S.D.N.Y. 1988) ............................................................................ 17

*Hart v. Internet Wireline,*
145 F. Supp. 2d 360, 368-69 (S.D.N.Y. 2001) ................................................................... 18

*Lapin v. Goldman Sachs Group, Inc.,*
506 F. Supp. 2d 221, 244-49 (S.D.N.Y. 2006) ................................................................... 24

*Lentell v. Merrill Lynch & Co.,*
396 F. 3d 161, 172-73 (2d Cir.) ...................................................................................... 22

*Ouaknine v. MacFarlane,*
897 F.2d 75, 79 (2d Cir. 1990) ......................................................................................... 6

*Novak v. Kasaks,*
    216 F. 3d 300, 309 (2d Cir. 2000)................................................................. 16

*In re Parmalat Sec. Litig.,*
    375 F. Supp. 2d 278, 307-10 (S.D.N.Y. 2005) ....................................... 25

*Pollio v. MF Global, Ltd.,*
    No. 08 Civ. 6858 (JSR), 2009 WL 921133 at *3 (S.D.N.Y. April 7, 2009).................... 12

*In re Razorfish, Inc. Sec. Litig.,*
    No. 00 Civ. 9474 (JSR), 2001 WL 1111502, at *3 (S.D.N.Y. Sept. 21, 2001) ................. 8

*Rolf v. Blyth, Eastman Dillon & Co., Inc.,*
    570 F.2d 38, 47 (2d Cir. 1977).................................................................. 16

*SEC v. First Jersey Sec., Inc.,*
    101 F.3d 1450 (2d Cir. 1996)................................................................... 24

*Stevelman v. Alias Research Inc.,*
    174 F.3d 79 (2d Cir. 1999)...................................................................... 18

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,*
    531 F.3d 190, 196 (2d Cir. 2008)............................................................ 20

*Tellabs v. Makor Issues & Rights Ltd.,*
    551 U.S. 308, 127 S. Ct. 2504, 2510 (2007) ........................................ 16

*United States v. Int'l Longshoreman's Ass'n,*
    518 F. Supp. 2d 422, 463 (E.D.N.Y. 2007) .......................................... 8

**Statutes**

15 U.S.C. § 78u-4(b)............................................................. 1, 6, 8, 10, 16

Fed. R. Civ. Proc. § 8(a) ................................................................ 1, 6

Fed. R. Civ. Proc. § 8(a)(2)............................................................ 6, 8

Fed. R. Civ. Proc. § 9(b) ....................................................... 1, 6, 8, 14, 15

Fed. R. Civ. Proc.§ 12(b)(6) ............................................................ 1

Securities Exchange Act § 20(a)...................................................... 24

Securities Act of 1933 Rule 144A .................................................. 2

Securities Exchange Act of 1934 Section 10(b) and Rule 10b-5................ 8

Defendants Ameriquest Mortgage Company ("Ameriquest"); Ameriquest Mortgage Securities Inc. ("AMSI"); Argent Mortgage Company, LLC ("Argent"); Argent Securities Inc. ("ARSI") (collectively, "Mortgage Companies"); ACC Capital Holdings Corporation ("ACH"); and Ameriquest Capital Corporation (now known as SBP Capital Corporation) ("SBP") respectfully submit this memorandum of law in support of their Motion to Dismiss the Amended Complaint ("AC") in this action pursuant to Rules 12(b)(6), 9(b), and 8(a) of the Federal Rules of Civil Procedure, and Section 21D(b)(3)(A) of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b).

## Background

Plaintiffs are large, sophisticated hedge funds that have specialized in investment and trading strategies involving mortgage-backed securities for many years and are also experts in real estate markets and trends. (*See* AC ¶ 59). For their part, until they ceased operations in August 2007, the Mortgage Companies had years of experience in the origination, packaging, and securitization of mortgage loans. (AC ¶ 24). As experienced participants in their respective corners of the mortgage-backed securities industry, Plaintiffs and the Mortgage Companies stood at arm's length in their dealings with each other. Each understood the other's objectives, and possessed the expertise and market power to protect its own interests.

In six transactions from October 2005 to May 2006, Plaintiffs, through private placements principally by independent investment banks, acquired $354 million-worth of complex, "first-loss" (*i.e.*, extremely risky) securities from five different offerings, which ultimately were collateralized by subprime residential mortgage loans originated by the Mortgage Companies. (AC ¶¶ 53-57). The Prospectus Supplement for each offering advised investors of a host of risk factors related to the quality of the subprime mortgage loans behind the securities they purchased. The Mortgage Companies disclosed, for example, that their

1

underwriting standards were not as stringent as those of more traditional lenders and that, as a result, "the Mortgage Loans are likely to experience rates of delinquency, foreclosure, and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner." (*See, e.g.*, Series 2005-W3 Prospectus Supplement, dated April 15, 2005 ("2005-W3 Pro. Supp."), at S-11 [Ex. 1-A to Tiberend Decl. ¶ 3]).[1] They also disclosed that "a substantial number" of the mortgage loans would represent exceptions even to the Mortgage Companies' own more permissive Underwriting Guidelines. (*See, e.g.*, Pro. Supp. at S-26).

Based on these disclosures alone, it is clear that the Mortgage Companies did not attempt to conceal or obscure the quality or nature of the mortgage loans underlying the securities that Plaintiffs ultimately purchased. Indeed, it would have been futile to even attempt to do so, given the industry and market expertise, and market power, that Plaintiffs, and investors like them, possessed. The Mortgage Companies also knew from their extensive experience that these securities were not for the uninitiated and only experienced, knowledgeable investors like Plaintiffs were likely to purchase them.[2] Plaintiffs or the underwriters, or some independent third party acting on their behalf, could, and typically would, conduct their own due diligence, including an actual file review of the mortgage loans, before agreeing to purchase securities backed by subprime mortgages. (*See, e.g.*, 2006-W1 Purchase Agreement between Ellington Management Group, L.L.C. ("Ellington") and Ameriquest, dated Feb. 23, 2006 § II.B [Exh. 4-E

---

[1] Where the documents for each of the five securitizations are identical in respect of any particular proposition, this memorandum will cite to the Series 2005-W3 deal documents as representative of all five securitizations.

[2] In fact, Plaintiffs were "qualified institutional investors" under Rule 144A of the Securities Act of 1933 because they owned or invested on a discretionary basis over $100 million of securities in 2005. (2006-W1 Transferee Representation Letter, dated Feb. 21, 2006, executed by Ellington Credit Fund, Ltd. [Exh. 4-F to Tiberend Decl. ¶ 21]).

to Tiberend Decl. ¶ 20]). That the business practices of certain of the Mortgage Companies were being investigated by various regulatory authorities served only to reinforce this expectation. And, to no surprise, the contemplated independent due diligence was performed. (*See, e.g.*, Letter, dated Oct. 28, 2005, from Ellington to Citigroup Global Markets, Inc. re: Commitment to Purchase 2005-W2 ("2005-W2 PA") [Exh. 3-E to Tiberend Decl. ¶ 15]). Neither the warnings in the Prospectus Supplements nor the due diligence dissuaded Plaintiffs from purchasing these "first-loss" securities. Nor were Plaintiffs deterred by the mounting evidence that the "housing bubble" had been pricked and, particularly in California and Florida where the mortgage loans were concentrated, was rapidly losing air. Of course, as time passed, the "housing bubble" gave way to the "subprime crisis," and the number of subprime mortgage loan defaults increased dramatically. As a consequence, payments on the mortgage loans underlying the "first-loss" securities Plaintiffs purchased decreased.

Unhappy that their risky bets had not lived up to their expectations, more than a year after their initial purchase, Plaintiffs contacted ACH to arrange an audit of the loan files for specific underperforming loans from seven series of securities they had purchased—the five that are the subject of this suit and two others. (*See* Letter, dated Jan. 17, 2007, from Ellington to ACH ("Audit Letter") [Exh. 7 to Tiberend Decl. ¶ 27]). In January 2007, Plaintiffs were given access to the defaulted loan files they had specified in their request ("2007 Audit"). For over a month, with the assistance of a team of experts, Plaintiffs scoured the loan files for purported deficiencies which, if discovered, they believed would obligate the Mortgage Companies to repurchase the mortgage loans in question. (AC ¶ 70). In March 2007, after completing their review, Plaintiffs submitted to Deutsche Bank National Trust Company ("Deutsche Bank"), the Trustee, a repurchase demand for approximately 1,200 mortgage loans, or less than 3 percent of

the underlying mortgage pools, for which they claimed to have found some "deficiency." (Letter, dated Mar. 21, 2007, from Ellington to Deutsche Bank [Exh. 8 to Tiberend Decl. ¶ 28]; Letter, dated June 12, 2007, from Ameriquest to Deutsche Bank ("AMQ Response") [Exh. 9 to Tiberend Decl. ¶ 29]).The Trustee was obligated to forward the demand to the Seller in accordance with the terms of the Pooling and Servicing Agreement ("PSA"). (*See, e.g.*, Series 2005-W3 PSA, dated Oct. 1, 2005 ("PSA"), § 2.03 [Exh. 1-D to Tiberend Decl. ¶ 6]).Within 90 days, Ameriquest responded by agreeing to repurchase 30 of the loans identified by Ellington and providing a loan-by-loan analysis explaining why each of the remaining claims were baseless. (AMQ Response; Letter, dated Aug. 9, 2007, from Ellington to Deutsche Bank [Exh. 10 to Tiberend Decl. ¶ 30]).

Apparently dissatisfied with the response to their repurchase demand and eschewing an action by the Trustee for breach of the PSA and/or Mortgage Loan Purchase Agreement ("MLPA"),[3] in January 2009, Plaintiffs filed a complaint ("the Complaint") alleging securities fraud based on the alleged "deficiencies" they claimed to have discovered two years prior during their 2007 Audit. (Compl. ¶¶ 36-37). Despite clear language in the Prospectus Supplements, which accompanied each of the securities offerings, that a substantial number of the subprime mortgage loans would represent exceptions to the Mortgage Companies' generally more permissive Underwriting Guidelines, Plaintiffs claimed that they were misled because the "deficiencies" in the loans in the mortgage pools represented a departure from the Guidelines.

---

[3] The sole remedy for deficiencies in the mortgage pool is for the Trustee to assert a repurchase claim. Because any recovery would go to the related securitization trust, it is unlikely, however, that Plaintiffs, as subordinate bondholders, would have benefitted from a successful repurchase claim. (*See, e.g.*, PSA § 2.03(a)). Significantly, Deutsche Bank has not asserted a repurchase claim, despite its legal obligation to do so in the event that it receives a valid repurchase request by any holder of the securities.

The mortgage loans, therefore, were allegedly riskier than represented and the securities worth less than Plaintiffs believed when they bought them. After a motion to dismiss the initial Complaint was fully briefed, during oral argument, Plaintiffs asked for, and were granted, leave to replead their claim.

In their second attempt to properly plead an actionable fraud, Plaintiffs not only lard their new pleading with confusing and irrelevant detail, but also scurry to amend the theory of the alleged fraud. Plaintiffs now contend that they were defrauded, not because the mortgage loans failed to comply with the Underwriting Guidelines, as they alleged originally, but because they were misled by certain representations and warranties in the MLPA which the 2007 Audit disclosed had been breached. (AC ¶¶ 77, 79). Plaintiffs once again misread the deal documents. They mischaracterize the representations and warranties in the MLPA as "categorical" and "unqualified," when explicit language in the MLPA circumscribes them and actually provides exclusive contractual remedies for their breach.

Plaintiffs again attempt to plead a fraud by numbers rather than by providing salient facts, but this time their numbers are more bloated and even more dubious. Not only are many of the alleged "violations" baseless, Plaintiffs fail to allege facts to demonstrate that the so-called violations made the representations in the MLPA both untrue and untrue at the time they were made or that Defendants knew or should have known the representations were untrue. Despite its new fraud theory with its trumped-up numbers, and even a dressed-up scienter claim, the AC suffers from the same incurable pleading deficiencies that plagued the Complaint. It comes no closer to pleading a fraud, much less pleading a fraud with the particularity required by Rule 9(b) and the PSLRA, and should be dismissed with prejudice.

**Argument**

## I.    The Amended Complaint Violates Rule 8(a)

At the hearing on May 5, 2009, the Court, after stating its view that Plaintiffs' initial

Complaint was insufficient "on virtually every element of fraud," (5/5/2009 Hearing Tr., at 17),

granted Plaintiffs leave to replead in order to try to provide the degree of particularity required

by Rule 9(b) and the PSLRA. But neither Rule 9(b) nor the PSLRA relieves Plaintiffs of their

obligation to comply with Rule 8(a)(2), which requires that a complaint provide "a short and

plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc.

8(a)(2). The requirements of Rules 8(a) and 9(b) are completely congruent and actually

complement each other: there is no conflict between the requirement of pleading fraud with

particularity and, at the same time, providing a "short and plain statement of the claim." *See*

*Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir. 1990).

The AC fails to meet these basic pleading requirements. Rather than describing the

relevant factual details of the alleged misrepresentations in the MLPA, the AC defies Defendants

to try to decipher the claim against them by requiring them to sift through page after page of

confusing and extraneous data. In lieu of a short and plain statement of their claim, the AC is a

dizzying morass of repetitive (and sometimes inconsistent) conclusory allegations and a series of

duplicative and incoherent cross-references among and between 13 misrepresentations allegedly

contained in Article 6 of the MLPA, which are based on 41 types of "violations," which, in turn,

consist of 9,960 individual "violations" or "deficiencies" that are detailed in its 77 pages and in

174 pages of charts, tables and lists which are annexed to and incorporated into it. As in the

Complaint, these "violations" were identified during Ellington's 2007 Audit of 3,772 defaulted

loan files. (AC ¶ 71). The exhibits, however, are nothing more than a meaningless "data dump."

They appear to provide information about thousands of so-called "violations" and "deficiencies"

(a distinction the AC makes and never bothers to explain, (*see* AC ¶¶ 71, 73, 76, 79)), but most often they actually provide no additional insight into the misrepresentations that allegedly are at the heart of this case. In fact, the exhibits only add to the confusion because they are bereft of the kind of factual detail which would give meaning to the ocean of irrelevant data that they import into the pleading. These problems are compounded by the morass of conjoined, overlapping, conclusory, and often misleading, allegations, all of which are virtually impossible to sort through in order to evaluate Plaintiffs' claim.

For example, the AC alleges that at the time the loans were originated, 3,230 loans had no final title insurance (Viol. 39) while another 19 loans lacked a commitment for title insurance (Viol. 38), which, in the aggregate, are said to account for a total 3,249 "violations" of the MLPA. (Exh. "Summary of Violation"). The relevant representation in the MLPA, however, is stated in the disjunctive to require that either a final title insurance policy or a commitment for title insurance, not both, must be in place at the time the loan is originated. (*See, e.g.*, Series 2005-W3 MLPA, dated Oct. 26, 2005 ("MLPA"), § 6(12) [Exh. 1-C to Tiberend Decl. ¶ 5]). So while Exhibits 38 and 39 attribute 3,249 "violations" to an alleged lack of title insurance at origination, according to these exhibits, only three loans could have violated the representation because they may not have had either a commitment for insurance or a final policy at origination. (*See* Exh. 38 & 39).[4]

Plaintiffs' method of pleading by conclusion and cross-reference is impenetrable,

---

[4] This correction regarding the single largest source of the 9,960 "violations" alleged in the AC virtually eliminates MLPA § 6(12) as a source of violations by reducing the number of affected loans to only three. It also reduces by one-third the total number of violations for three of the other 13 alleged "misrepresentations" which also are based on the absence of title insurance: the number of "material errors," (*see, e.g.*, MLPA § 6(2)); the number of violations of underwriting guidelines, (*see, e.g.*, MLPA § 6(13)); and the number of alleged departures from "industry standards." (*See, e.g.*, MLPA § 6(23)).

unwieldy and unnecessarily prolix and places an unjustified burden on Defendants to try to evaluate the claim against them, and, as such, fails to satisfy the "short and plain statement" requirement of Rule 8(a)(2). *See United States v. Int'l Longshoreman's Ass'n*, 518 F. Supp. 2d 422, 463 (E.D.N.Y. 2007).

## II.    The Amended Complaint Fails to State a Claim Under Section 10(b)

To plead a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, a plaintiff must allege that each defendant (i) made a misstatement or omission of material fact, (ii) with scienter, (iii) in connection with the purchase or sale of securities, (iv) upon which it relied, and (v) that plaintiff's reliance was the proximate cause of its injury. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007). To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs must "provide the grounds upon which [their] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Id.* at 98 (internal quotation and citation omitted). The heightened pleading standards of Rule 9(b) and the PSLRA, 15 U.S.C. 78u-4(b) (1), further require that Plaintiffs plead each of the above elements with particularity.[5] *See In re Razorfish, Inc. Sec. Litig.*, No. 00 Civ. 9474 (JSR), 2001 WL 1111502, at *3 (S.D.N.Y. Sept. 21, 2001).

Despite a newly-minted fraud theory, and its other drastic revisions, the AC suffers from the same fatal deficiencies that plagued Plaintiffs' initial pleading. First, because, at its core, it relies on an obvious misreading of deal documents, it fails to allege sufficient facts to support a plausible claim that Plaintiffs were misled by any statement made by one or more of the

---

[5] Although the courts accept as true all well-pleaded allegations in a complaint and draw all reasonable inferences in favor of the plaintiff, no credit is given to conclusory statements that are unsupported by factual allegations. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). In ruling on the motion, courts may consider the full text of "documents incorporated into the complaint by reference" or possessed by or known to the plaintiff and relied upon in bringing suit. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

Defendants. Second, and as importantly, its conclusory allegations of falsity and materiality lack facts that would explain how or why any of the alleged misrepresentations was fraudulent.

### A.    *Plaintiffs Fail to Allege a Material Omission or Misstatement*

#### 1.    *Plaintiffs Were Not Misled by the Offering Materials*

Plaintiffs now claim that they paid too much for their risky securities because they were misled by the Mortgage Companies' purported "unqualified assurances about both the nature of the loans…and the underwriting process by which the loans were made." (AC ¶ 10). In their formulaic recitation of the "Misrepresentations," which are now limited to certain representations and warranties in the MLPA, they drone on that each of the warranties was "stated categorically, without qualification," (AC ¶ 82, 85, 87, 91, 94, 97, 100, 106, 109, 113, 116, 119, 122). But mere incantations cannot change the actual words of the MLPA: the representations and warranties themselves contain critical qualifying language such as "in all material respects" or "no material error." (*See, e.g.*, MLPA §§ 6(1), 6(2)). The representations and warranties are also limited only to the condition of the loans at the time of the closing of the sale of the mortgage loans to the depositor. (*See, e.g.*, MLPA § 6(a)). Plaintiffs cannot simply apply a convenient label and ignore the actual language of the representations and warranties in the MLPA in order to press a baseless fraud claim.

Relying on this misreading of the MLPA's representations and warranties, Plaintiffs claim to have been misled by Defendants' alleged failure to conform strictly to these so-called "categorical, unqualified assurances." (AC ¶ 73). According to this latest theory, anything short of perfection in the individual mortgages means that Plaintiffs were misled. But Plaintiffs are sophisticated investors, highly experienced in the real estate market and in investment strategies involving mortgage-backed securities, and it could not reasonably have expected that 47,259 subprime mortgages in the loan pools that collateralize the securities it bought would be perfect.

Nor did Defendants represent that they would be.

Not only are the representations and warranties qualified by their own terms, the MLPA qualifies them even further by providing for a specific and exclusive remedy for "breach of representation and warranty." (*See, e.g.*, MLPA § 7). Because a breach or mistake is inescapable in a pool of 47,259 loans, the MLPA specifies that, upon discovery of a breach of any of the representations and warranties that materially and adversely affects the value of any mortgage loan or the interest therein, Ameriquest (as seller) must cure the breach, remit a prepayment charge shortfall, or repurchase or substitute for a defective mortgage loan, as applicable. (*Id.*) This contractual remedy was tailored specifically to address any breach that existed at the time the representations were made—the very "fraud" alleged by Plaintiffs—thus belying their claim that they expected, or Defendants represented, that over 47,000 mortgage loans would be free of any inherent defect or error in the origination process. (*See id.*)

2.    *Plaintiffs Fail to Allege the Misrepresentations with Sufficient Particularity*

To satisfy the heightened pleading requirements of Rule 9(b), for each misrepresentation alleged, Plaintiffs must "(1) specify the statements that it contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 98-99, 105. Under the PSLRA, a plaintiff must go even further and "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief," as they are in the AC, (*see* AC at 1), "the complaint shall state with particularity all facts on which that belief is formed." *Id.* (citing 15 U.S.C. § 78u-4(b)(1)). Plaintiffs again have failed to meet these standards because nowhere in either their 77-page amended pleading, or in the attached 174 pages of charts and lists which it incorporates, do they allege any facts that explain why a particular statement was fraudulent.

Plaintiffs were instructed during oral argument on the motion to dismiss the Complaint

on how to cure their pleading deficiencies, if they could:

> THE COURT: Is there anywhere in this complaint where you allege with
> particularity, just taking the example I've picked, frankly, at random, where you
> allege with particularity how the statement that each mortgaged property was
> covered by a valid hazard insurance policy is false, yes or no?
> MS. HENRY: No, beyond saying that the statement is false, by which we mean
> that *if you go and look at the loans*, there are a substantial number of homes that
> are not covered by a valid policy.
> THE COURT: *That won't do*. That will not do it under any of the Second Circuit
> law I know of.

(5/5/2009 Hearing Tr., at 15-16 (emphasis added)). Despite the Court's explicit instruction as to

what "won't do," the AC, with respect to the very same "statement," alleges nothing more than

the converse of the MLPA's representation. Plaintiffs, once again, summarily allege that:

"MLPA § 6(26) was misleading because, *as Ellington's file review revealed* ... improvements

upon the mortgaged property were not covered by... hazard insurance ...with respect to the

following violation: Violation 41: No Hazard Insurance." (AC ¶ 115). To mask their deficient

allegation, they proceed to repeat this mantra in the AC's "Violations" section and then cross-

reference a list of 11 loans from the five offerings. (AC ¶ 270). Indeed, the remaining allegations

in the AC are no different: Plaintiffs merely parrot for each of the 13 "Misrepresentations" and

each of the 41 types of "violations" that "*Ellington's file review revealed...*" the converse of the

proposition they claim is false. But, as the Court noted during argument: "That won't do."

Plaintiffs confuse the reams of data with essential details. Raw data without any context

is, at best, indecipherable; here it is often simply meaningless. Through tautology, extrapolation

and unsupportable inferences, Plaintiffs now attempt to ratchet-up their numbers to suggest that

the violations of the representations and warranties of the MLPA were rampant and these

offerings were cauldrons of fraud. They now allege that there are 9,960 violations including

"over 8,000 deficiencies and missing documents" grouped into 41 types of violations. These

"violations" allegedly now affect 3,359 loans, representing 90 percent of the audited sample of defaulted loans, (AC ¶¶ 73, 125), as opposed to 40 percent as alleged in the Complaint, (Compl. ¶ 39). This tally of violations is meaningless. Whatever numbers Plaintiffs finally settle on, their numbers and percentages do not relieve them of their obligation to plead the necessary details of the fraud which they attempt to allege. *See, e.g., Pollio v. MF Global, Ltd.*, No. 08 Civ. 6858 (JSR), 2009 WL 921133 at *3 (S.D.N.Y. April 7, 2009).

But this is precisely what the AC fails to do. It offers no factual detail to explain why the representations and warranties in the MLPA are false. For example, the AC lists seven categories of violations (320 individual violations) allegedly to demonstrate that the MLPA misrepresented that the Mortgage Loan Schedule ("MLS") was accurate in all material respects. Each of these alleged violations is premised solely on the difference between some number in the loan file (*e.g.*, property value, FICO score, loan-to-value ratio) and another number listed on the MLS. A difference in the two numbers, however, does not mean that the MLS was inaccurate or false. All it means is that the numbers are different, and Plaintiffs do not explain why a discrepancy between the FICO score listed on the MLS and the score appearing on one of the required "lender credit report[s]" means that the MLS is inaccurate. (*See* AC ¶¶ 84, 130-140).[6] The remaining six types of "violations" are no different. In each instance, the AC equates the mere difference between numbers on different documents with a breach of the MLPA representation that the MLS is accurate in all material respects, but alleges no facts to explain why a mere discrepancy means that the MLS was inaccurate in a material respect, so as to render

---

[6] The loan origination process can produce several credit reports with varying scores. (*See* Argent Underwriting Guidelines, Effective Date: Dec. 12, 2005, at 6-1 [Exh. 6 to Tiberend Decl. ¶ 26]). Plaintiffs fail to identify which of the credit reports they reference or explain why the score they reference is accurate and the one used in the MLS inaccurate.

Defendants' statement untrue.[7]

For many of the claimed violations of the representations and warranties in the MLPA, Plaintiffs allege nothing more than that the violations are "an impermissible procedural departure from the Underwriting Guidelines and violated both the underwriting standards - strict adherence to which was required by MLPA § 6(13) - and industry standards." (*See, e.g.*, AC ¶ 159). This mantra, which is repeated after the description of each category of "violation," is unaccompanied by any explanation of why or how the "violation" makes the corresponding representations untrue. The AC lists 33 types of violations (9,621 individual violations) as a basis for claiming that Defendants violated industry standards, but nowhere does it identify by name the prevailing "industry standards" to which it refers; nor does it specify any industry standard in particular, or bother to explain how the Defendants violated those standards. (AC ¶¶ 109-112; *see, e.g.*, AC ¶ 160). Similarly, the AC alleges 18 types of violations (7,440 individual violations) which are "an impermissible departure from the Underwriting Guidelines," but neither names the Guidelines to which it refers, nor to any guideline in particular, nor alleges how those guidelines were violated.[8] (AC ¶¶ 100-105; *see, e.g.*, AC ¶ 160). Without alleging some facts to explain how the

---

[7] This specious claim that a mere variance between two numbers somehow means that one of them is false literally permeates the pleading. It obscures the important fact that the allegedly "false" number on the MLS often makes the loans appear riskier, not safer, than they actually were. For example, in 127 of the 135 "violations" attributed to the difference between the property value listed on the MLS and the appraised value in the loan file, the MLS understates the property value. (Exh. pp. 6-8). Similarly, in 15 out of 31 "violations" based on differences in FICO scores (Exhs. 1 & 2), the MLS understates the applicant's FICO score. Plaintiffs claim that understating FICO amounts to "part of a pattern of errors (of the same type or of different types), because such a pattern calls into question the reliability of the loan origination process generally." (AC ¶ 136). But even assuming that the FICO score in the MLS should have been the same as the FICO score on the credit report, a mere 15 violations (Viols. 1 and 2 combined) out of a sample of 3,772 loans is not a pattern that would render false the representation that the MLS is "true and correct in all material respects."

[8] In fact, the "Underwriting Standards of the Originator" section of the Prospectus Supplements

enumerated violations represent a departure from industry or underwriting standards, the allegations are meaningless, and the AC does not satisfy the pleading standards of Rule 9(b) or the PSLRA.

Plaintiffs rely, for the first time in the AC, on alleged missing documents as the source of a lion's share of their claimed violations, but these allegations are the product of hindsight. The AC attributes over 8,000 of the alleged "violations" to missing documents in the loan files which Plaintiffs examined some eight to sixteen months after the securities at issue here were first offered and reaches the untenable conclusion, albeit on information and belief, that, "Defendants' fail[ure] to provide the missing documents" means "that elements of the loan origination and underwriting process were omitted with respect to the affected loans."[9] (AC ¶ 72). The AC never identifies what documentation was required and missing, and does not even allege that missing documentation was the basis for the particular "violation." It merely concludes, for example, that "Ellington's file review revealed that the loan originators failed to obtain the borrower's credit report," and proceeds to cross-reference a list of loans. (AC ¶ 156). Even if Plaintiffs could identify the documentation that was necessary and missing, they do not allege that the document(s) were missing when the securities were offered. The mere fact that

---

outlines procedural requirements only with respect to evaluating whether a loan application should be granted—such as what documentation of income is sufficient and how the property should be valued—and it is unclear why, in complaining about the quality of the loans, Plaintiffs include a host of violations that have nothing to do with evaluating the loan applicant but go only toward perfecting the security interest and other formalities. (*Compare* AC ¶ 105 *with* Pro. Supp. at S-26-28).

[9] Although it is unclear from the AC, the general allegation that "over 8000" of the violations are based on missing documents leads us to surmise that 8,664 of the 9,960 individual "violations" (Viols. 8-11, 14-22, 25-26, 28-31, 33-39, 41) are the result of missing documentation, including: 2,382 loans for which Defendants "failed to obtain the borrower's credit report," (AC ¶ 156, Exh. 8 & 9), 670 loans for which "no verification of employment…had been obtained," (AC ¶ 182, Exh. 15 & 16), 91 loans for which "no appraisal of the property had been obtained," (AC ¶ 156, Exh. 25).

documents were missing does not mean that the documents were never procured.[10]

The AC's reliance on these "missing documents" for the further conclusion that certain loan origination procedures were not performed is even more specious. Without alleging specific facts that would explain why the documents were required for those procedures or what those procedures involved, the AC does not raise a plausible inference that "elements of the loan origination and underwriting process were omitted with respect to the affected loans." (AC ¶ 72).

These are only a few examples of the AC's endemic failure to allege how or why the Defendants' statements are untrue either now—or most importantly—when they were made at the time of the offerings. Plaintiffs' continued reliance on numbers alone, whether in the form of alleged violations, deficiencies, or misrepresentations, even though they are accompanied by reams of charts, lists, and schedules, does not relieve them of the ultimate obligation to plead the relevant details of each misrepresentation as Rule 9(b) and the PSLRA require.

B.    *Plaintiffs Fail to Plead the Requisite Scienter*

Unable to plead any facts regarding any Defendant's motive and opportunity, Plaintiffs base their scienter claim on the conscious misbehavior or recklessness prong of this Circuit's two-prong scienter standard. *See ECA Local 134 IBEW Joint Pension Trust v. J.P. Morgan*

---

[10] Plaintiffs seem genuinely oblivious to the need to tie their allegations of falsity to the time the representations were made. Instead, they seem to rely on circumstances existing at the time of the 2007 Audit and, from that, incorrectly conclude that Defendants' earlier representations were untrue when they were made. In addition to the 8,664 violations which are based solely on documents that were missing during their audit, Plaintiffs contend that 232 loans exhibited an "LTV violation due to property valuation" which they adduce by comparing the appraised value of the mortgaged property to a "reconciled value" based on factors—such as population statistics and comparable home prices—existing at the time of their audit. (Exh. 24). Clearly, changes in property value between 2005 and 2007 could be expected, and their analysis fails to suggest that the "reconciled" value was based on information existing at the time representations originally were made. Plaintiffs plead no other facts to suggest that the reconciled value applied at the time of the offering, or that reasonable minds could not have differed as to the value, such that Defendants could have misrepresented a then-existing fact as to the value of the property.

*Chase*, 553 F.3d 187, 198-99 (2d Cir. 2009). A complaint in a Section 10(b) case must state with particularity the facts giving rise to a "strong inference" that the defendant acted with the required state of mind. 15 U.S.C.A. § 78u-4(b)(2). For that inference to be strong, it must be such that a reasonable person would deem the inference of a culpable mental state "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs v. Makor Issues & Rights Ltd*, 551 U.S. 308, 127 S. Ct. 2504, 2510 (2007). In order to survive a motion to dismiss under the "recklessness" standard, the complaint must allege facts sufficient to demonstrate "at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care…to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (citing *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1977)).[11] Plaintiffs have failed to allege facts sufficient to give rise to the necessary strong inference that any of the Defendants were consciously reckless in making the representations in the MLPA. Indeed, the scienter allegations in the AC are non-starters because there is no allegation that the Defendants even failed in the duty which Plaintiffs would ascribe to them.

Plaintiffs claim that because Defendants gave "categorical assurances" in the MLPA regarding the mortgage loans, they had a duty to institute unspecified "customary quality control measures" or to conduct an undefined "customary review of the securitized loan pools." (AC ¶¶ 68, 272). They further claim that Defendants' de-centralized loan origination network also

_____

[11]Because Plaintiffs have alleged no motive, "the strength of [their] circumstantial allegations must be correspondingly greater" than if they had. *See ECA*, 553 F.3d at 198-99. In this context, recklessness is not merely a heightened form of negligence. At the very least, the complaint must allege facts to show that the Defendants acted with a conscious disregard of the truth. *See, e.g., In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007).

required "a review of the individual loan files" in order to provide the basis for "the extensive, categorical assurances about the loans that are contained in the MLPA." (AC ¶ 284). Using these dual assumptions as springboards, Plaintiffs conclude that, given the purported prevalence of the alleged violations, "either the Defendants did not perform a reasonable and necessary review before giving those broad assurances (and thus avoided knowledge of the inaccuracy of the assurances, through a level of recklessness that was deliberate or conscious), or the Defendants did perform such a review but proceeded to deliberately misrepresent the loans and the underwriting of them." (AC ¶ 299).

The contention that "categorical assurances" in the deal documents spawned a corresponding duty to review loan files before the securities were offered for sale is baseless. As we amply demonstrate above, there were no categorical assurances, and any contrary claim is plainly contradicted by the language of MLPA itself.[12] But even if Plaintiffs had been given such categorical assurances, they never even allege that Defendants lacked quality control procedures or failed to review loan files; instead, they ask that lack of such quality controls be inferred, even though several of the factual allegations in the AC support the contrary inference. For example, the undated testimony of Tami Carnes, a former Vice President of Loan Resolution for Argent, which Plaintiffs quote, describes quality control procedures when she says that "through the process of the loan, on receiving documents, each document is reevaluated for the loan." (AC ¶ 281). Even if the AC did allege that there were no quality control procedures, allegations of non-compliance with even well-established, formalized industry standards (*e.g.*, GAAP), absent fraudulent intent, do not support a strong inference of scienter. *See, e.g., Stevelman v. Alias*

---

[12] *Supra* at pp. 9-11. Statements that are directly contradicted by the clear language of deal documents cannot be the basis of a federal securities fraud claim. *Feinman v. Schluman Berlin & Davis*, 677 F. Supp. 168, 170 (S.D.N.Y. 1988).

*Research Inc.*, 174 F.3d 79 (2d Cir. 1999); *Chill v. General Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996). [13]

Indeed, the AC fails to allege sufficient facts to support a scienter claim based on a failure to implement quality control procedures or to review the securitized loan pools, even if those procedures were absent. Plaintiffs certainly offer no facts to support their naked assertion that anything short of a review of individual loan files in the circumstances presented here would be reckless or that loan file reviews by senior management are "customary" in the subprime mortgage securitization industry; they never even describe what they mean by a loan file review. The allegation that Ameriquest's business model assigned too much discretion to "low-ranking loan officials" and "independent brokers" to depart from the lenders underwriting guidelines, absent a review of individual loan files, gets Plaintiffs no closer to a valid scienter claim. (AC ¶¶ 279-84). Plaintiffs allege no facts that would suggest that Defendants' sales force was assigned too much discretion; indeed, the AC never even defines what too much discretion means or the criteria it uses to draw that conclusion. There also are other ways to obtain confidence in the quality of the mortgage loans, short of direct review of individual loan files, such as company-wide loan origination procedures for employees and independent brokers, which would permit such representations. In that instance, loan officers' adherence to the procedures, not individual loan files, would be reviewed. The AC certainly does not allege any facts to suggest that Defendants had reason to suspect that loans were not properly originated either by their employees or independent brokers. Just as senior management is not required to take a gloomy,

---

[13] There is no factual allegation in the AC that would support an inference of conscious avoidance here. "Even an egregious failure to gather information will not establish 10b-5 liability as long as the defendants did not deliberately shut their eyes to the facts." *Bayou,* 534 F. Supp. 2d at 415 (quoting *Hart v. Internet Wire, Inc.,* 145 F. Supp. 2d 360, 368-69 (S.D.N.Y. 2001)).

fearful or defeatist stance, *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 42 (2d Cir. 2000), in the absence of facts that would suggest to the contrary, it is not required to suspect wrongdoing by its employees. *Chill*, 101 F.3d at 268-71. Plaintiffs, of course, never allege that Defendants did not have proper loan origination procedures in place, and any suggestion that they did not is belied by Defendants' reputation for adherence to "best practices" (*see* AC ¶¶ 288, 291, 292), and their response to various regulatory inquiries, as discussed below.

The allegations regarding prior regulatory inquiries into aspects of certain of the Defendants' past lending practices also fail to support the claim that certain Defendants were required to exercise some (again unspecified) degree of heightened vigilance prior to making the representations in the MLPA. Plaintiffs' argument overlooks several obvious facts alleged in, or discernible from, the AC: (1) the inquiries regarded alleged practices occurring well in the past; (2) the alleged past practices and the inquiries were well known in the industry and, indeed, were disclosed in the deal documents themselves; and (3) not only did the settlement with the Attorneys General include protections against such practices, but the allegations of impropriety had also been broadly scrutinized both by regulators and, most particularly, by sophisticated investors in the mortgage securitization industry, like Ellington. And, again, Plaintiffs never actually allege that Defendants did not exercise such heightened vigilance; rather, they supply only hypothetical conclusions. (*See, e.g.*, AC ¶ 285 ("It would have been still more reckless and deceptive for the Defendants to give such broad, categorical assurances without conducting a significant review...")).

Among the few facts that Plaintiffs do allege, some actually suggest the implausibility of their claim. For example, one of the newspaper articles Plaintiffs quote states that, "Ameriquest ...has been held up as an industry model since agreeing in 2000...to adhere to a list of 'best

practices.'" (AC ¶ 292). Defendants had also implemented compliance monitoring to ensure the proper lending practices were being followed. (AC ¶ 288). The more plausible inference to be drawn from these and other alleged facts is that Defendants, whom Plaintiffs describe as "a sophisticated, large scale enterprise that had originated and securitized billions of dollars of mortgages," (AC ¶ 277)—a leader in mortgage securitizations for many years—performed proper due diligence before offering the securities to sophisticated investors like Plaintiffs who would do their own diligence or, as they did here, rely on a third-party's diligence before purchasing the securities. (*See* 2005-W2 PA). Thus, not only have Plaintiffs failed to allege facts sufficient to support their claim that Defendants had a duty to review individual loan files in which they failed, they have also failed to allege that Defendants failed to conduct a reasonable investigation of any other specific source of information, or to implement quality control measures, "that would have demonstrated [to any of them] the falsity of the allegedly misleading statements." *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008).

Instead of pleading facts to support their bald claim that Defendants did not conduct an appropriate level of due diligence, Plaintiffs attempt to back-in to that conclusion by relying on yet another flawed premise: the alleged "violations" were so endemic in the loan files that, unless Defendants turned a blind eye, they had to have known of them, and, as a result, also knew the representations in the MLPA were materially false. (AC ¶¶ 272, 278).This claim is equally specious. First, as discussed in detail above, *see supra* section II.A.2, the AC fails to allege sufficient particularized facts to establish that the "violations," in themselves, constituted misrepresentations. Second, Plaintiffs offer no reason to believe that the 2007 Audit, which was conducted many months after the relevant securitizations, resembled anything close to the type

of pre-securitization review which they claim proper diligence required. Third, Plaintiffs offer no reason to believe that the "violations" they allegedly discovered during the 2007 Audit even existed at the time of the securitizations. Plaintiffs' claim that a review of loan files would have disclosed widespread "violations" is fundamentally flawed because some 90 percent of their alleged "violations" are based on mere hindsight. Plaintiffs conducted their audit eight to 16 months after the relevant securitizations; yet many of the claimed violations in the AC are based solely on allegations that certain unidentified documents were missing from the audited loan file. Of course, documentation found missing eight to 16 months after the loans are originated does not mean that the documents were never procured or that certain procedures had not been followed.

Plaintiffs extrapolate these dubious "violations" to the broader loan pool of over 47,000 mortgage loans and conclude that the "violations" were prevalent and obvious, although they allege nothing to suggest that their sample is representative of the mortgage pool as a whole. To make matters worse, the AC does not even say whether the sample of 3,772 loan files Plaintiffs examined, or the 3,359 deficient loan files which they allegedly discovered, are derived from the five securitizations at issue, or included loans from a much larger mortgage pool, representing all seven of the series of securities that they asked to examine during the 2007 Audit. (AC ¶¶ 71, 73, 125; Audit Letter).

Accordingly, it is impossible to conclude that a review of each individual loan file prior to each securitization would have disclosed "violations" that would have alerted Defendants to the fact that certain representations in the MLPA were materially false and that such misrepresentations somehow made the affected loans more likely to default. Plaintiffs' hyperbole regarding the extent of the "violations" cannot be a springboard for their purely conditional

allegations regarding the Defendants' state of mind.

In fact, Plaintiffs' claim that they were misled becomes even more implausible, if, as they now claim, 90 percent of the loans did violate the representations and warranties in the MLPA. As highly sophisticated investors with deep expertise in subprime mortgage-backed securities, Plaintiffs hardly could have been duped by such obvious misrepresentations; and Defendants could hardly have expected that they could be duped. Knowing what they did about the Defendants—the prior allegations regarding their lending practices which are chronicled in the newspaper articles cited in the AC—Plaintiffs would have been on notice to exercise vigilance in evaluating the securities they purchased. And of course, the securities were purchased subject to such diligence by a third-party, which included an actual file review. (2005-W2 PA). If the "violations" were so prevalent and apparent as Plaintiffs claim, it is surprising that the diligence team retained by the unaffiliated investment banks from whom they bought the securities also "missed," or dismissed as insignificant, these "violations" during their pre-purchase review of the individual mortgage loan files, and that these "deficiencies" only became "obvious" when Plaintiffs audited a skewed sample of defaulted loans. Ultimately, Plaintiffs allege nothing more than poor file-keeping, not fraud.

## C. *Plaintiffs Fail to Allege Loss Causation*

The AC fails to adequately plead loss causation because it alleges no non-conclusory facts that would give rise to a plausible inference that the value of their securities diminished as a result of the alleged misrepresentations. To survive a motion to dismiss in a Section 10(b) case, Plaintiffs must allege loss causation—the causal connection between the material misrepresentation and the actual loss they suffered. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *Lentell v. Merrill Lynch & Co.,* 396 F. 3d 161, 172-73 (2d Cir. 2005). And they must do so with "enough facts to state a claim to relief that is plausible on its face." *See Iqbal,* 129 S.

Ct. at 1240; *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1973, fn. 14 (2007). Plaintiffs here

rely solely on the naked assertion that "liability arises not from the general risks associated with

subprime mortgage loans, nor from increasing default rates associated with a general economic

downturn…[but] *is a direct consequence of their fraud*." (AC ¶ 15 (emphasis added)). That is not

enough.

The AC alleges nothing to support its sweeping conclusion of loss causation. It does not

allege that the high-risk, first-loss securities which Plaintiffs purchased fared any worse than

comparable subprime mortgage-backed securities in the market during the collapse in home

prices or that the loans collateralizing these securities generally performed worse than other

subprime residential loans. Plaintiffs never provide the overall default rate for the loan pools, or

disclose the amount by which their securities allegedly decreased, or even state that their

securities actually decreased in value. These shortcomings in pleading loss causation are even

more obvious because, as it is now pled, the fraud never connects the alleged misrepresentations

to the mortgage default rate, which ultimately determines the value of these securities. The

Complaint alleged that impermissible departures from the lender's underwriting guidelines led to

loans to less credit-worthy mortgagors, which increased the chances of default. (Compl. ¶ 5).

More defaults would reduce the income stream from regular mortgage payments and lower the

return on the securities, and lessen their value. (Compl. ¶ 4). The Complaint thus suggested at

least a tenuous connection between the value of the securities and the alleged misrepresentations.

Plaintiffs' new theory is based solely on alleged breaches of representations and warranties in the

MLPA. Those breaches, however, largely relate to formalities in the loan origination process, not

the quality or riskiness of the loans. No facts are alleged to suggest that the "violations"

generally increased the default rate in the loan pool or that more defaults could be attributed to a

particular type "violation." There is no allegation, for example, that the absence of title insurance or hazard insurance or lower property appraisals contributed to a higher default rate or, indeed, any explanation as to how they could.

In order to survive a motion to dismiss, a plaintiff must do more than plead facts that give rise to the "sheer possibility that a defendant has acted unlawfully." *See Iqbal,* 129 S. Ct at 1249. The complaint must allege facts sufficient to state a claim that is plausible. *Id.; Dura,* 544 U.S. at 342. Plaintiffs' bald conclusion here, that their loss is attributable to the Defendants' "fraud," rather than to the collapse of the housing market during the most serious economic crisis of our times, patently fails to meet these basic pleading requirements for loss causation.[14]

### III.     The Section 20 Claim Fails to Allege Culpable Participation

Because Plaintiffs do not state a claim pursuant to Section 10(b) or Rule 10b-5 against any of the Mortgage Companies, they also fail to plead the "primary violation" element of their control liability claim against ACH or SBP. *See Edison Fund v. Cogent Inv. Strategies Fund,* 551 F. Supp. 2d 210, 230-31 (S.D.N.Y. 2008). A defendant's "culpable participation" is also an element of a claim of control person liability under Section 20(a) of the Securities Exchange Act. *See SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450 (2d Cir. 1996). Although there is disagreement among the judges in this District as to the meaning of "culpable participation" and what is required to plead it properly in connection with a Section 20(a) claim, (*see generally, Lapin v. Goldman Sachs Group, Inc.,* 506 F. Supp. 2d 221, 244-49 (S.D.N.Y. 2006) (assembling cases and discussing the intra-circuit split)), the weight of authority balances toward the view that a plaintiff bears the burden of pleading a defendant's culpable participation in an alleged fraud and that such pleading is subject to the heightened pleading requirements of the PSLRA. *See, e.g., id.*

---

[14] Plaintiffs' common law fraud claim also should be dismissed for all of the reasons their Section 10(b) claim fails: failure to plead a material misrepresentation, scienter or loss causation.

at 246-47 (culpable participation must be pled, and with the same particularity as scienter under

section 10(b)); *but see In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307-10 (S.D.N.Y. 2005)

(alleging culpable participation is not required).

Plaintiffs fail to state a Section 20(a) claim against either ACH or SBP because they do

not plead sufficient relevant particularized facts to raise a strong inference that either ACH or

SBP was in any meaningful sense a culpable participant in any primary violation. They allege no

fact that serves to indicate that SBP had any meaningful role in the securitizations at issue; and

the one fact they do allege regarding ACH—that ACH participated in the MLPA as an

indemnitor (AC ¶ 305)—is not sufficient, by itself, to raise an inference of ACH's conscious

misbehavior or recklessness. The remaining conclusory allegations (*see, e.g.,* AC ¶ 315 ("The

Control Persons actively encouraged the securitization of loans while knowing, or recklessly

avoiding knowledge, that the securitizations included such defective loans.")), do not get

Plaintiffs any closer to the mark. The Section 20(a) claim against ACH and SBP should,

therefore, be dismissed.

### Conclusion

For all of the reasons set forth herein, the motion should be granted in all respects and the

AC should be dismissed, with prejudice, and judgment entered in favor of Defendants.

DATED:  June *19* , 2009            By: _____
                                            Victor J. Rocco
                                Law Offices of Victor J. Rocco
                                    Michael J. Cereseto
                                      Kalley R. Aman
                                    Buchalter Nemer, P.C.

                                *Attorneys for Defendants Ameriquest Mortgage Company;
                                Ameriquest Mortgage Securities Inc.; Argent Mortgage
                                Company, LLC; Argent Securities Inc.; ACC Capital
                                Holdings Corporation; and Ameriquest Capital
                                Corporation (now known as SBP Capital Corporation)*