**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Ellington Management Group, L.L.C.; Ellington
Overseas Partners, Ltd.; Ellington Mortgage
Investors, LP; Ellington Mortgage Partners, L.P.;
Ellington Credit Fund, Ltd.; Ellington Long Term
Fund, Ltd.; and Ellington Special Opportunities,
Ltd.

                Plaintiffs,

     v.

Ameriquest Mortgage Company; Ameriquest
Mortgage Securities Inc.; Argent Mortgage
Company, L.L.C.; Argent Securities Inc.; ACC
Capital Holdings Corporation; and Ameriquest
Capital Corporation (now known as SBP Capital
Corporation)

                Defendants.

Civil Action No.: 09 CIV 0416 (JSR)

ECF Case

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**Boies, Schiller & Flexner LLP**

Robin A. Henry (RH 6781)
Motty Shulman (MS 0351)
Daniel E. Holloway (DH 5254)
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Fax: (914) 749-8300

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................i

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT ....................................................................................................................4

I.    THE COMPLAINT SATISFIES FRCP 8(A) ....................................................4

II.   THE COMPLAINT ALLEGES AMERIQUEST'S MATERIAL MISSTATEMENTS
      AND OMISSIONS WITH PARTICULARITY ..................................................4

   A.  Ameriquest's Representations and Warranties Were Categorical and Unqualified ........5

   B.  The Complaint Alleges False Representations With Particularity ...................................7

      1.   MLPA Representation 12 (Title Insurance) ........................................................7

      2.   MLPA Representation 26 (Hazard Insurance) ....................................................8

      3.   MLPA Representation 1 (Mortgage Loan Schedules)........................................9

      4.   MLPA Representation 13 (Underwriting Standards) ........................................10

      5.   MLPA Representation 23 (Industry Standards) ................................................11

   C.  The Absence of Documents In the Loan File is Evidence They Were Not Obtained ......12

III.  THE COMPLAINT PLEADS SCIENTER ........................................................13

   A.  The Complaint Far Exceeds the Legal Standard for Pleading Scienter.........................13

   B.  Ameriquest Proposes No Opposing Inference, but Only Argues Against the Factual
       Allegations of the Complaint .......................................................................................16

      1.   Ameriquest's Response to the Complaint's Scienter Theory ...........................17

      2.   Ameriquest's Other Statements ........................................................................19

IV.   THE COMPLAINT PLEADS LOSS CAUSATION........................................22

V.    THE COMPLAINT IS NOT REQUIRED TO, BUT DOES, PLEAD CULPABLE
      PARTICIPATION.............................................................................................23

CONCLUSION ...............................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Adelphia Recovery Trust v. Bank of America, N.A.*,
   2009 WL 1676077 (S.D.N.Y. 2009)..............................................................................8

*In re Atlas Air Worldwide Holdings, Inc. Sec. Lit.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) .......................................................................13

*Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*,
   2007 WL 1988150 (S.D.N.Y. 2007)......................................................................12, 13

*In re Carter-Wallace, Inc., Sec. Lit.*,
   220 F.3d 36 (2d Cir. 2000) ........................................................................13, 14, 15, 21

*Chill v. General Electric Co.*,
   101 F.3d 263 (2d Cir. 1996) .................................................................................13, 21

*Cosmas v. Hackett*,
   886 F.2d 8 (2d Cir. 1989) ......................................................................................13, 15

*Dura Pharmaceuticals, Inc. v. Broudo*,
   544 U.S. 336 (2005)......................................................................................................22

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase*,
   553 F.3d 187 (2d Cir. 2009) ..........................................................................6, 8, 13, 15

*In re eSpeed, Inc. Sec. Lit.*,
   457 F. Supp. 2d 266 (S.D.N.Y. 2006) .......................................................................13

*Kalin v. Xanboo, Inc.*,
   2009 WL 928279 (S.D.N.Y. 2009)..............................................................................25

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) .......................................................................................22

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ......................................................................................13

*Medis Investor Group v. Medis Technologies, Ltd.*,
   586 F. Supp. 2d 136 (S.D.N.Y. 2008) .......................................................................13

*Montoya v. Mamma.Com Inc.*,
   2006 WL 770573 (S.D.N.Y. 2006)..............................................................................25

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ......................................................................7, 13, 14, 15

*In re Pfizer, Inc. Derivative Sec. Lit.*
  2009 WL 180349 (2d Cir. 2009) ...............................................................................13

*In re Pfizer Inc. Sec. Lit.*,
  584 F. Supp. 2d 621 (S.D.N.Y. 2008) .......................................................................25

*SEC v. Lyttle*,
  538 F.3d 601 (7th Cir. 2008) ....................................................................................13

*SEC v. Texas Gulf Sulphur Co.*,
  401 F.2d  833 (2d Cir. 1968) .....................................................................................15

*S.E.C. v. Zandford*,
  535 U.S. 813 (U.S. 2002) ............................................................................................5

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008) ...............................................................................13, 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308, 127 S. Ct. 2499 (2007)..............................................................13, 15, 17

*Vacold LLC v. Cerami*,
  545 F.3d 114 (2d Cir. 2008) ........................................................................................5

## STATUTES & RULES

15 U.S.C. § 78t .............................................................................................................23

15 U.S.C. § 78u-4 ...........................................................................................................7

FRCP 9...........................................................................................................................7

FRCP 8....................................................................................................................4, 5, 6

Plaintiffs Ellington Management Group, L.L.C.; Ellington Overseas Partners, Ltd.; Ellington Mortgage Investors, LP; Ellington Mortgage Partners, L.P.; Ellington Credit Fund, Ltd.; Ellington Long Term Fund, Ltd.; and Ellington Special Opportunities, Ltd. (collectively "Ellington") submit this Memorandum of Law in Opposition to Defendants Ameriquest Mortgage Company, Ameriquest Mortgage Securities Inc., Argent Mortgage Company, L.L.C., Argent Securities Inc., ACC Capital Holdings Corporation ("ACC Holdings"), and Ameriquest Capital Corporation's (now known as SBP Capital Corporation) ("ACC") (collectively "Ameriquest" or "Defendants") Motion to Dismiss the Amended Complaint dated June 19, 2009.

## PRELIMINARY STATEMENT

In 2005 and 2006, Ellington purchased $354 million of subprime-mortgage-backed securities issued by Ameriquest and collateralized by mortgages originated by Ameriquest. As an experienced investor in that market, Ellington understood the systemic risks of such securities and conducted analyses to determine their expected performance and how much to pay for them. Ameriquest strongly vouched for the integrity of its loan origination process, making extensive representations and warranties that unambiguously assured investors that no material error had occurred with respect to any loan. Ellington relied on Ameriquest's representations in conducting its analyses. What Ellington did not know was that Ameriquest's assurances were false and that they materially misrepresented the quality of the mortgages.

In January 2007, approximately one year after purchasing the securities, Ellington noticed higher-than-expected default rates in the underlying mortgages, even after taking account of changed economic conditions. Ellington thus exercised its contractual right to review the underlying mortgage loan files. At first, Ameriquest improperly refused to allow Ellington to review the files. Ultimately, however, Ellington, at its own expense, was permitted to conduct an

on-site review of a limited number of loan files.  As detailed in the Amended Complaint ("AC" or the "Complaint"), Ellington's limited review revealed that many of the representations made by Ameriquest in the offering documents were false and that, contrary to the representations, many of the loan files were materially deficient and, among other things, lacked key documents such as loan notes, deeds, appraisals, and credit reports.  In the midst of Ellington's review, Ameriquest abruptly terminated the review and refused to provide Ellington additional information.  Ellington's loan file review nonetheless revealed that Ameriquest had materially misrepresented the loans in the offering documents.

The Complaint and its exhibits detail the false statements made by Ameriquest that Ellington identified in its limited loan file review:  when the statements were made, who made the statements, and why the statements were false.  Thus, the Complaint alleges that Ameriquest represented that "[t]he information set forth on the Mortgage Loan Schedule with respect to each Mortgage Loan is true and correct in all material respects."  (AC ¶ 82).  The Complaint then alleges that this representation was made in the respective Mortgage Loan Purchase Agreement ("MLPA") and that this representation was false because the Mortgage Loan Schedule was materially inaccurate in at least seven different ways.  (AC ¶ 84).  For each of the seven ways, the Complaint then explains how the representation was false and why the false representation impacts the value of the loan.  The Complaint further provides the relevant reference loan number, along with any relevant loan-level explanatory information.  For example, with regard to one type of inaccuracy (Violation 4), the Complaint alleges that the Schedule "stated a longer prepayment penalty term than actually applied to the loan" (AC ¶ 144) and explains that the length of the penalty term "was material to the analysis and valuation of the underlying loans" because a longer term produced a larger expected payment stream (AC ¶ 145).  The Complaint

2

also includes an exhibit (Exhibit 4) showing the 24 affected loans and the discrepancies.

Ameriquest argues that Ellington misread the offering documents and – contrary to its own prior position – now contends that its representations were qualified (seeming to make a materiality argument). Unlike the Complaint, which explains in detail the materiality of each misrepresentation (*see e.g.*, AC ¶¶ 134, 139, 142, and 148), Ameriquest fails to explain what loans were not covered by the representations or why the misrepresentations are not material.

Ameriquest also argues that the Complaint fails to adequately allege scienter. As Ameriquest concedes (at 16), Ellington need only allege facts from which a reasonable person would "deem the inference of a culpable mental state 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" Yet nowhere does Ameriquest suggest any inference, however unlikely, from the factual allegations of the Complaint that does not include scienter. Ameriquest does not even attempt to present an innocent explanation for how nearly 90% of the loan files Ellington analyzed were misrepresented in the offering documents. There is no innocent explanation.

Finally, thousands of missing documents in the loan files – for instance, a borrower credit report or an executed note – is not simply a matter of "poor file-keeping." These documents and the related procedures were necessary to control default risk and to protect the rights of the security holder and to obtain remedies in the event of default. Ameriquest understood the importance of the so-called "formalities" and for that reason made extensive representations that they were observed. Ellington relied on those representations, which the Amended Complaint alleges were false when they were made. For these reasons, Ameriquest's motion to dismiss should be denied.

3

## ARGUMENT

## I.     THE COMPLAINT SATISFIES FRCP 8(A)

The Complaint is structured to clearly and concisely discuss 13 representations and warranties in the offering materials (*see* AC ¶¶ 77-124), and 41 different violations of those representations (*see id.* ¶¶ 125-271).  Because multiple violations may relate to a single representation, and vice versa, the Complaint discusses the representations in one section and the violations in a separate section, in each section clearly identifying which representations relate to which violations.  (*E.g.*, *id.* ¶¶ 84, 160.)  The Complaint explains the materiality of the representations and of the violations.  (*E.g.*, *id.* ¶¶ 95, 225-26.)  The Complaint also presents voluminous information concerning individual loans in exhibits corresponding to each violation.  The exhibits provide detail for each loan, to the extent any detail is needed to explain the violation.  Where the violation is evidenced by the absence of a document – as the failure to obtain a credit report is evidenced by the absence of a credit report – the exhibit simply lists the specific loans for which the document is missing.  Where the violation requires explanation, the exhibit provides detail for each affected loan.  (*E.g.*, *id.* ¶ 223, Ex. 27 (Regulatory Compliance Violations).)  Thus, for each misrepresentation, the Complaint specifies the statement; where, when, and by whom it was made; and why it was misleading.[1]

## II.     THE COMPLAINT ALLEGES AMERIQUEST'S MATERIAL MISSTATEMENTS AND OMISSIONS WITH PARTICULARITY

Ameriquest erroneously argues that the Complaint misreads the MLPA representations and fails to "allege how or why the Defendants' statements are untrue."  (Brief at 15.)

---

[1] The Complaint generally uses "violation" and "deficiency" interchangeably, except in ¶¶ 71 and 73, which distinguish between problems evidenced by "information present in the files" and problems evidenced by missing documents.

## A.    Ameriquest's Representations and Warranties Were Categorical and Unqualified

Ameriquest now asserts for the first time that its representations were qualified.  (Brief at 5, 9.)  Ameriquest does not assert (nor could it) that the representations applied only to some, but not all, of the loans.  Instead, Ameriquest simply notes that the representations were statements of historical fact instead of future predictions ("limited only to the condition of the loans at the time of the closing") and that the scope of each representation is defined by its language ("the representations [ ] themselves contain critical qualifying language such as 'in all material respects'").  (*Id.* at 9)  Ameriquest then erroneously characterizes the Complaint as claiming that "anything short of perfection in the individual mortgages means that Plaintiffs were misled," and knocks this straw man down, urging that Ellington "could not reasonably have expected that 47,259 subprime mortgages in the loan pool . . . would be perfect."[2]  (*Id.*)

First, the Complaint alleges that the representations – as historical statements of fact defined by their language – were false when they were made.[3]  And the Complaint further alleges in detail that each violation was material and violated the terms of the relevant representations.  (*See* AC ¶¶ 82-271.)  For instance, MLPA Representation No. 2 stated that "No material error . . . has taken place on the part of any person . . . involved in the origination of the

_____

[2] Ameriquest also hints that the MLPA somehow contracts away Ellington's remedy under the federal securities fraud laws.  Even if Ellington were a party to the MLPA, the provision of a contractual remedy would not bar a fraud remedy.  *See Vacold LLC v. Cerami*, 545 F.3d 114, 122 (2d Cir. 2008).  *Cf. S.E.C. v. Zandford*, 535 U.S. 813, 823-24 (U.S. 2002).

[3] Ameriquest's sole attempt to show that any alleged violation is based on events that occurred after the representations were made concerns the Complaint's allegation that certain property value appraisals were "improperly inflated."  (AC ¶ 210.)  Ameriquest says – with no basis in fact – that this allegation is based on comparing property values when the loans were made to property values many months later.  (*See* Opening Br. at 15, n. 10; AC ¶ 210.)  Ameriquest's sole justification for this erroneous reading of the Complaint is that it does not specifically disclaim it.  To be clear, Ellington's allegations of inflated property appraisals are based on a "retro analysis" to determine property values at the time of the original, inflated appraisals.

Mortgage Loan. . . ." (*Id.* ¶ 85.) The Complaint alleges that for certain loans (identified in two exhibits), "the loan originators failed to obtain the borrower's credit report." (*Id.* ¶ 156.) The Complaint explains that "Review of a borrower's credit reports is an essential element of the underwriting process," and alleges that the failure to obtain a credit report "was a material error" and falsified MLPA Representation No. 2. (*Id.* ¶¶ 157-60.)

Second, each of the MLPA representations identified in the Complaint – which Ameriquest itself has characterized as "categorical representations" (1st MTD Reply[4] at 6) – applies to each and every loan in the securitized pools. (*See, e.g.*, AC ¶ 82 ("The information set forth on the Mortgage Loan Schedule with respect to each Mortgage Loan is true and correct in all material respects.") (quoting MLPA Representation No. 1; emphasis added).)

Third, the Complaint does not simply allege that the mortgage pool was somewhat less then perfect. The Complaint alleged widespread violations, identifying 9,960 individual violations of the MLPA representations, affecting 3,359 loans from a sample of 3,772. (*See* AC ¶ 73, Ex. pp. 1-2.)

Finally, to the extent Ameriquest argues that particular representations or violations were not material, that question can only be adjudicated on a more complete record. *See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase*, 553 F.3d 187, 197 (2d Cir. 2009) ("Because materiality is a mixed question of law and fact . . . a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.") (quotation marks and ellipses omitted).

---

[4] April 27, 2009, Reply Brief on Ameriquest's motion to dismiss the original complaint.

**B.    The Complaint Alleges False Representations With Particularity**

The purpose of the pleading requirements of FRCP 9(b) and the PSLRA is to provide defendants with fair notice of the claims against them, so they can defend themselves, and to prevent strike suits. *See Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir. 2000). The Complaint provides detail far in excess of what is required. Ameriquest nowhere explains – because there is no explanation – why it cannot defend against Ellington's claims without additional information.

Apart from erroneously (but repeatedly) declaring that the Complaint offers no factual detail (*e.g.* Brief at 5, 6, 12), Ameriquest's argument is that the alleged violations of 5 of the 13 MLPA representations identified in the Complaint are inadequate – either because the alleged facts do not contradict the representations, or because the Complaint does not give enough detail. Ameriquest does not address the other 8 false MLPA representations. Ameriquest also argues, however, that the absence of a document from a loan file is an insufficient basis for alleging the document was not obtained. We address each argument in turn.

1.    MLPA Representation 12 (Title Insurance)

This representation assured investors that each loan had, <u>as of the date the loan was originated</u>, at least a commitment to issue a title insurance policy. (*See* AC ¶ 97.) The commitment was necessarily required to be genuine. The purpose of a commitment (and the representation) was to ensure that a final policy would in fact be issued. The Complaint alleges that <u>many months (and in some cases, years) after the origination of the loans</u>, when Ellington conducted its 2007 file review, many loans still had no final title insurance policy. (*See id.* ¶¶ 99, 259-66.) Ameriquest argues (at 7) that these allegations permit no inference of a violation of the representation. Ameriquest ignores the obvious inference: Where a loan file was papered with a "commitment" at the time it was originated, but several months later there still was no actual policy, there is a strong inference that the "commitment" was not genuine. That inference

is buttressed by other allegations in the Complaint.  As the Complaint alleges, Ellington had a

right to review the missing documents, if they existed, and asked Ameriquest to furnish copies of

the missing documents, but Ameriquest failed to do so.  (*Id.* ¶¶ 71-72.)  Further, the Complaint

alleges that grave allegations have been made against Ameriquest – including by former

employees and the Attorneys General of 33 states – of widespread fraud in the loan origination

process.  (*Id.* ¶¶ 285-290.)  Ellington is entitled to all reasonable inferences from the allegations

of the Complaint.  *See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan*

*Chase*, 553 F.3d 187, 196 (2d Cir. 2009).  Ameriquest's argument presents a fact dispute

between competing inferences, which is inappropriate for determination on a motion to dismiss.

*See Adelphia Recovery Trust v. Bank of America, N.A.*, 2009 WL 1676077, *3 (S.D.N.Y. 2009).

### 2.    MLPA Representation 26 (Hazard Insurance)

This representation assured investors that as of the MLPA Closing Date, each property

was covered by a hazard insurance policy.  The Complaint alleges that, contrary to the

representation, some properties were not covered, and the Complaint identifies the relevant loans

by deal name and loan number.  (*See* AC ¶¶ 113-15, 270-71, Ex. 41.)  The evidence that the

properties were not covered by a policy is straightforward and unambiguous:  Ellington looked in

the loan file and the required policy was not there.  At the hearing on Ameriquest's first motion

to dismiss, the question of what information must be pleaded in such a case arose with respect to

the hazard insurance violation.  The Court indicated that the original complaint did not provide

sufficient information.  Counsel for Ellington then asked for direction, noting that "the showing

would simply be there was no hazard insurance policy.  Now we can list the evidence which —"

The Court responded, "Yeah, but that's what you have to do."  (5/5/09 Hearing Tr. at 17-18.)

Ameriquest now contends (at 11) that the list of loans for which no policy had been obtained (*see*

AC ¶ 270, Ex. 41) is "meaningless," "indecipherable," "raw data without any context."  (Brief at

11.)  But Ameriquest explains neither what additional information could be given nor why the

listing of loans is not enough for Ameriquest to assess and defend against Ellington's allegation

that the MLPA falsely represented that all loans had hazard policies.

3.     <u>MLPA Representation 1 (Mortgage Loan Schedules)</u>

This representation assured investors that the Mortgage Loan Schedule (a summary of

detailed information for each loan) was true and correct in all material respects.  The Complaint

identifies 320 inaccuracies of 7 types, concerning borrower credit scores, property values,

prepayment penalty terms, loan-to-value ratios, and occupancy status of the borrowers.  The

Complaint explains, based on Ellington's experience with mortgage-backed securities, why the

inaccuracies were material.[5]  (*See* AC ¶¶ 82-84, 130-155, Ex. p. 1.)  Ameriquest argues (at 12)

that just because the Loan Schedule reported information that is different from the information in

the actual loan file does not mean the Loan Schedule is inaccurate:  "All it means is that the

numbers are different. . . ."  (Brief at 12.)  It is difficult to understand how different numbers for,

*e.g*., the prepayment penalty term – one in the Mortgage Loan Schedule and a different one in the

mortgage file – can both be correct.  In any case, the difference supports a reasonable inference

that the Loan Schedule was materially inaccurate, and the representation misleading.[6]

---

[5]  Ameriquest correctly notes that some of the inaccuracies in the Loan Schedules were conservative.  (*See* Brief at 13, n.7.)  The Complaint explains that such inaccuracies, taken singly, may not be material in themselves, but when taken collectively – and particularly in combination with the other violations noted in the Complaint – would strongly suggest to a prospective investor that Ameriquest's underwriting was unreliable.  (*See* AC ¶ 136.)

[6]  With respect to credit scores, Ameriquest suggests that where Ellington's loan file reviewers identified – and the Complaint alleges – a discrepancy between the credit score in the loan file and the credit score on the Loan Schedule, it is possible that there were multiple credit scores in the loan file and Ellington either did not see or deliberately overlooked the one that matched what was reported on the Loan Schedule.  (*See* Brief at 12, n.6.)  Ostensibly in support of this speculation about the facts, Ameriquest cites a page of its Underwriting Guidelines that requires only a single credit report and a single credit score.  (*See* Tiberand Dec. Ex. 6 at 6-1 ("The loan file must contain <u>a</u> credit report that accesses three credit repositories. . . ." and "Each

4.    MLPA Representation 13 (Underwriting Standards)

This representation assured investors that every loan adhered to Ameriquest's "underwriting standards."  Ameriquest seemingly argues that this representation was meaningless because the offering materials disclosed that loan officers could disregard its "Underwriting Guidelines" entirely.[7]  (*See* Brief at 2, 4.)  As explained in the Complaint, however, the offering materials disclosed only that loan officers had discretion to waive strict enforcement of select borrower-qualification criteria, where the borrower's less-than-required performance on one criterion was compensated for on other criteria.  The materials did <u>not</u> disclose that loan officers could disregard the Guidelines or omit <u>any</u> steps in the underwriting process required by the Guidelines (*e.g.*, obtaining a credit report).  (*See* AC ¶¶ 100-104.)

The Complaint specifies 18 ways in which Representation 13 was violated (*e.g.*, failure to obtain a credit report).  Each violation was the omission of an important step in the origination process bearing either on default risk or the severity of loss in the event of default – the omission of which was not disclosed or permitted.  The Complaint separately discusses each violation, explains why the violation was material, and identifies each loan that exhibited the violation in Ellington's 2007 review.  Where the evidence of the violation was a missing document (*e.g.*, a missing credit report), the Complaint lists the loans from which it was missing.  Where there is explanatory detail to give, the Complaint gives it for each individual loan (*e.g.*, for property appraisals performed by unlicensed appraisers, the Complaint names the appraiser and gives his or her licensing information).  (*See* AC ¶ 105 and the sections and exhibits referred to therein.)

---

credit report must contain <u>a</u> Fair Isaac credit score. . . .") (emphasis added).)  Ameriquest's speculation simply contradicts the Complaint's specific allegations of inaccuracies and raises a fact issue for discovery and trial.  To be clear, Ellington's reviewers noted a violation only where there was no matching score in the loan file.

[7] The "Underwriting Guidelines" were one component of the "underwriting standards." (*See generally* AC ¶¶ 100-104.)

Nonetheless, Ameriquest says (at 13) that the Complaint provides no explanation "of why or how the 'violation' makes the corresponding representations untrue" and that the Complaint "neither names the Guidelines to which [the allegations] refer[ ], nor to any guideline in particular, nor alleges how those guidelines were violated." Ameriquest's point appears to be that the Complaint should cite the page in the Guidelines that requires a loan officer to obtain a credit report for a prospective borrower (or to obtain income documentation or verification of employment, etc.). As Ameriquest notes (at 8, n.5), its Underwriting Guidelines are incorporated into the Complaint by reference, and Ameriquest knows full well what they say.[8] Because the Complaint identifies the individual loans exhibiting each violation (and gives explanatory detail where there is any to give), Ameriquest can assess the allegations on a loan-by-loan basis. Indeed, it has already done so. (*See* Brief at 4, AC ¶ 72.)

        5.    MLPA Representation 23 (Industry Standards)

This representation assured investors that (among other things) the origination procedures for each loan were "in all material respects legal, proper, reasonable and customary" in the industry. (*See* AC ¶ 111.) The Complaint alleges that 33 of the 41 violations identified in Ellington's 2007 file review violated industry standards – for example, failing to verify rent or mortgage payments where required to do so, failing to obtain an executed sales contract, failing to obtain a review appraisal for a minimum improvement property (*i.e.*, a very small residence), etc. For each of those 33 violations, the Complaint identifies the individual loans exhibiting the violation and, where there is loan-level explanatory information to give, gives it. (*See id.* ¶ 112 and sections and exhibits referred to therein.) Despite its assertion to the contrary (at 13),

---

[8] For instance, the violations of Representation 13 relate to the Underwriting Guidelines submitted as Tiberand Dec. Ex. 6 as follows: Viol. 8-9 / p. 6-1; Viol. 10, 15, 16 / pp. 10-1 – 10-3; Viol. 20-21 / 5-1; Viol. 23-25 / p. 16-1; Viol.27-31 / p. 5-1; Viol. 37-39 / p. 13-1.

Ameriquest thus knows exactly what practices Ellington alleges to be industry standards, knows that Ellington's allegation that Representation 23 was false is based on Ameriquest's failure to observe those practices, and can examine – indeed, already has examined (*see* Brief at 4, AC ¶ 72) – the individual loans that Ellington alleges violate those industry standards.

### C.     The Absence of Documents In the Loan File is Evidence They Were Not Obtained

As the Complaint alleges, when Ellington reviewed the loan files in 2007, it found over 8,000 instances in which a significant document that should have been in the loan file was not there.  (*See* AC ¶ 71.)  Ellington was entitled to receive and review copies of the documents, and Ellington specifically asked Ameriquest to provide the approximately 8,000 missing documents. Ameriquest failed to provide them.  Ellington thus concludes and alleges that the documents were never obtained or created in the first place, and that Ameriquest did not perform the basic, customary steps in the loan origination process related to the missing documents.  (*See id.* ¶ 72.) Thus, in a section headed "No Credit Report," the Complaint alleges that for certain loans "the loan originators failed to obtain the borrower's credit report."  (*Id.* ¶ 156.)  In a section headed "No verification of assets," the Complaint alleges that for certain loans "no verification of assets had been obtained."  (*Id.* ¶ 178.)

Ameriquest says that alleging that a procedure was not performed, because the related document was not in the loan file when Ellington reviewed it, is "specious":  "The mere fact that documents were missing does not mean that the documents were never procured."  (Brief at 14-15.)  At trial, Ameriquest will be entitled to offer innocent explanations for the absence of significant documents.  The absence of the documents from the loan files, however, supports a finding that the documents were never obtained, and that Ameriquest never performed the required procedures related to the missing documents.  *See Bear, Stearns Funding, Inc. v.*

*Interface Group-Nevada, Inc.*, 2007 WL 1988150, *20, n.25 (S.D.N.Y. 2007). This is particularly true here, where Ellington's review was wrongfully terminated by Ameriquest, where Ellington gave Ameriquest a detailed list of missing documents and requested them, but Ameriquest was unable to provide them (AC ¶¶ 71-72), and where former Ameriquest employees and the Attorneys General of 33 states have accused Ameriquest of widespread fraud and abuse in its loan origination practices (*id.* ¶¶ 285-90).

## III.    THE COMPLAINT PLEADS SCIENTER

### A.    The Complaint Far Exceeds the Legal Standard for Pleading Scienter

To plead scienter, the Complaint must make factual allegations that – if true – make the inference that Defendants acted recklessly or with intent as likely as any opposing inference. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2504-05 (2007). For a corporate defendant, a plaintiff need not plead scienter for any particular individual. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). A strong inference is pleaded by allegations that Defendants engaged in deliberately illegal behavior, failed to check information they had a duty to monitor, or had access to information suggesting that their public statements were not accurate. *See Dynex*, 531 F.3d at 196; *ECA, Local 134*, 553 F.3d at 199 (2d Cir. 2009); *Novak,* 216 F.3d at 308-09 (2d Cir. 2000). The more important information is to a corporation's business operations, the stronger the inference that the corporation was aware of it. *See Cosmas v. Hackett*, 886 F.2d 8, 13 (2d Cir. 1989).[9]

---

[9] *See also In re Pfizer, Inc. Derivative Sec. Lit.*, – Fed. App'x. –, 2009 WL 180349, *3 (2d Cir. 2009) (summary order); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008); *Medis Investor Group v. Medis Technologies, Ltd.*, 586 F.Supp.2d 136, 146 (S.D.N.Y. 2008); *In re eSpeed, Inc. Sec. Lit.*, 457 F.Supp.2d 266, 293 (S.D.N.Y. 2006); *In re Atlas Air Worldwide Holdings, Inc. Sec. Lit.*, 324 F.Supp.2d 474, 489 (S.D.N.Y. 2004). *Cf. SEC v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008); *In re Carter-Wallace, Inc., Sec. Lit.*, 220 F.3d 36, 40 (2d Cir. 2000) (quoting *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996)).

The Complaint makes specific factual allegations of violations that were so prevalent and obvious that Ameriquest either knew the representations were false or avoided such knowledge only by recklessly failing to take even minimal steps to ensure that they were true. (AC ¶¶ 76, 272-73.) Specifically, the Complaint makes factual allegations that 41 distinct types of violations of the MLPA representations occurred in the loans backing the securities. (*Id.* ¶¶ 125-271.) The Complaint alleges that these violations affected 90% of the loan files Ellington reviewed, with an average of three violations for each affected loan. (*See id.* ¶¶ 71-73.) Even if the rate of violations in the sample Ellington reviewed were <u>double</u> the rate in the overall loan pool, still nearly half of all loans contained violations. The Complaint alleges open and obvious violations: For example, for over 63% of the files Ellington reviewed, no credit report had been obtained, a fact that could be ascertained simply by looking in the file and seeing that there was no credit report. (*See id.* ¶¶ 71-72, 156, Ex. 8-9.)

On the facts alleged, Ameriquest had a duty to conduct a reasonable review to ensure that the MLPA representations it was making to investors were true. Ameriquest made the representations in order to induce investors to buy the securities at a higher price than they would pay if those representations were not given. (*Id.* ¶¶ 10-11, 64-66.) The imperative to confirm the truth of the representations was particularly great here because (a) Ameriquest granted substantial discretion to low-ranking employees (*id.* ¶¶ 279-84) and (b) Ameriquest was well aware of grave allegations of widespread fraud and abuse by its loan officers, had acknowledged the truth of such allegations at least in part, and had publicly committed to monitoring loan decisions and preventing improprieties (*id.* ¶¶ 285-300). *See In re Carter-Wallace, Inc., Sec. Lit.*, 220 F.3d 36, 40 (2d Cir. 2000) ("An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness."); *Novak*, 216 F.3d at

308 (2d Cir. 2000) ("[W]e have found allegations of recklessness to be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 861-62 (2d Cir. 1968) ("It does not appear to be unfair to impose upon corporate management a duty to ascertain the truth of any statements the corporation releases . . . .").

If taken to be true (as they must be), the allegations of the Complaint do not merely support an inference of scienter; they establish it.  The allegations establish that Ameriquest had access to the loan files, and that even a minimal review of the file would have revealed that the MLPA representations were misleading.  (*e.g.*, AC ¶¶ 73, 76.)  *See Dynex*, 531 F.3d at 196; *ECA, Local 134*, 553 F.3d at 199; *Novak*, 216 F.3d at 308-09.  The allegations establish that the violations were widespread and directly affected Ameriquest's core business.  If exposed, the violations would have severely impaired the ability of Ameriquest to conduct its business (by securitizing its loans and collecting its profits) (*see id.* ¶¶ 3-4, 11) and thus the violations can be presumed to have been known to Defendants.  *See Cosmas*, 886 F.2d at 13.  The allegations establish that Ameriquest had a duty to monitor the loan files, because it otherwise could not be confident that the MLPA representations were true (especially in light of Ameriquest's knowledge of grave allegations of widespread improprieties by its loan officers and brokers, and Ameriquest's public commitment to monitor their work and to weed out those responsible for improprieties).  (*See* AC ¶¶ 272-300.)  *See In re Carter-Wallace,* 220 F.3d at 40; *Novak*, 216 F.3d at 308; *Texas Gulf Sulphur Co.*, 401 F.2d at 861-62.

Ameriquest opposes the inference of scienter only by rejecting the specific factual allegations of the Complaint as untrue – which the Supreme Court's decision in *Tellabs* does not allow.  *See* 127 S.Ct. at 2509.  Ameriquest's sole alternative to that improper argument is to

propose that Defendants had no idea that a substantial percentage of the loans they made and sold violated the MLPA representations. That inference would require believing that the management-level employees of a large and sophisticated enterprise simply did not attend to the core business of the enterprise, did not oversee its operations, did not assess performance of subordinate employees in making loans, did not monitor the risk of loans they were making, but simply delegated decision-making authority over the lending of billions of dollars to unsupervised subordinates who engaged in a vast conspiracy to keep management in the dark and somehow succeeded. (And such a delegation of authority would itself be grossly reckless, as would the making of any representations about the loans in that situation.) Plaintiffs' inference of scienter is vastly more compelling.

### B.    Ameriquest Proposes No Opposing Inference, but Only Argues Against the Factual Allegations of the Complaint

Ameriquest makes no attempt to present any inference against scienter that accepts as true the Complaint's factual allegations of 41 specific ways in which the MLPA representations were violated, and of the prevalence of those violations. The essence of Ameriquest's "scienter" argument is simply a jury argument that the allegations are untrue – that there were no violations of the MLPA representations, but simply "poor file-keeping" by Ameriquest. (Brief at 22.) And the "proof" Ameriquest presents to support this "poor file-keeping" story is that there was some amount of pre-deal due diligence by third parties. (*See id.*) However, virtually no information appears in the record about this due diligence – not the size of the sample reviewed or how or by whom it was selected, not the procedure the review followed, not the scope of the review of individual loan files, not the adequacy of the diligence, not the extent to which Ameriquest thwarted the diligence. Ameriquest's counterfactual theory is that wherever investors have the benefit of some due diligence, securities fraud cannot exist. By offering only a jury argument

against the allegations, Ameriquest tacitly admits that if the factual allegations are accepted as true – as *Tellabs* requires – scienter is established.

        1.      <u>Ameriquest's Response to the Complaint's Scienter Theory</u>

Ameriquest's response to the Complaint's theory of scienter begins at page 20.

<u>First</u>, Ameriquest argues (at 20) that the Complaint does not plead misstatements with particularity, so no discussion of scienter is required.  That is not a scienter argument.

<u>Second</u>, Ameriquest suggests (at 20-21) that a pre-securitization review would have been less extensive than Ellington's 2007 review and would not have found the violations – an assertion completely at odds with Ameriquest's argument that the existence of pre-deal due diligence means the alleged violations must not have existed.  Again, this argument simply denies the factual allegations, which show in detail (as the Complaint explicitly states) that "The deficiencies are so apparent and so pervasive that they would have been discovered had [Ameriquest] conducted even a minimal review prior to creating the securities."  (AC ¶ 76.)

<u>Third</u>, Ameriquest asserts (at 21) that because Ellington's file review occurred after the securitizations, there is "no reason" to believe that the violations of the MLPA representations existed at the time of the securitizations.  But the Complaint makes 41 specific, detailed factual allegations of violations that did exist at the time of the securitizations.  Under *Tellabs* the factual allegations are to be accepted as true.  *See* 127 S.Ct. at 2509.  Obviously, Ameriquest will contest the allegations at trial, but that core fact dispute does not furnish a scienter argument now.

Furthermore, Ameriquest is wrong in claiming (at 21) that "90 percent of [Ellington's] alleged 'violations' are based on mere hindsight."  What Ameriquest dismisses as "hindsight" is this:  The loan file did not contain, for instance, a credit report some eight to eighteen months after the representations were made.  Ellington was entitled to review the missing document if it existed, and asked for a copy of it.  Ameriquest failed to provide it.  (AC ¶¶ 71-72.)  And the

context is this:  Former employees of Ameriquest, and the Attorneys General of 33 states

accused Ameriquest of widespread fraud and abuse in the origination of loans.  Ameriquest's

most senior officers admitted the truth of the accusations at least in substantial part, Ameriquest

paid hundreds of millions of dollars to settle the accusations, and Ameriquest publicly committed

to fire the offending loan officers and to prevent further fraud and abuse and promised to accept

a monitoring and compliance regime.  (*Id*. ¶¶ 285-293.)  Ameriquest's argument against the

alleged violations is a trial argument.  Nonetheless, the Complaint's allegations of violations are

vastly more plausible than Ameriquest's "poor file-keeping" story.

Fourth, Ameriquest argues (at 21) that the file sample Ellington reviewed was not

representative and therefore no conclusions can be drawn from it about the overall loan pool.

Again Ameriquest mistakes a trial argument for a dismissal argument.  The Complaint alleges

that violations of the MLPA representations were prevalent in the overall loan pool.  (AC ¶ 76.)

Nearly 90% of the sample Ellington reviewed violated the representations.  Even if that sample

was so skewed that the rate of violations there was twice the rate in the overall pool, still nearly

45% of the overall loan pool violated the representations.[10]

Fifth, Ameriquest (at 22) elaborates its jury argument against the specific factual

allegations of 41 distinct violations of the MLPA representations.  Ameriquest argues that it

would never have tried to perpetrate a fraud, knowing that third parties would perform some pre-

deal due diligence.  The record is all but bare concerning such due diligence – who performed it,

how extensive it was, how well it was performed, whether Ameriquest thwarted it.  Notably, in

making the due diligence argument, Ameriquest cites a letter concerning Ellington's purchase of

---

[10] Ameriquest says the Complaint does not allege that the violations identified in the
Complaint relate to the five securitizations at issue here.  (Brief at 21.)  All affected loans,
however, are identified by deal name in the exhibits to the Complaint.  (*See also* AC Exhibit
"Summary of Violations" at Exhibits Pages 1-2.)

securities from a third-party investment bank.  In that letter, the investment bank observes that

pre-deal due diligence was performed by a third-party to that purchase, and the bank refuses to

vouch for, and is at pains to disclaim any responsibility for, the due diligence.  (*See* Tiberand

Dec. Ex. 3-E at 1.)  The questions concerning pre-deal due diligence must be addressed through

discovery and trial, where Ameriquest may make its jury argument.  And that argument is

dubious.  Ameriquest (a) made a convincing show of responding to allegations of fraud and

abuse by its loan officers, (b) purported to select the loans to be included in the securitizations

(AC ¶ 295), (c) vouched for the integrity of those loans in the strongest possible terms, and (d)

created the loan put-back device that Ameriquest describes at page 10 of its brief (by which

Ameriquest appeared to protect investors in the event any violations were discovered later –

although that proved to be just another false representation).  These assurances reduced the need

for pre-deal due diligence and gave comfort to investors that the public accusations against

Ameriquest, whatever their merits, did not affect the securitized pools.  (*See* AC ¶¶ 294-97.)  The

Complaint's allegations of specific violations are immensely more plausible than Ameriquest's

"poor file-keeping, not fraud" story.

## 2.  Ameriquest's Other Statements

The first five pages of Ameriquest's scienter section contain an assortment of assertions,

some with no clear impact on the scienter analysis in this case.  <u>First</u>, Ameriquest emphasizes

that the Complaint alleges only that <u>either</u> Ameriquest did conduct a review of the loan files and

then intentionally made false statements, <u>or</u> Ameriquest recklessly failed to conduct such a

review.  Ameriquest appears to believe that this statement is a fatal concession, but

understandably cannot explain how or why it is fatal.  (*See, e.g.,* Brief at 16 ("[T]he scienter

allegations . . . are non-starters because there is no allegation that the Defendants even failed in the duty which Plaintiffs would ascribe to them.").)  It is not.  (*See* above at 13-16.)

Second, Ameriquest appears to argue that Ellington's scienter argument fails because the Complaint does not describe in detail the pre-securitization review that Ameriquest should have conducted.  (*See id.* at 16, 18 ("[T]hey never even describe what they mean by a loan file review.").)  It is enough for Ellington to show that Ameriquest had a duty to ensure that its representations were true, whatever that required.

Third, Ameriquest appears to argue that it had no obligation to ensure that its representations were true, because they were not categorical.  (*See id.* at 17.)  Presumably, Ameriquest is again here insinuating that either the representations or the violations were not material.  But the Complaint alleges materiality in detail, and materiality cannot be decided on this motion.  (*See* above at 4-6.)

Fourth, Ameriquest says the Complaint alleges that Ameriquest "assigned too much discretion" to loan officers.  (*See* Brief at 18.)  Here, again, Ameriquest misreads the Complaint, which alleges only that the discretion increased the need for a compliance review, because it increased the potential for violations of the MLPA representations.  (*See* AC ¶¶ 279-84.)

Fifth, Ameriquest says that to ensure that the MLPA representations are true, it did not need to conduct a "direct review" of loan files, but could simply have promulgated company-wide procedures and then reviewed loan officers' adherence to them.  (*See* Brief at 18.)  Ameriquest of course does not say it did monitor adherence to such policies, but merely hypothesizes that it could have.  The hypothetical is irrelevant, however, since Ameriquest repeatedly indicates that it did <u>not</u> monitor loan officers' compliance with its Underwriting Guidelines.  (*See id.* at 2, 4.  *See also* 1st MTD Opening Br. at 12.)  It is difficult to envision a

review of loan officers' compliance with loan origination procedures that did not involve a
review of the loans they were originating.  In any event, through detailed factual allegations, the
Complaint alleges widespread violations of the ostensibly required procedures.  If Ameriquest
did review loan officer compliance, then it knew the representations at issue were false.  If
Ameriquest did not conduct a review – of whatever sort – to ensure the representations were true,
then it recklessly avoided knowledge that they were false.

Sixth, Ameriquest says it had no reason to think the loans violated the MLPA
representations, and that it is not required to suspect wrongdoing by its employees.  (*See id.* at
18-19 (citing *In re Carter-Wallace*, 220 F.3d 36, 42 (2d Cir. 2000); *Chill v. Gen. Elec. Co.*, 101
F.3d 263, 268-71 (2d Cir. 1996)).)  Neither case Ameriquest cites addresses a situation remotely
like the present case.  Here, not only did the obligation to act with ordinary care require a review
to ensure the accuracy of the MLPA representations, but there was a heightened need for such a
review in light of the discretion granted to loan officers and, most importantly, in light of
Ameriquest's knowledge of accusations of nationwide fraud and abuse and its public
commitment to prevent such misconduct.  (*See* AC ¶¶ 279-300.)

Seventh, Ameriquest argues that the accusations of widespread improprieties do not
matter, because they were public, and because Ameriquest promised to prevent improprieties and
had a good reputation.  (*See* Brief at 19-20.)  Indeed.  Ameriquest knew the warning signs,
promised to prevent improprieties, and gave the strongest possible assurances that the securitized
loan pools were unaffected by them.  The problem is simply that those assurances were false.
(*See* above at 18-19.)

Ameriquest's assertions are unavailing.  The factual allegations of the Complaint
establish that Ameriquest either knew the MLPA representations were false but made them

21

anyway, or avoided such knowledge by turning away from its clear need (and duty) to perform a reasonable review (which would have revealed that the representations were false).

## IV.    THE COMPLAINT PLEADS LOSS CAUSATION

To plead loss causation, the Complaint allegations must support a causal link between the alleged misconduct and the economic harm ultimately suffered by Ellington.  *See Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005).  The Complaint shows that Ameriquest's false representations inflated the purchase price of the securities (AC ¶¶ 10-11) and the expected value of the payment streams yielded by the securities (*id.* ¶¶ 5-8, 10, 13). Ellington relied on the misrepresentations and thus paid an inflated price.  (*Id.* ¶¶ 8, 14.)  The risk concealed by the misstatements was later realized – *i.e.*, the quality of loans and the payment streams from the securities were far less than would be expected if Ameriquest's representations had been true.  (*Id.* ¶¶ 13-14, 301-02.)  Ellington lost the amount it over-paid for the securities. Ellington also suffered the related but additional loss of the payment streams it would have received if Ameriquest's representations had been true.  (*See id.* ¶¶ 14, 302.)

Ameriquest says the Complaint fails to explain why the alleged misrepresentations affected the value of the securities – that the alleged violations "largely relate to formalities in the loan origination process, not the quality or riskiness of the loans."  (Brief at 23.)  While loss causation need only be pleaded in accordance with FRCP 8(a), *see Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005), the Complaint pleads in detail the materiality of the misrepresentations.  (*E.g. id.* ¶¶ 162, 195.)  The violations increased both the borrower's credit risk (or the risk of default) (*e.g.*, AC ¶¶ 157, 162, 167, 172, 176, 179, 183) and the loss risk (the severity of losses when a borrower does default) (*e.g.*, *id.* ¶¶ 195, 226, 231, 235, 239).  The mere "formalities" Ameriquest dismisses affect the payment streams yielded by the securities because they affect the ability to enforce the borrower's payment obligations or to recover the property in

the event of default.  The Complaint thus alleges in detail that the misrepresentations related not only to the fairness of the price Ellington paid for the securities but (relatedly) to the size of the payment streams yielded by the securities.

Ameriquest ignores the allegations that Ellington paid an inflated price for the securities and lost that investment when the hidden risk was realized.  Ameriquest focuses on the amount of the payment streams yielded by the securities, but even here Ameriquest ignores the allegations that the payment streams would have been greater if Ameriquest's representations had been true.  Indeed, by suggesting (however unavailingly) that the sample of loan files Ellington reviewed was skewed (*see* above at 18), Ameriquest suggests that the fewer the violations, the fewer the mortgage defaults – which is strong evidence of loss causation.  Ameriquest erroneously implies (with no explanation or citation to authority) that the Complaint must also allege that other mortgage-backed securities – securities not at issue here, backed by other mortgages the integrity of which neither Ellington nor Ameriquest could vouch for – performed better than the securities here.  (Brief at 23.)  But regardless of how other securities performed, Ellington suffered loss both from the inflated price it paid and from the difference between the actual payment streams yielded by the securities and the larger streams that would have been yielded if Ameriquest's representations had been true.

## V.    THE COMPLAINT IS NOT REQUIRED TO, BUT DOES, PLEAD CULPABLE PARTICIPATION

The Complaint asserts control-person claims against ACC and ACC Holdings (the "Control Persons") – the parent companies of the other Defendants – under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t.  In opposing Ameriquest's first motion to dismiss, Ellington argued that despite a split of authority in this District, the more persuasive view is that culpable participation need not be pleaded.  (*See* 1st MTD Opposition at 20-24.)  Ellington

reaffirms that view and respectfully refers the Court to the parties' prior briefing on that issue. Nonetheless, the Complaint does plead culpable participation.

The Complaint alleges that all the Defendants functioned in practice as a single enterprise. The intertwining of the Defendants went well beyond simply having a handful of executives in common. <u>First</u>, the business of the Control Persons was coterminous with that of their subsidiaries and was simply to oversee and collect the profits from the latter. (AC ¶ 304.) <u>Second</u>, ACC Holdings actively participated in the securitizations, taking a direct financial stake in the accuracy of the MLPA representations. (*Id.* ¶ 305-06.) <u>Third</u>, the officers of the Control Persons were substantially the same individuals who were officers of the other Defendants. (*Id.* ¶ 307-08.) <u>Fourth</u>, the Control Persons and the other Defendants jointly employed mid-level managers and low-ranking employees. (*Id.* ¶ 309.) <u>Fifth</u>, the Control Persons employed people in functions that would be irrational if the formal distinctions between the parent and subsidiary companies were meaningful in practice. Thus, the Control Persons, which ostensibly were not loan originators or servicers, employed "loan officers" and "account executives" and employed a Vice President of Loan Resolution to handle title resolution issues. (*Id.* ¶¶ 310-11.) <u>Sixth</u>, the Control Persons exercised direct control over the loan files created by the subsidiaries. (*Id.* ¶ 311.) <u>Seventh</u>, the Control Persons had substantially the same knowledge as the other Defendants. (*Id.* ¶¶ 307-08.) <u>Eighth</u>, the Control Persons were aware of the serious accusations of widespread improprieties by the loan officers and brokers employed by the enterprise, and publicly took responsibility for firing the offending persons and preventing improprieties. (*See id.* ¶¶ 289-93.) <u>Ninth</u>, the Control Persons were aware that discretion was granted to loan officers and brokers, with the effect of increasing the potential for errors and abuses that violated the MLPA representations. (*See id.* ¶¶ 307-08, 279-84.) <u>Tenth</u>, the Control Persons were aware

24

that the MLPA representations were commercially valuable to the enterprise and were made to induce investors to buy the mortgage-backed securities.  (*See id.* ¶¶ 307-08, 312.)  Finally, the Control Persons actively encouraged the securitization of loans while knowing, or recklessly avoiding knowledge, that the loans violated the MLPA representations.  (*Id.* ¶ 315.)

These allegations are more than sufficient to plead culpable participation on the part of the Control Persons.  *Cf. In re Pfizer Inc. Sec. Lit.*, 584 F.Supp.2d 621, 641 (S.D.N.Y. 2008) ("[A]llegations that [individual defendants] participated directly in the day-to-day management of [the company] and made strategic decisions is sufficient to [plead] culpable participation."); *Montoya v. Mamma.Com Inc*., 2006 WL 770573 (S.D.N.Y. 2006) ("While senior officers do not, solely by virtue of their positions, always have access to information indicative of fraud . . . [defendants] surely had a 'duty to monitor' who was actually running the company that they purportedly managed.  Therefore, plaintiffs' allegations are sufficient to plead scienter."); *Kalin v. Xanboo, Inc*., 2009 WL 928279 (S.D.N.Y. 2009) (that person was a joint officer of two companies was insufficient to show participation by one of the two, absent allegation that the officer was acting on behalf of that company at the relevant time).

## CONCLUSION

Ameriquest's motion to dismiss the Amended Complaint should be denied.


Dated: July 10, 2009
      Armonk, New York            By:  /s/ Robin A. Henry
                                              BOIES, SCHILLER & FLEXNER LLP
                                              Robin A. Henry (RH 6781)
                                                Motty Shulman (MS 0351)
                                                Daniel E. Holloway (DH 5254)
                                                333 Main Street
                                                Armonk, New York 10504
                                                Telephone: (914) 749-8200
                                                Fax:  (914) 749-8300