**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ELLINGTON MANAGEMENT GROUP, L.L.C.;
ELLINGTON OVERSEAS PARTNERS, LTD.;
ELLINGTON MORTGAGE INVESTORS, LP;
ELLINGTON MORTGAGE PARTNERS, L.P.;
ELLINGTON CREDIT FUND, LTD.;
ELLINGTON LONG TERM FUND, LTD.; and
ELLINGTON SPECIAL OPPORTUNITIES, LTD.,

                Plaintiffs,

vs.

AMERIQUEST MORTGAGE COMPANY;
AMERIQUEST MORTGAGE SECURITIES INC.; ARGENT MORTGAGE COMPANY, L.L.C.; ARGENT SECURITIES INC.; ACC CAPITAL HOLDINGS CORPORATION; and AMERIQUEST CAPITAL CORPORATION (now known as SBP Capital Corporation),

                Defendants.

CIVIL ACTION NO. 09 CIV. 0416

ECF CASE

---

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT**

Victor J. Rocco (VR-4191)
Law Offices of Victor J. Rocco
500 Fifth Avenue, 29th Floor
New York, New York 10110
Telephone: (212) 575-5533
Fax: (212) 997-7646

Michael J. Cereseto (*pro hac vice*)
Kalley R. Aman (*pro hac vice*)
Buchalter Nemer, P.C.
1000 Wilshire Blvd, Ste. 1500
Los Angeles, California 90017
Phone: (213) 891-0700
Fax: (213) 891-0400

*Attorneys for Defendants Ameriquest Mortgage Company; Ameriquest Mortgage Securities Inc.; Argent Mortgage Company; LLC, Argent Securities Inc.; ACC Capital Holdings Corporation; and Ameriquest Capital Corporation (now known as SBP Capital Corporation)*

## Table of Contents

Table of Contents ................................................................................................................. i

Table of Authorities ............................................................................................................ ii

Preliminary Statement ......................................................................................................... 1

I.      Plaintiffs' Section 10(b) Claims Should be Dismissed. ............................................. 2

          A.      Plaintiffs Fail to Allege a Material Misrepresentation with Particularity ............... 2

          B.      Plaintiffs Fail to Plead the Requisite Scienter .......................................................... 3

          C.      Plaintiffs Fail to Plead Loss Causation .................................................................. 7

II.     Plaintiffs' Section 20 Claim Should be Dismissed. ................................................... 9

Conclusion ......................................................................................................................... 10

# Table of Authorities

## Cases

*Chill v. General Elec. Co.*,
    101 F.3d 263, 268-71 (2d Cir. 1996) .................................................................................... 5

*In re Baesa Sec. Litig.*,
    969 F. Supp. 238, 243 (S.D.N.Y. 1997) ................................................................................ 5

*In re BearingPoint, Inc. Sec. Litig.*,
    525 F. Supp. 2d 759, 769 (E.D.Va. 2007) ............................................................................ 7

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004) .......................................................................... 4

*Kalin v. Xanboo, Inc.*,
    526 F. Supp. 2d 392, 406-07 (S.D.N.Y. 2007) .................................................................... 9

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147, 157 (2d Cir. 2007) ......................................................................................... 8

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161, 173, 174, 176 (2d Cir. 2005) ..................................................................... 8, 9

*Mishkin v. Ageloff*,
    No. 97 Civ. 2690 (LAP), 1998 WL 651065, at *26 (S.D.N.Y. Sept. 23, 1998) ................... 9

*Novak v. Kasaks*,
    216 F.3d 300, 309 (2d Cir. 2000) ......................................................................................... 4

*South Cherry Street, LLC v. Hennessee Group LLC*,
    No. 07 Civ. 3568, 2009 WL 2032133, at *14 (2d Cir. July 14, 2009) ................................. 7

*Teamsters v. Dynex*,
    531 F.3d 190, 196, 196-97 (2d Cir. 2008) ........................................................................ 4, 6

## Statutes

15 U.S.C. § 78j(b) (Section 10(b) of the Securities Exchange Act of 1934) ............................... 2
15 U.S.C. § 78t (Section 20(a) of the Securities Exchange Act of 1934) .............................. 9, 10

Defendants respectfully submit this Reply Memorandum in further support of their Motion to Dismiss the Amended Complaint ("AC").

## Preliminary Statement

The AC is nothing more than a baseless breach of contract claim dressed up to mimic a fraud. Despite its inordinate length, it alleges no facts that reasonably could suggest that the "violations" of the representations and warranties in the Mortgage Loan Purchase Agreement ("MLPA")—which Plaintiffs claim to have found during their audit long after they began purchasing these securities—were false representations when they were made and, if they were, how these "violations" were misrepresentations regarding the quality of the underlying mortgages upon which Plaintiffs profess to base their claim.

Plaintiffs' paltry scienter allegations are based entirely on these dubious "violations." The AC alleges that the violations were so prevalent that Defendants must have known about them or deliberately turned a blind eye to them, but offer no plausible reason why any of the Defendants would do so. The AC is devoid of any fact that would suggest that anyone in senior management of any of the Defendants intended to deceive anyone regarding the quality of the mortgages, or knew, or even suspected, that the MLPA representations were not true. In fact, Plaintiffs offer no reason why the deal documents would disclose equally, if not more damning information about the quality of the underlying mortgages, and the high risk nature of the securities they collateralized, while withholding information regarding technical breaches of the MLPA representations which Plaintiffs allege.

Plaintiffs' fraud claim also fails because nothing in the AC demonstrates how, as a result of the "violations" of the MLPA representations, Plaintiffs were misled as to the quality of the mortgages that ultimately secured their investments. The AC drones on about the alleged violations; it provides no facts, however, about whether these violations contributed, in any way,

1

to an increase in the anticipated default rate within any mortgage pool, to the default of any single loan, or to a reduction in the income stream allocable to Plaintiffs' first-loss securities. Nor, of course, is there any *fact* alleged to suggest that the loss of value of these securities was attributable to the "violations" rather than to the collapse of the housing market in the most severe economic crisis since the Great Depression.

## I.  Plaintiffs' Section 10(b) Claims Should be Dismissed.

### A.  *Plaintiffs Fail to Allege a Material Misrepresentation with Particularity*

Plaintiffs have taken their opportunity to replead, with the benefit of the Court's explicit admonition as to what "won't do," and have submitted only more of the same and, once again, fail to explain why any of the MLPA representations are untrue, either now or at the time they were made. However the AC tries to embellish (or disguise) its conclusory allegations—through repetition, extraneous detail, and catalogues of loan reference numbers—it alleges nothing more than the opposite of an MLPA representation, if that.[1] Even if Plaintiffs properly could offer new facts in their Opposition to explain why a representation was false—as they try to do with respect to title insurance—they cannot change the fact the AC provides merely a formulaic recitation that their "file review revealed" the converse of a phrase in the representation without providing any context or further factual particulars.[2] Other violations are nothing more than the converse

---

[1] Plaintiffs' contention that Defendants only addressed five of the 13 "misrepresentations," (Opp. 7), is inaccurate and overlooks that these examples were illustrative of pleading deficiencies affecting all of the Plaintiffs' allegations of misrepresentations. (MTD 10-15). In particular, Defendants challenge the adequacy of all violations based on missing documents (MTD 14-15), which make up most or all of the basis for ten of the alleged misrepresentations.

[2] The AC alleges that Plaintiffs' "file review revealed that no final title insurance policy had been obtained" for loans listed in Exhibit 39 (AC ¶ 263), and that their "file review revealed that no commitment to obtain title insurance policy had been obtained" for the loans listed in Exhibit 38, (AC ¶ 259). Plaintiffs' lists, however, say nothing about the wording of the MLPA representation or the interaction of the clauses. Even where the Opposition attempts to fill in the gaps to explain why the AC claims 86 percent of the loans lacked title insurance (Opp. 7-8), the proffered explanation still cannot explain why the AC double-counts loans which might have lacked a

2

of an entire representation (*e.g.* no hazard insurance, (AC ¶¶ 115, 270)), and yet others, seem to come out of nowhere (*e.g.* no stated income letter is a "material error" and a "departure from industry standards" though Plaintiffs admit that the letter is not required and never explain why its absence is a material error, (AC ¶¶ 165-70)). Nor do Plaintiffs provide any details that would support their allegations that certain loans are actually "violations" (*e.g.* no allegation that the loans listed as lacking stated income letters are even stated income loans, (*id.*)).

For 87 percent of the "violations," Plaintiffs do not even allege that their file review revealed any breach of the MLPA representations, but merely that their review did not find proof to support the representation, so the representation must be false. (*See also* MTD 14-15). Plaintiffs press for an inference that a procedure was not followed because a physical document was not found during their audit, but they do not identify the document which they could not find or claim that the procedure even required physical documentation in the loan file. These inferences are not only strained but, at times, defy logic, as where Plaintiffs claim that a necessary process was not performed while simultaneously alleging that the results of that same process for the same loan were transposed incorrectly on some schedule.[3] Even a cursory examination of the exhibits reveals countless such inconsistencies and contradictions among the allegations which Plaintiffs would have this Court accept as true.

### B.  *Plaintiffs Fail to Plead the Requisite Scienter*

In all of their pleadings, both the Complaint and AC, roughly 100 pages and over 400 paragraphs (without exhibits), Plaintiffs do not allege any fact, a single conversation, or document or meeting, that would suggest that senior management knew of, or suspected, any of

---

prior commitment but had a final policy in place.

[3] For example, Plaintiffs claim that for loan number AMSI 2005-R10 134078369, no appraisal had been obtained (Exh. 25) while also alleging that the appraised value, which they list as $220,000, was understated on the MLS by $1,000 (Exh. 3).

the alleged "violations" of the MLPA representations, or, if such violations existed, that anyone in management had a motive to conceal or remain deliberately ignorant of them. And Plaintiffs cite to no report or compilation which would have alerted Defendants to the existence of any alleged violation. Indeed, there is no allegation in the AC that anyone associated with any of the Defendants even recognized the alleged "violations" to be breaches of the MLPA's representations and warranties. Instead, Plaintiffs hypothesize that Defendants were necessarily reckless in making the MLPA representations because (1) they had some undefined duty to "ensure the truth" of the statements, and (2) the purported prevalence of the alleged violations indicates that they breached this duty (no matter what it may have required Defendants to do). (Opp. 14-22). We have found no case, and Plaintiffs have cited none, that would support such a capacious and dangerous expansion of scienter in a federal securities fraud case.

Plaintiffs bottom their scienter claim on the alleged existence of raw data in the form of documents in tens of thousands of individual loan files which they claim alerted the Defendants (without ever identifying which Defendant or attempting to distinguish between them)[4] or should have alerted them to the "violations." This argument is neither persuasive nor supported by the authority upon which they rely. For example, in *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir. 2000), the Court of Appeals held that public statements that are not consistent with a corporation's "reasonably available data" are sufficient to impute a strong inference of scienter. The court subsequently explained in *Teamsters v. Dynex,* 531 F.3d 190, 196 (2d Cir. 2008), that "reasonably available data" does not mean "raw data," but data that "had been collected into reports or statements" which demonstrated that the company's public statements were untrue. It went on to reject a separate claim that the complaint adequately pleaded scienter because it

---

[4] The conspicuous and repeated failure to distinguish among the Defendants is improper, especially given the different role each played in the origination and securitization processes. *See, e.g., In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004).

alleged, as Plaintiffs allege here, that the defendants had failed to review information that they had a duty to monitor. *Id.*; (*see also* 1st MTD Reply13-16). That sensible and binding determination is equally fatal to Plaintiffs' scienter allegations here.

Plaintiffs try, in vain, to embellish their initial scienter claim with allegations that Defendants' business model and past allegations of predatory lending practices, which involved only some of the Defendants, gave rise to some undefined elevated duty to "confirm the truth" of the representations in the MLPA. (Opp. 14). Plaintiffs' claim that Defendants' grant of discretion to low-level employees and brokers necessitated some level of diligence or oversight, even if true (and no well-pled facts are alleged to support either claim), certainly cannot support an inference of deliberate or conscious recklessness on the part of senior management. This Court has held that even a corporate parent's awareness of mismanagement at a subsidiary "hardly creates a strong inference that the subsidiary's financial statements are false" such that the parent would be expected to verify financials submitted by the subsidiary before incorporating them into public statements. *In re Baesa Sec. Litig.*, 969 F. Supp. 238, 243 (S.D.N.Y. 1997). Here, the AC contains no factual allegation to suggest that employees or brokers abused the discretion given to them or that any Defendant's senior managers were aware of any such abuses so that it would have been careless of management not to closely supervise their activities. *See Chill v. General Elec. Co.*, 101 F.3d 263, 268-71 (2d Cir. 1996). The AC does not even explain how the exercise of the discretion given to employees and brokers could (much less, did) affect the accuracy of the MLPA representations, and there is certainly no plausible suggestion that employees or brokers falsified loan documentation. In fact, the AC never even alleges, other than hypothetically, that Defendants did not exercise appropriate diligence or oversight.

Plaintiffs' contention that senior managers were aware of, and had undertaken steps to resolve, allegations of past violations of predatory lending laws does not get them over the

5

hurdle. They offer no reason to infer that these allegations of remote conduct involved any of the mortgages which collateralized their securities, or that senior management's awareness of these allegations, which had been addressed in settlements, would lead them to believe, at the time the MLPA representations were made, that the loans included in the relevant mortgage pools materially failed to comply with these representations. In short, Plaintiffs fail to allege a nexus between the allegations of past violations of predatory lending laws and the material accuracy of the MLPA representations sufficient to support a strong inference that Defendants acted with deliberate recklessness in making the representations.

Even if the AC alleged facts that gave rise to a duty to monitor the loan files, conduct due diligence or have in place quality control procedures—and it does not—Plaintiffs never allege, except as a hypothetical conclusion, that any Defendant shirked that responsibility. Plaintiffs' reliance solely on the claimed prevalence of purported violations to support a contrary conclusion is untenable. (*See supra* I-A; AC ¶ 272).

To the extent that Plaintiffs contend that any Defendant intended to mislead them because the alleged categorical nature of the MLPA representations suggested that diligence had been done before the representations were made, the factual allegations in the AC do not give rise to a strong inference of an intent to mislead. That the AC does not allege that any Defendant ever expressly represented that such diligence had been done, in itself, is dispositive of this claim. Assuming that Plaintiffs are correct regarding the import of the representations, the only factual allegation in the AC that would support a possible motive for such a misrepresentation is that Defendants wanted to get the highest price for the securities. (AC ¶ 66). But this sort of general motive to maximize profits, one possessed by all businesspeople, is not a cogent reason for any of the Defendants to mislead potential investors. *See, e.g., Teamsters*, 531 F.3d at 196-97.

If any Defendant did shirk a duty, the AC's allegations, at best, suggest negligence, never

a conscious avoidance of the truth. Plaintiffs do not—indeed cannot—suggest a motive as to *why* any of the Defendants would be animated to lie about or remain blind to the alleged violations of the MLPA representations. It simply makes no sense that Defendants would make material and substantive cautionary disclosures about the quality of the mortgages in the other deal documents while indiscriminately lying in the MLPA to the highly sophisticated investors, such as Ellington, who would be interested in their securities. To the contrary, given Defendants' prominence in the industry and the importance of their reputations as industry leaders to the viability of their businesses, (AC ¶¶ 277, 292), it is extremely unlikely that they would have assumed the risk of not disclosing the "violations," if they knew about them, and risk serious damage to their business. *See South Cherry Street, LLC v. Hennessee Group LLC,* No. 07 Civ. 3568, 2009 WL 2032133, at *14 (2d Cir. July 14, 2009). That the deal documents disclosed negative information about the quality of the mortgages and nature of the securities that were being offered demonstrates that Defendants were not prepared to assume that risk, and were completely forthcoming in their disclosures, thus rebutting any plausible inference of fraudulent intent. *Id., see also In re BearingPoint, Inc. Sec. Litig.*, 525 F. Supp. 2d 759, 769 (E.D.Va. 2007).

    C.    ***Plaintiffs Fail to Plead Loss Causation***

In both the AC and their Opposition, Plaintiffs invest considerable effort explaining that they paid more for the securities than they now believe they were worth (which they concede is insufficient to plead loss causation (Opp. 22-23)), but nowhere do they allege any facts that demonstrate that any of the "violations" contributed to or caused a single loan to default, increased the default rate for any mortgage pool, or decreased the income stream that would have been due them, thus impairing the value of their investment. For example, there is no allegation that either any of the 11 loans which lacked hazard insurance or the 3,238 loans which lacked title insurance defaulted because of the lack of hazard or title insurance. To the extent that they

7

claim the securities performed "worse than Ellington reasonably expected," (AC ¶ 302), Plaintiffs do not say how they expected the securities to perform or disclose the amount of any claimed shortfall; nor do they say that any Defendant made a specific representation regarding the size of the return on their investments.

Plaintiffs say (with no explanation or citation to authority) that they have no obligation to plead that their securities performed worse or differently than similar securities in the marketplace, but "where the plaintiff's loss coincides with marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by fraud decreases," and the complaint must allege facts which, if proven, would show that the loss was attributed to the misrepresentations, rather than the marketwide downturn. *See Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 174 (2d Cir. 2005).

The Opposition asserts that certain "materiality" allegations satisfy loss causation because the corresponding violations increased the "borrower's credit risk" or "the severity of losses when a borrower goes into default." (Opp. 22). However, the AC fails to allege any fact that suggests that the "risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions," *Lentell,* 396 F.3d at 173, because the lack of post-default remedies could not have caused Plaintiffs' loss[5] and the "borrower's credit risk" was not concealed.[6] *See Lattanzio v. Deloitte & Touche LLP,* 476 F.3d 147, 157 (2d Cir. 2007) (where normative warnings adequately reflect the risk of actual loss, misrepresentations that do not

---

[5] The availability or extent of post-default remedies is irrelevant to Plaintiffs' loss because their securities are dependant on the income stream from regular mortgage payments and pre-payment penalties which would cease at the time of default.

[6] To the extent that these allegations state that a certain document or procedure is "an essential element of the underwriting process," (AC ¶ 157), or is "standard practice in the sub-prime mortgage industry," (*see, e.g.,* A.C. ¶ 183), they are irrelevant to Plaintiffs' loss because that something is essential or standard practice does not imply that its absence, actually affected the quality of the collateral.

conceal the risk of that specific loss are insufficient to plead loss causation). Plaintiffs were warned time and time again that the mortgage loans underlying their securities were "likely to experience rates of delinquency, foreclosure, and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner." (MTD 2). Defendants disclosed that these effects would be amplified as a result of changes in the value of the mortgaged properties. (*Id.*). And Plaintiffs also knew that their securities, in particular, were the riskiest in the bunch. Where, as here,

> [S]ubstantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment.

*Lentell*, 396 F.3d at 176. And there are no well-pled allegations of fact to support an inference that the breaches of the MLPA representations—and not the disclosed warnings related to the quality of the mortgage loans, the volatility of their first-loss securities, or simply the collapse in the housing market—proximately caused their loss.

## II.     Plaintiffs' Section 20 Claim Should be Dismissed.

"[T]he weight of Second Circuit precedent favors the view that a Plaintiff plead 'culpable participation' to state a section 20(a) claim, and that such participation must be plead with particularity." *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 406-07 (S.D.N.Y. 2007) (citations omitted). This requires, at a minimum, "particularized facts of the controlling person's conscious misbehavior or recklessness." *Id.* In their Opposition, Plaintiffs list several allegations which they claim are "more than sufficient to plead" ACH's and SBP's culpable participation in the alleged fraud. (Opp. 24-25). They are wrong. To meet their burden of pleading particularized facts of ACH's and SBP's culpable participation, Plaintiffs are required "to provide some detail about what [each] is alleged to have done, and when [each] did it." *Mishkin v. Ageloff*, No. 97

9

Civ. 2690 (LAP), 1998 WL 651065, at *26 (S.D.N.Y. Sept. 23, 1998). The only particularized allegation of an action taken by either ACH or SBP is that ACH participated in the MLPA as an indemnitor. (AC ¶ 305). The remainder of the listed allegations are either relevant, if at all, only to the issue of control, or entirely conclusory. Thus, the AC fails to allege sufficient particularized facts to give rise to a strong inference of either ACH's or SBP's conscious misbehavior in connection with the primary violation it attempts—but also fails—to plead. The Section 20(a) claim should, therefore, be dismissed as to both ACH and SBP.

## Conclusion

For the reasons set forth above and in the Motion to Dismiss the AC, Defendants respectfully request that this Court dismiss the AC in its entirety with prejudice.

DATED: July /7, 2009       By: _____
                                Victor J. Rocco
                                Law Offices of Victor J. Rocco
                                Michael J. Cereseto
                                Kalley R. Aman
                                Buchalter Nemer, P.C.

*Attorneys for Defendants Ameriquest Mortgage Company; Ameriquest Mortgage Securities Inc.; Argent Mortgage Company; LLC, Argent Securities Inc.; ACC Capital Holdings Corporation; and Ameriquest Capital Corporation (now known as SBP Capital Corporation)*